UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re SUNEDISON, INC. SECURITIES
LITIGATION

This Document Relates To:

*Horowitz et al. v. SunEdison, Inc., et al.*,
1:16-cv-07917-PKC

Civil Action No. 1:16-md-02742-PKC

MDL No. 2742

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' CLAIMS UNDER SECTIONS 11, 12(a)(2), AND 15 OF THE SECURITIES ACT OF 1933

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022-6069
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179

*Attorneys for Underwriter Defendants*

SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, California  94104
Telephone:  (415) 772-1200
Facsimile:  (415) 772-7400

*Attorneys for Individual Defendants*

WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts  02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

*Attorneys for Individual Defendant
Peter Blackmore*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES…………………………...…………………………………...iii

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS ........................................................................................3

      A.    SunEdison's Rapid Expansion and Resulting Debt .....................................3

      B.    The Margin Loan ...................................................................................4

      C.    SunEdison's Disclosures About Its Increasing Debt and Liquidity
             Risks......................................................................................................4

      D.    Intra-Quarter Events Leading Up To The Preferred Offering ....................5

      E.    The Preferred Offering..........................................................................5

      F.    Post-Offering Events.............................................................................6

ARGUMENT .........................................................................................................7

    I.    Plaintiffs Fail To State a Claim Based on SunEdison's Projections and
        Beliefs Regarding Liquidity and Anticipated Capital Requirements. ....................8

      A.    The Challenged Forward-Looking Statements Are Non-Actionable
             Under the PSLRA's "Safe Harbor" and the "Bespeaks Caution"
             Doctrine..................................................................................................8

      B.    Plaintiffs Fail To Allege that SunEdison's Forward-Looking
             Statements About Liquidity and Capital Requirements Were False. ........10

    II.    Plaintiffs Fail To State a Claim Based on Alleged Omissions Concerning the
        Margin Call and Second Lien Loan.....................................................................13

      A.    Plaintiffs Identify No Actionable Omission Relating to the Margin
             Call.......................................................................................................13

      B.    Plaintiffs Identify No Actionable Omission Relating to the Second
             Lien Loan..............................................................................................14

      C.    Plaintiffs Fail To Allege any Duty To Disclose the Margin Call or the
             Second Lien Loan Prior To, or in Connection with, the Preferred
             Offering.................................................................................................17

III.  Plaintiffs' Remaining Allegations Are Improper Attempts To Reverse-Engineer a Securities Claim Based On Hindsight and Fail to State a Claim for Other Reasons. ...................................................................................................19

    A.  Plaintiffs Fail To State a Claim Based on Alleged Misstatements Relating To Internal Controls Over Financial Reporting. ........................19

    B.  Plaintiffs Fail To State a Claim Based on Alleged Misstatements Concerning SunEdison's Planned Use of Proceeds from the Preferred Offering. ...........................................................................................................22

    C.  Plaintiffs Fail To State a Claim Based on Alleged Debt Misclassification. ....................................................................................23

    D.  Plaintiffs' Allegations of a Failure to Disclose "Known Trends" Under Item 303 of Regulation S-K Do Not State a Claim. .....................24

CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520 (S.D.N.Y. 2009) ...........................................17

*Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662
    (D. Colo. 2007) ...........................................................................................................21

*C.D.T.S. v. UBS AG*, 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) .......................................20, 21

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) .....................................21

*Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989).................................................21

*Cutsforth v. Renschler*, 235 F. Supp. 2d 1216 (M.D. Fl. 2002)................................................21, 22

*DeMaria v. Anderson*, 153 F. Supp. 2d 300 (S.D.N.Y. 2001)......................................................22

*Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228 (S.D.N.Y. 2012) ....................................19

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).........................................................................................14

*In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357
    (S.D.N.Y. Aug. 19, 2015) ............................................................................................17

*Field v. Trump*, 850 F.2d 938 (2d Cir. 1988) ..............................................................................14

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 53 F.
    Supp. 3d 882 (E.D. La. 2014) .....................................................................................14

*In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534 (S.D.N.Y. 2010)............................18

*Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816 (S.D.N.Y. 2010) .............................................12

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002)..........................................8, 10

*Hutchison v. Deutsche Bank Secs., Inc.*, 647 F.3d 479 (2d Cir. 2011) ........................................15

*I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759 (2d Cir. 1991).......................23

*In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109 (S.D.N.Y. 2010) ............................25

*Iowa Pub. Employees' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137 (2d Cir. 2010)......................10

*Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408 (S.D.N.Y. 2008)...............................23

*Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706 (2d Cir. 2011) ......................................24

*Lopez v. Ctpartners Exec. Search, Inc.*, 173 F. Supp. 3d 12 (S.D.N.Y. 2016)............................24

*In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278 (S.D.N.Y. 2014) ..............21, 22

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ........................................17

*Medina v. Tremor Video, Inc.*, 640 F. App'x 45 (2d Cir. 2016) ......................................24

*Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966 (N.D. Cal. 2015)..................................21

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406
  (S.D.N.Y. 2013)............................................................................15

*Nguyen v. MaxPoint Interactive, Inc.*, 2017 WL 570939 (S.D.N.Y. Feb. 13, 2017) ...................14

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct.
  1318 (2015)............................................................................11, 12, 17

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662
  (S.D.N.Y. 2008) ........................................................................10, 19

*In re ProShares Trust Sec. Litig.*, 728 F.3d 96 (2d Cir. 2013) .....................................13

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)........................................9, 10, 11, 25

*Ross v. Lloyds Banking Grp., PLC*, 2012 WL 4891759 (S.D.N.Y. Oct. 16, 2012)
  (Castel, J.) ..............................................................................16

*In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386 (S.D.N.Y. 2016) (Castel, J.) ....................19

*Scott v. Gen. Motors Corp.*, 46 F. Supp. 3d 387 (S.D.N.Y. 2014) ....................................24

*In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007) ........................19

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ........................................18

*Solow v. Citigroup, Inc.*, 2012 WL 1813277 (S.D.N.Y. May 18, 2012) ................................10

*Stadnick v. Vivint Solar, Inc.*, 2015 WL 8492757 (S.D.N.Y. Dec. 12, 2015) ..........................18

*Taormina v. Annie's, Inc.*, 2015 WL 1743585 (N.D. Cal. Apr. 16, 2015) ..............................20

*In re Thornburg Mortg., Inc. Sec. Litig.*, 683 F. Supp. 2d 1236 (D.N.M. 2010)....................14

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) ....................................17

*Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)......................................................11, 12

*Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 2016 WL 1261135
  (S.D.N.Y. Mar. 30, 2016) ................................................................................................21

**Statutes**

15 U.S.C. § 77k ..................................................................................................................7, 14

15 U.S.C. § 77*l* ..................................................................................................................7, 14

15 U.S.C. § 77o ......................................................................................................................25

15 U.S.C. § 77z-2(c)(1) .......................................................................................................8, 10

**Rules, Regulations, and Administrative Materials**

Fed. R. Civ. P. 12(b)(6) ..........................................................................................................1

17 C.F.R. § 229.303(a)(3)(ii) .................................................................................................24

17 C.F.R. § 229.508(a) ...........................................................................................................18

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (Aug. 12, 1999) .............................15

**Other**

David Garlock, Federal Income Taxation of Debt Instruments (CCH 2015)………………..15, 16

The Underwriter Defendants and Individual Defendants[1] respectfully submit this memorandum of law in support of their motion pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the claims asserted against them under the Securities Act of 1933 (the "Securities Act") in Plaintiffs' Second Amended Consolidated Securities Class Action Complaint (the "Complaint" or "Compl.") (Dkt # 158).[2]

## PRELIMINARY STATEMENT

This brief exclusively concerns Plaintiffs' claims under the Securities Act with respect to a single offering of SunEdison preferred stock—the August 18, 2015 offering of $650 million of convertible preferred securities (the "Preferred Offering").  These are the only claims asserted against the Underwriters and SunEdison's outside directors.

In pursuit of an attractive yield, Plaintiffs knowingly invested in a highly leveraged company that carried more than $11 billion in debt, reported negative earnings quarter after quarter, and starkly warned investors of its significant liquidity needs and risks.  *After* the Preferred Offering, those risks materialized in the context of a global downturn in the prices of renewable energy stocks—a phenomenon driven by markets' reactions to low energy prices and the expectation of rising interest rates and their likely negative effect on capital-intensive renewable energy firms.  But the materialization of *disclosed* risks that may have contributed to investor losses cannot be twisted with hindsight into a viable Securities Act case.

Notably, Plaintiffs offer none of the allegations of sham accounting, systemic fraud, government charges, auditor resignations, or financial restatements often seen in connection with

---

[1] The Underwriter Defendants (or "Underwriters") are Deutsche Bank Securities, Inc.; Goldman, Sachs & Co. LLC (f/k/a Goldman, Sachs & Co.); J.P. Morgan Securities LLC; Macquarie Capital (USA), Inc.; MCS Capital Markets LLC; Merrill Lynch, Pierce, Fenner & Smith Incorporated; and Morgan Stanley & Co. LLC.  The Individual Defendants are Antonio Alvarez, Peter Blackmore, Ahmad Chatila, Clayton Daley, Jr., Emmanuel Hernandez, Georganne Proctor, Steven Tesoriere, James Williams, Brian Wuebbels, and Randy Zwirn.

[2] Documents cited as "Ex. ___" are attached to the concurrently-filed Omnibus Declaration of Jaime A. Bartlett in Support of Defendants' Motions to Dismiss.

securities litigation related to a corporate bankruptcy.[3]  Indeed, most of Plaintiffs' Securities Act claims relate to statements in the registration statement and/or the prospectus supplement for the Preferred Offering, as well as the financial statements incorporated therein by reference (collectively, the "Offering Documents") about what management "believe[d]" and "expect[ed]" concerning SunEdison's projected liquidity and anticipated capital needs and resources. Plaintiffs do not plausibly allege those opinions were not honestly held at the time.  Moreover, these were forward-looking statements that were accompanied by on-point cautionary language, including references to SunEdison's mounting indebtedness, its negative cash flows, and its resulting negative cash balance.  Those same Offering Documents also warned investors of the risks and potential consequences to SunEdison if it could no longer readily access the capital markets to fund ongoing operations and planned acquisitions.  That these events transpired in no way suggests that management's beliefs were not genuine or that the risks were misrepresented.

The Complaint also takes issue with the alleged failure to disclose in the middle of the quarter in progress (1) a margin call that SunEdison experienced, and (2) a single loan that, at the time, comprised less than *1.5 percent* of SunEdison's nearly *$11 billion* of total disclosed indebtedness.  In the context of SunEdison's publicly disclosed indebtedness, neither of these alleged omissions can plausibly be viewed as impacting the total mix of information available to investors.  As to the margin call, all of the relevant information was publicly disclosed.  As to the loan, Plaintiffs' attempt to portray it as material due to supposedly "onerous" terms is based on unsupported math, and the allegedly concealed relationship between SunEdison and an affiliate of one of the Underwriters was already extensively disclosed in the Offering Documents.

Plaintiffs' other variations on the same theme—based on supposed misstatements or

---

[3] Plaintiffs' recent Complaint amendments, which incorporate allegations from actions recently filed by two former yieldco executives, are not part of the Securities Act claims and pertain to time periods after the Preferred Offering.

omissions related to internal controls, the planned use of proceeds from the Preferred Offering, the classification of certain debt, and a claimed failure to disclose as "known trends" SunEdison's purported business practice of slow-paying its vendors—constitute a fundamentally misguided effort to manufacture a securities claim based on adverse developments subsequent to the offering.  SunEdison's bankruptcy filing in April 2016 does not suggest that its financial condition and associated risks were misrepresented in connection with the Preferred Offering more than seven months earlier.

At bottom, Plaintiffs claim that the Offering Documents by which SunEdison sought to raise $650 million for "general corporate purposes" were misleading because SunEdison *actually needed the money* and did not explicitly say so (even though it had tapped the capital markets for several billion dollars over the previous six months and had never reported an operating profit). Plaintiffs' Securities Act claims should be dismissed with prejudice.

## STATEMENT OF FACTS

### A.    SunEdison's Rapid Expansion and Resulting Debt

Beginning in 2013, SunEdison rapidly transformed itself from a silicon wafer manufacturer into a company that designed, developed, and financed renewable energy projects globally.  (*See* Compl. ¶¶ 25-26.)  SunEdison took on significant debt to finance the development and construction of those projects.  (*Id.* ¶ 32.)  As explained in its 2015 second quarter 10-Q, which was expressly incorporated in the Offering Documents, SunEdison's total indebtedness more than quadrupled from $2.6 billion in 2013 (*id.*) to nearly $11 billion in the second quarter of 2015 (*See* Ex. 10 (Q2 2015 10-Q) at 18).

SunEdison formed TerraForm Power and TerraForm Global, two "yieldco" subsidiaries, to purchase and operate projects that SunEdison acquired and/or developed.  (Compl. ¶ 27.) TerraForm Power, which was created to purchase and operate projects primarily in North

America, went public in 2014.  (*Id.* ¶ 28.)  TerraForm Global, which was created to purchase and operate projects in emerging markets, went public in July 2015.  (*Id.*)

### B.    The Margin Loan

On January 29, 2015, SunEdison completed a $2.4 billion acquisition of First Wind LLC, a wind power company.  (Ex. 2 (2014 10-K) at 1.)  In connection with that acquisition, a SunEdison subsidiary entered into a $410 million, two-year margin loan.  (Compl. ¶ 33.)  The margin loan was disclosed and discussed in SunEdison's 10-Q for the first quarter of 2015, which was expressly incorporated in the Offering Documents and explained (among other details) that SunEdison had guaranteed the loan, that the loan was secured by SunEdison's holdings of TerraForm Power stock, and that SunEdison would be required to post additional collateral or prepay some or all of the loan if the value of TerraForm Power stock fell below specified levels.  (*See* Ex. 9 (Q1 2015 10-Q) at 22; Ex. 2 at Exhibit 10.130.)

### C.    SunEdison's Disclosures About Its Increasing Debt and Liquidity Risks

SunEdison filed its 2014 10-K in early March 2015.  In that filing, which was expressly incorporated in the Offering Documents, SunEdison specifically warned investors that it "may not be able to generate sufficient cash to service all of [its] indebtedness and may be forced to take other actions to satisfy [its] obligations under [its] indebtedness, which may not be successful."  (Ex. 2 at 33.)  It further warned that this could result in "substantial liquidity problems" and force the Company to delay investments or even to file for bankruptcy.  (*Id.*)

On August 6, 2015, SunEdison filed its 10-Q for the second quarter of 2015, which also was expressly incorporated in the Offering Documents.  (*See* Ex. 10.)  That filing explained SunEdison's deteriorating liquidity position in detail.  Among other things, SunEdison disclosed: (i) current liabilities exceeding current assets by approximately $250 million (*id.* at 6); (ii) a working capital deficit of $252 million (*id.* at 60); (iii) the need for $5 billion in funding from

external sources over the past six months (*id.* at 62); and (iv) the anticipated need for an additional $5 billion to fund its business plan going forward (*id.* at 61).  SunEdison thus warned investors that although it "*believe*[*d*] [its] liquidity [would] be sufficient," "no assurances" could be made "if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan."  (*Id.* at 61 (emphasis added).)  The 10-Q also warned it "could be costly to secure and maintain" the additional funds necessary to meet SunEdison's liquidity needs and that financing costs themselves might "adversely impact[]" liquidity.  (*Id.*)

### D.   Intra-Quarter Events Leading Up To The Preferred Offering

Prior to the Preferred Offering, on or about August 7, 2015, TerraForm Power's stock price declined to an extent that SunEdison was required to post cash collateral under the terms of the margin loan.  (Compl. ¶ 315.)  As noted, the terms of the margin loan were publicly disclosed in SunEdison's 10-Q for the first quarter of 2015, including the fact that a margin call would be triggered if TerraForm Power's stock (which was publicly traded) declined below a certain point.

On August 11, 2015, SunEdison entered into a $169 million second lien loan.  (Ex. 12 (Q3 2015 10-Q) at 34.)  At the time, that loan amounted to *less than 1.5 percent* of SunEdison's nearly $11 billion of publicly disclosed indebtedness.  (*See, e.g.*, Ex. 10 at 18.)  Neither the margin call nor the second lien loan was large enough to merit an immediate 8-K filing, but were included in SunEdison's 2015 third quarter 10-Q, consistent with the company's regular SEC reporting cycle.  (Ex. 12 at 28, 34 (disclosing margin call and second lien loan).)

### E.   The Preferred Offering

SunEdison launched the Preferred Offering on August 18, 2015.  The prospectus supplement incorporated by reference SunEdison's 2015 second quarter 10-Q, which reported nearly $11 billion in debt and negative cash flow.  (Ex. 22 (Pro. Supp.) at S-iii; Ex. 10 at 7, 60.)  Not surprisingly, SunEdison's earlier disclosures in its 2014 10-K and 2015 first and second

quarter 10-Qs had led to significant and widely discussed market concerns about SunEdison's liquidity. (*See, e.g.*, Ex. 28 (David Nicklaus, *SunEdison gets caught in energy downdraft*, ST. LOUIS POST-DISPATCH (Aug. 10, 2015)). Commentators noted that SunEdison's "structure puts it on a treadmill of sorts … [it] must keep acquiring and developing projects to keep dividends growing at the two TerraForm entities." (*Id.*) SunEdison was thus required to "tap capital markets repeatedly by issuing stock or debt." (*Id.*) Although this was "fine as long as we're in a bull market and investors believe in SunEdison's strategy," "[w]hen doubts creep in, as is happening now [*i.e.*, early August 2015], SunEdison's cost of capital goes up." (*Id.*) [4] In recognition of the high-risk nature of their investment, investors in the Preferred Offering were entitled to receive a perpetual 6.75% dividend on their SunEdison preferred stock.

**F.    Post-Offering Events**

The period directly following the Preferred Offering saw deteriorating macroeconomic conditions. In fall 2015, stock prices in renewable energy companies were hit especially hard amid a historic depression in oil and gas prices that reduced interest in renewable energy companies and significantly altered the economics of renewable energy project development. (*See* Ex. 30 (Diane Cardwell, *Renewable Energy Financing Hits a Snag*, N.Y. Times (Oct. 11, 2015))).[5] As Plaintiffs themselves recognize, TerraForm Power's stock price continued to decline precipitously *after* the Preferred Offering, which "fundamentally changed" SunEdison's

---

[4] Indeed, one reason that a company like SunEdison would do a preferred stock offering when there are rumors about its liquidity is to raise funds to enhance its liquidity and address those concerns. *See, e.g.*, Ex. 27 (Larry Swedroe, *Why you should avoid preferred stocks*, CBS MONEYWATCH (Apr. 20, 2012, 7:00 AM) ("Given the lower cost of tax-deductible conventional debt (preferred stock dividends aren't deductible), one has to ask why companies issue preferred stock … The answer isn't reassuring. They may issue preferred stocks because they've already loaded their balance sheet with a large amount of debt and risk a downgrade if they piled on more.")).

[5] By November 2015, the stock prices of almost all North American renewable energy yieldcos were trading well below their IPO prices. *See* Ex. 32 (Christian Roselund, *Despite Rapid Growth, Yieldcos Face Money Troubles*, PV Magazine (Nov. 20, 2015)); Ex. 33 (Tom Konrad, *What Yieldco Managers Are Saying About the Market Meltdown*, Renewable Energy World (Dec. 17, 2015) ("many YieldCos [are] trading at half their peak prices")).

financial outlook.  (Compl. ¶¶ 135-37.)

The economic climate in which SunEdison and its yieldcos operated continued to deteriorate throughout the fall of 2015 and early 2016, particularly for companies that, like SunEdison, relied on debt to fuel rapid expansion.  As energy prices remained stubbornly low, revenue growth was unable to keep pace with the costs of servicing existing debt (much less the cost of additional capital required to fund operations and needed growth).  (*See* Ex. 30.)

In late 2015, the Audit Committee of SunEdison's Board commenced an independent investigation of the accuracy of SunEdison's financial projections.  (*See* Ex. 16 (Current Report 8-K, filed Apr. 14, 2016).)  These projections were not part of the Offering Documents and are not the subject of the Securities Act claims.  Although the investigation found that SunEdison's executives may have been overly optimistic, it found no material misstatements in SunEdison's financial statements.  (*Id.*)  On April 21, 2016, SunEdison filed for Chapter 11 bankruptcy.

## ARGUMENT

As the Court knows, to state a claim under Section 11 and 12(a)(2) of the Securities Act, a complaint must plausibly allege facts establishing the existence of a false statement of material fact or an omission of a material fact necessary to make an affirmative statement not misleading. 15 U.S.C. §§ 77k(a), 77*l*(a)(2).  Plaintiffs predicate their Securities Act claims on supposed misstatements and/or omissions relating to:  (i) SunEdison's projected liquidity and anticipated capital requirements (Compl. ¶¶ 453-60); (ii) the margin call and the second lien loan (*id.* ¶¶ 461-62, 465-66); (iii) internal controls (*id.* ¶¶ 470-74); (iv) the planned use of the Preferred Offering proceeds (*id.* ¶¶ 463-64); (v) the alleged misclassification of certain debt (*id.* ¶¶ 467-69); and (vi) a claimed failure to disclose "known trends" under Item 303 of Regulation S-K (*id.* ¶¶ 475-77).  With respect to each of these items, Plaintiffs' inability to identify an actionable

material misstatement or omission requires dismissal of their Securities Act claims.

I.   **Plaintiffs Fail To State a Claim Based on SunEdison's Projections and Beliefs Regarding Liquidity and Anticipated Capital Requirements.**

Plaintiffs allege that two generalized statements in SunEdison's 2014 10-K and 2015 first and second quarter 10-Qs were materially misleading; namely, that SunEdison "believe[d]" its liquidity would be sufficient to support its operations for the next 12 months, and that SunEdison "expect[ed]" to have sufficient capital to support the acquisition and construction phases of its planned projects for 2015 and to otherwise meet its capital needs for the remainder of 2015. (Compl. ¶¶ 453-55.)  These allegations do not state a claim because the challenged statements are non-actionable forward-looking statements and expressions of opinion.

A.   **The Challenged Forward-Looking Statements Are Non-Actionable Under the PSLRA's "Safe Harbor" and the "Bespeaks Caution" Doctrine.**

The alleged misstatements are quintessentially forward-looking, as they relate to SunEdison's projected liquidity "for the next twelve months" and its anticipated capital needs and resources "for the remainder of 2015."  As such, they are non-actionable under the PSLRA's "safe harbor" and the "bespeaks caution" doctrine because they were accompanied by ample, on-point cautionary language and risk disclosures.  *See* 15 U.S.C. § 77z-2(c)(1)(A)(i); *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

For example, SunEdison cautioned that "no assurances" could be made that its liquidity would be sufficient to support its operations for the next 12 months "if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan." (Compl. ¶¶ 453-55.)  And although Plaintiffs claim that the second lien loan demonstrates the falsity of the liquidity projections (*see* Compl. ¶ 460), it actually demonstrates that the cautionary language was directly on point.  The drop in TerraForm Power's stock price that prompted the margin call and (according to Plaintiffs) the need for the second lien loan is precisely the type of

"significant adverse event" that SunEdison warned could negatively affect its liquidity.

Moreover, Plaintiffs ignore the two paragraphs of cautionary statements about

SunEdison's need to raise additional funds to meet its anticipated liquidity and capital

requirements that were contained in SunEdison's 2014 10-K and 2015 first and second quarter

10-Qs, all of which were incorporated in the Offering Documents:

> In addition to our need to maintain sufficient liquidity from cash flow from our operations and borrowing capacity under our credit facilities, ***we will need to raise additional funds in the future in order to meet the operating and capital needs of our renewable energy system development business***.… However, ***there can be no assurances that such project financing or equity will be available to us***, or available on terms and conditions we find acceptable.  We may not be able to sell renewable energy projects or secure adequate debt financing for such projects on favorable terms, or at all, at the time when we need such funding.
>
> ***In the event that we are unable to raise additional funds, our liquidity will be adversely impacted***, we may not be able to maintain compliance with our existing debt covenants and our business will suffer.  If we are able to secure additional financing, these funds could be costly to secure and maintain and could significantly impact our earnings and liquidity.

(*See, e.g.*, Ex. 10 at 61, emphasis added.)  Also ignored by Plaintiffs is SunEdison's further

warning to investors that it "may not be able to generate sufficient cash to service all of [its]

indebtedness and may be forced to take other actions to satisfy [its] obligations under [its]

indebtedness, which may not be successful," which in turn could result in "substantial liquidity

problems" and force SunEdison to delay investments or even file for bankruptcy.  (Ex. 2 at 33.)

These were "meaningful cautionary statements" under the PSLRA because they directly

addressed SunEdison's liquidity risk, including by explicitly detailing the company's need to be

able to inexpensively access the capital markets, the potential difficulties of doing so, and the

consequences if it were not able to do so.  *See Rombach v. Chang*, 355 F.3d 164, 172-76 (2d Cir.

2004) (applying safe harbor to forward-looking statements despite alleged liquidity crisis as

evidenced by, for example, failure to timely pay vendors).  Furthermore, there is no dispute that

SunEdison's SEC filings accurately reported its negative cash flow and mounting debt.  Given

this, and considering the challenged statements in light of the express cautions describing the

very risks that ultimately materialized, those statements are non-actionable under the "bespeaks

caution" doctrine because "no reasonable investor could have found the statement[s] materially

misleading."  *Iowa Pub. Employees' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir.

2010); *see also Halperin*, 295 F.3d at 357 (inquiry is "whether defendants' representations or

omissions, considered together and in context, would … mislead a reasonable investor").

Nor, of course, can Plaintiffs contend that SunEdison misled investors because it did not

characterize its liquidity situation in a more negative and pessimistic light.  *See Rombach*, 355

F.3d at 174 ("corporate optimism do[es] not give rise to securities violations"); *see also Solow v.*

*Citigroup, Inc.*, 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012) (defendant "was not

obligated to characterize its performance or future outlook in negative terms, speculate on future

negative results or paint themselves in the most unflattering light possible"), *aff'd*, 507 F. App'x

81 (2d Cir. 2013).  SunEdison's disclosures more than sufficiently apprised investors of the risks

of their investments into a highly leveraged company, and the securities laws do not permit

plaintiffs to pursue a claim by arguing that the risks should have been disclosed using gloomier

verbiage.  *See, e.g.*, *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672

(S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009).

**B.      Plaintiffs Fail To Allege that SunEdison's Forward-Looking Statements
          About Liquidity and Capital Requirements Were False.**

The PSLRA's safe harbor provides a further basis for dismissal of these claims—

Plaintiffs' failure to plausibly allege that SunEdison's forward-looking statements regarding its

liquidity and capital requirements were made with actual knowledge of falsity.  *See* 15 U.S.C.

§ 77z-2(c)(1)(B).  Relatedly, Plaintiffs' claims based upon SunEdison's statements that it

"believe[d]" and "expect[ed]" it would have sufficient liquidity and capital through 2015 fail because they are statements of opinion, and Plaintiffs do not plead facts establishing that SunEdison's management did not genuinely hold those opinions at the time of the Preferred Offering.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1325-27 (2015); *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).

Plaintiffs assert that these opinions about the future were not genuinely held because SunEdison was "suffering from a liquidity crisis"—which Plaintiffs define as not being able to pay vendors on time—by March 2015.  (*See* Compl. ¶ 456.)  Managing the timing of payments to one's vendors (*i.e.*, utilizing trade credit) is not indicative of a liquidity crisis.  Indeed, SunEdison disclosed that it historically maintained A/P balances with its vendors as a form of "financing" and had, "[a]t times … increased the number of days' payables outstanding."  (Ex. 2 at 18.)  But even if SunEdison was having trouble paying its vendors on time, this would not establish that management did not honestly believe in August 2015 that it had access to sufficient financing to maintain its liquidity and provide sufficient capital as described in its SEC filings.  *See Rombach*, 355 F.3d at 174 n.8 (the fact that issuer did not seek bankruptcy protection until May 2000 belied the urgency of any "liquidity crisis" as of August 1999).

Plaintiffs also allege that SunEdison's Senior Internal Auditor performed an A/P audit in April 2015, which purportedly demonstrated that SunEdison's liabilities exceeded its revenues and that SunEdison was therefore "in huge trouble" by July 2015.  (Compl. ¶ 457.)  However, that SunEdison's liabilities exceeded its revenues was disclosed in its SEC filings leading up to and incorporated in the Offering Documents.[6]  Again, that well-disclosed reality does not suggest that SunEdison's management did not genuinely hold the challenged opinions—that SunEdison

---

[6] *See* Ex. 10 at 4 (showing $256 million loss from continuing operations over the quarter); *id.* at 6 (showing current liabilities on SunEdison's balance sheet exceeding current assets by approximately $250 million); *id.* at 60 (management discussion of liquidity and capital resources reflect current "working capital deficit" of $252 million).

had access to sufficient liquidity to maintain existing operations—at the time.

SunEdison's supposed "admission" in *March 2016* of flaws in its cash forecasting and liquidity management procedures likewise cannot establish that the challenged opinion statements from nearly a year earlier were "false." (*See* Compl. ¶ 459.) "A statement is actionable only if materially false or misleading at the time it is made." *Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816, 826 (S.D.N.Y. 2010). The Complaint does not allege that the flaws identified in March 2016 even existed in August 2015—indeed, as discussed below, those flaws arose "in connection with newly implemented systems" in *late* 2015 (Compl. ¶ 92)—or, if they did exist in August 2015, that SunEdison's management knew about them at that time.

Finally, Plaintiffs' passing attempt to frame their allegations as an omissions-based claim fares no better. An opinion statement is actionable based on an omissions theory only to the extent it misleadingly "convey[s] facts about how the speaker has formed the opinion – or … about the speaker's basis for holding that view." *Omnicare*, 135 S. Ct. at 1328. As the Second Circuit has explained, an opinion statement cannot be misleading by omission "so long as Defendants conducted a 'meaningful' inquiry." *Tongue*, 816 F.3d at 214. Plaintiffs' attempt to meet this standard—which the Supreme Court has noted "is no small task for an investor"—by simply asserting that SunEdison failed to disclose "fact[s] cutting the other way" is insufficient. *Omnicare*, 135 S. Ct. at 1332.[7] No facts are alleged showing either a lack of meaningful inquiry or the absence of a reasonable basis for SunEdison's 12-month liquidity projections. *See id.* (noting that investors are required to allege "particular (and material) facts … about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes

---

[7] Compare with Compl. ¶ 459 ("[T]hese statements were misleading by virtue of omitting the facts contradicting these statements.").

the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context").[8]

## II. Plaintiffs Fail To State a Claim Based on Alleged Omissions Concerning the Margin Call and Second Lien Loan.

Plaintiffs' claims based on the alleged August 7, 2015 margin call and the August 11, 2015 second lien loan fail to identify any actionable omission for multiple independent reasons.

### A. Plaintiffs Identify No Actionable Omission Relating to the Margin Call.

For a claimed omission to be actionable, there must be "a *substantial* likelihood that the disclosure of the omitted material would have been viewed by the reasonable investor as having *significantly* altered the total mix of information already made available." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (emphasis in original).  Plaintiffs can make no such showing with respect to the margin call.

SunEdison disclosed in its 10-Q for the first quarter of 2015, which was expressly incorporated in the Offering Documents, that:  (1) the margin loan was secured by SunEdison's holdings of TerraForm Power Class B stock; (2) the value of TerraForm Power's Class B stock was determined by the market price of its publicly traded Class A stock; and (3) if the value of the Class B shares securing the margin loan fell below $820 million (*i.e.*, twice the $410 million loan amount), SunEdison would be required to post cash collateral or repay all or a portion of the loan.  (Ex. 9 at 22.)  SunEdison further disclosed in that same 10-Q that it had entered into a corresponding amendment of a February 2014 credit facility agreement.  (*Id.* at 23.)  That agreement was included in SunEdison's 2014 10-K (and therefore also incorporated by reference into the Offering Documents) and disclosed that the margin loan was secured by 32.2 million

---

[8] Management's liquidity predictions are part of management's commentary on SunEdison's financial statements and are plainly based on the historical financial data reported therein.  With the exception of the loan classification issue discussed in Section III.C *infra*, Plaintiffs do not question the accuracy of SunEdison's financial statements. The basis of SunEdison's forward-looking opinion statement is therefore not only reasonable—it is unassailable.

TerraForm Power Class B shares.  (Ex. 2 at Exhibit 10.130, p. 4.)  Multiplying that figure by the publicly known trading price of TerraForm Power stock provides an approximation of the value of the margin loan collateral on any given day.  Combined with the publicly disclosed requirement of a 2:1 value to loan ratio, investors could readily ascertain when a margin call might be triggered.[9]  Given the breadth of these disclosures, Plaintiffs cannot identify any further information that was required to be disclosed.  Indeed, Plaintiffs themselves allege that the margin call must have occurred on August 7, 2015 based on calculations made using only information that was public as of the date of the Preferred Offering.  (Compl. ¶ 466.)  Plaintiffs thereby tacitly admit that any alleged omissions with respect to the margin call were immaterial as a matter of law.  *See Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1988) (where total price and number of shares were disclosed, "defendant's failure to perform…[the] calculation" of the per-share acquisition price was immaterial); *Nguyen v. MaxPoint Interactive, Inc.*, 2017 WL 570939, at *5-6 (S.D.N.Y. Feb. 13, 2017) (omission immaterial where "simple arithmetic computation based on the information disclosed would have revealed" omitted information).

**B.**     **Plaintiffs Identify No Actionable Omission Relating to the Second Lien Loan.**

An omission is not actionable unless it concerns a *material* fact.  15 U.S.C. § 77k; 15 U.S.C. § 77*l*(a)(2).  Courts evaluate both quantitative and qualitative factors in determining materiality.  *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,

---

[9] SunEdison was not required to disclose each and every term of the margin loan so that investors could make even more precise predictions as to the date and magnitude of any margin call.  *In re Thornburg Mortg., Inc. Sec. Litig.*, 683 F. Supp. 2d 1236, 1257-58 (D.N.M. 2010) ("no authority for the proposition that a company is subject to [Securities Act] liability for failure to disclose the entire content of its contracts").  Nor was SunEdison required to warn investors that a margin call was imminent due to the decline in TerraForm Power's share price.  The securities laws do not require issuers to predict the future, including the trading price of its own or another company's shares.  *See, e.g.*, *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 897 (E.D. La. 2014) (defendants cannot be faulted for failing to foresee or disclose the prospect of company's bankruptcy, which "would most assuredly operate as a self-fulfilling prophecy").  Indeed, SunEdison's public prediction that a margin call might soon occur based on the declining share price of its publicly traded subsidiary—a company whose fortunes were linked to SunEdison's own—might make the margin call a *fait accompli*.  *See id.*

553 F.3d 187, 197-98 (2d Cir. 2009).  With respect to the second lien loan, Plaintiffs cannot identify factors demonstrating either quantitative or qualitative materiality.

In assessing materiality, the Second Circuit has adopted SEC Staff Accounting Bulletin No. 99.  *See Hutchison v. Deutsche Bank Secs., Inc.*, 647 F.3d 479, 485 (2d Cir. 2011).  Thus, quantitatively, "a deviation of less than [five percent] with respect to a particular item on the registrant's financial statements is unlikely to be material."  SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45151 (Aug. 12, 1999); *see also Hutchison*, 647 F.3d at 485; *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 422-23 (S.D.N.Y. 2013) ("Where misstatements implicate less than 5% of an entity's revenue, the misstatements are not likely to be material.").  The second lien loan was not quantitatively material because it amounted to less than 1.5 percent of SunEdison's nearly $11 billion of disclosed indebtedness.  (Ex. 10 at 18, 60.)

Nor was the second lien loan qualitatively material.  Plaintiffs try to suggest otherwise by alleging the loan had "onerous terms"—terms which Plaintiffs infer based on a purported "affective [sic] 15% interest rate."  (Compl. ¶ 462.)  Not only do Plaintiffs fail to plead any facts establishing that a supposed 15 percent interest rate on a second lien loan was above-market at the time, but their "[e]ffective" interest rate calculation is demonstrably incorrect.  The disclosed interest rate on the second lien loan was 9.25 percent.  (Ex. 12 at 34.)  SunEdison further disclosed that it had "paid fees of $9 million upon entry into the Second Lien Term Loan which were recognized as deferred financing costs."  (*Id.*)  Plaintiffs presumably derive their "[e]ffective 15% interest rate" figure by mischaracterizing those financing costs as "origination fees" paid to the lender, but there is no basis for Plaintiffs' revisionist math.  Borrowers incur all types of fees in connection with loans, such as their own legal fees and their lenders' legal and financial advisor fees.  *See, e.g.*, David Garlock, Federal Income Taxation of Debt Instruments

(CCH 2015) ¶ 101 ("…when a taxpayer borrows money, there are costs associated with the borrowing that must be paid to third parties … includ[ing] fees paid to lawyers and accountants.…").  Because those are fees for services and do not compensate the lender for the use of its funds, they are "not interest in form and don't fit the definition of interest."  *See id.*[10]

But even if the interest rate were 15 percent, the alleged omission would still not be material.  This Court's decision in *Ross v. Lloyds Banking Group, PLC* is instructive.  *See* 2012 WL 4891759, at *8-10 (S.D.N.Y. Oct. 16, 2012) (Castel, J.).  In that case, the plaintiff alleged that the disclosure of an emergency government loan would have put the company's shareholders on notice of "struggling conditions"—"particularly [the company's] declining liquidity"—because the loan had an above-market interest rate and required significant amounts of collateral.  *Id.*  Dismissing that claim, this Court held that the complaint failed to "plausibly allege that the non-disclosure of [the emergency loan] was a material omission" because defendants had already disclosed the company's reliance on government support to maintain liquidity, and disclosing a government loan with allegedly onerous terms to address liquidity needs would not have significantly altered the total mix of information.  *Id.* at *9-10.  Likewise here, SunEdison already disclosed nearly $11 billion in debt and further disclosed that it required, and would continue to rely on, external sources of capital to fund operations.  As in *Ross*, disclosure of the second lien loan, even if it had an above-market interest rate as Plaintiffs allege, would not have meaningfully altered the total mix of information already available to investors regarding SunEdison's substantial indebtedness and continuing need to borrow money.

---

[10] Moreover, the incremental "interest" expense (*i.e.* the difference between the alleged 15 percent "effective" interest rate and the stated interest rate that Plaintiffs do not allege was "onerous") would have been $2.25 million per quarter.  This would have been merely 1.54 percent of SunEdison's publicly disclosed quarterly interest expense at the time.  (Ex. 10 at 47.)  Indeed, the quarterly "interest" expense for the entire second lien loan would still only have been approximately 4.33 percent of SunEdison's publicly disclosed quarterly interest expense—still below the five percent threshold that courts commonly use when assessing quantitative materiality at the pleadings stage.

### C.       Plaintiffs Fail To Allege any Duty To Disclose the Margin Call or the Second Lien Loan Prior To, or in Connection with, the Preferred Offering.

Even assuming, contrary to the above, that any omission related to the margin call or second lien loan could be considered material, it is black letter law that the Securities Act does not require a company to disclose "any and all material information."  *See In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *11 (S.D.N.Y. Aug. 19, 2015); *see also Omnicare*, 135 S. Ct. at 1332 (no "general disclosure requirement" under the Securities Act). Accordingly, the alleged omission of the margin call and the second lien loan could be actionable only if there was "a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  Such a duty can arise only when the failure to disclose renders some affirmative statement misleading or untrue (as opposed to merely incomplete), *see Omnicare*, 135 S. Ct. at 1331 (Securities Act claim based on alleged omissions can arise "only when an issuer's failure to include a material fact has rendered a published statement misleading"); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011), or when there is some independent statutory or regulatory disclosure obligation, *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 528 (S.D.N.Y. 2009) ("The content of the duty depends largely on the itemized disclosures required by the securities laws and the regulations promulgated thereunder."). Plaintiffs do not identify any such duty to disclose here.

Because the margin call and the second lien loan occurred after SunEdison filed its 10-Q on August 6, 2015, the inquiry is whether SunEdison was required to disclose those events in the intervening 12 days before the Preferred Offering.  However, an issuer has no duty to update disclosures based on events that occur in the middle of a reporting period, *even in connection with an offering*, unless "the issuer is in possession of nonpublic information indicating that the quarter in progress at the time of the public offering will be an ***extreme departure*** from the range

17

of results which could be anticipated based on currently available information." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1210 (1st Cir. 1996) (emphasis added); *see also In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 542 (S.D.N.Y. 2010) (dismissing claims because plaintiffs failed to allege intra-period trends were extreme departures); *Stadnick v. Vivint Solar, Inc.*, 2015 WL 8492757, at \*11-13 (S.D.N.Y. Dec. 12, 2015) (same).

The margin call and second lien loan did not represent *any* change to SunEdison's financial condition or prospects, much less a change triggering a duty to update, because they simply reflected more of the same:  a company with negative cash flow and significant and increasing amounts of debt that was operating at a loss and depended on additional infusions of capital to fund operations and finance planned acquisitions.  (*See* Ex. 10 at 6, 60-62.)  Indeed, Plaintiffs themselves assert that SunEdison's financial outlook did not "fundamentally change[]" until the fourth quarter of 2015, when SunEdison had to prepay the entire margin loan following further declines in TerraForm Power's stock price.  (Compl. ¶ 142; *see also id.* ¶¶ 135-37.)

Nor, finally, did the omission of the second lien loan (which was provided by an affiliate of one of the Underwriters) render misleading the section of the Offering Documents summarizing the relationships between SunEdison and the Underwriters.  (*Id.* ¶ 462.)  The Offering Documents clearly described SunEdison's material relationships with the Underwriters, including over $1.4 *billion* of transactions (including other debt financings) with the same entity that provided SunEdison with the $169 *million* second lien loan.  (Ex. 22 at S-68.)  There was no independent statutory or regulatory requirement to specifically disclose the second lien loan either.  Item 508(a) of Regulation S-K, which governs such reporting, requires only a "brief[]" statement describing the "nature" of material relationships between an issuer (and its affiliates) and its underwriters (and their affiliates).  17 C.F.R. § 229.508(a).  Consistent with SEC rules,

18

the disclosures in the Offering Documents put investors on notice of the existence of financial relationships between SunEdison and the Underwriters aside from the Preferred Offering. SunEdison's non-inclusion of a comparatively small loan from an affiliate of one of the Underwriters thus did not conceal an otherwise undisclosed "material conflict of interest."

**III.    Plaintiffs' Remaining Allegations Are Improper Attempts To Reverse-Engineer a Securities Claim Based On Hindsight and Fail to State a Claim for Other Reasons.**

Plaintiffs also allege that the Offering Documents were materially misleading as to SunEdison's internal controls over financial reporting, the planned use of proceeds from the Preferred Offering, the classification of approximately $750 million in debt as non-recourse to SunEdison, and the failure to disclose—as a "known trend"—that SunEdison was in a liquidity crisis.  At bottom, these supposed misstatements and omissions "have been 'reverse-engineered'" to attempt to state a claim, and are impermissibly based on facts and events occurring *after* the Preferred Offering.  *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669-70 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009).  These allegations also fail to state a claim for several independent reasons, which are described below.

**A.    Plaintiffs Fail To State a Claim Based on Alleged Misstatements Relating To Internal Controls Over Financial Reporting.**

Plaintiffs' claim that the Offering Documents contained material misstatements regarding the effectiveness of SunEdison's internal controls over financial reporting is based exclusively on officers' SOX certifications.  (Compl. ¶¶ 470-72.)  Such certifications are quintessential statements of opinion.  *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 245-46 (S.D.N.Y. 2012); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 391 (S.D.N.Y. 2007). Thus, they cannot be actionable unless the officers did not genuinely believe their certifications were accurate at the time.  *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (Castel, J.) ("based on my knowledge" qualifications in defendants' SOX certifications signaled

opinion statements as to which plaintiffs were required to plead subjective falsity); *Taormina v. Annie's, Inc.*, 2015 WL 1743585, at *3 (N.D. Cal. Apr. 16, 2015) (statements regarding internal controls were opinions).  None of Plaintiffs' allegations establish subjective falsity.

*First*, Plaintiffs allege that former employees have explained that, "throughout the Class Period"—*i.e.*, through April 2016—SunEdison's internal controls were ineffective.  (Compl. ¶ 473.)  However, no facts are alleged showing that, as of the time of the Preferred Offering in August 2015, the certifying officers were aware of the claimed shortcomings, much less that any such awareness meant the officers disbelieved their certifications.

*Second*, Plaintiffs also make the hindsight-based allegation that SunEdison's "subsequent admissions corroborate" former employees' reports about ineffective internal controls.  (*Id.* ¶ 474.)  But that so-called "admission" does not demonstrate the certifying officers' awareness of issues affecting SunEdison's internal controls or show that they subjectively disbelieved their certifications when they were made.  To the contrary, the cited "admission"—a March 2016 press release announcing a delay in the filing of SunEdison's 2015 10-K—explained that management had identified material weaknesses in internal controls "primarily resulting from deficient information technology controls in connection with *newly implemented systems*."  (*Id.* ¶ 92, emphasis added.)  Similarly, the April 14, 2016 8-K, in which SunEdison's Audit Committee identified internal control issues as part of its investigation, does not show that any of the statements in SunEdison's 2014 10-K or the 10-Qs for the first or second quarters of 2015 were false or misleading at the time they were made.[11]  A "later realization that risk controls were not catching certain conduct and could be improved upon" is "insufficient to support an inference of falsity at the time the alleged statements were made."  *C.D.T.S. v. UBS AG*, 2013

---

[11] In addition, *none* of the four control issues identified by the Audit Committee touched on SunEdison's *public financial reporting*—a deficiency discussed in greater detail in Section I.b of KPMG's motion to dismiss.

WL 6576031, at *4 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015); *see also In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x. 442 (2d Cir. 2015) ("The fact that defendants recognized problems, announced that they were implementing effective controls and procedures, and then recognized more problems does not indicate that their statements were false at the times that they were made."); *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 2016 WL 1261135, at *11 (S.D.N.Y. Mar. 30, 2016).

Plaintiffs' "internal control" claims also fail because they stem not from misleading disclosures concerning the effectiveness of SunEdison's controls over financial reporting, but from SunEdison's alleged failure to effectively manage its financial affairs using the controls in place at the time.  However, "[t]he securities laws were not designed to provide an umbrella cause of action for the review of management practices."  *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 376-77 (S.D.N.Y. 2004); *see Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 640 (3d Cir. 1989) ("[T]he concerns underlying the securities acts are not implicated simply because management has failed to characterize … its financial reporting and accounting controls as inadequate and ineffective.").[12]  For example, Plaintiffs allege that SunEdison's internal controls were not effective because SunEdison "never integrated the accounting and financial reporting systems of its acquired companies."  (Compl. ¶ 473.)  However, this allegation merely reflects an "unsurprising situation involving a merger of two companies that had different computer systems," *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1244 (M.D. Fl. 2002), and in any event was a risk SunEdison specifically disclosed (Ex. 2 at 28).  These types of operating difficulties do not provide a basis for a securities law claim.  *Cutsforth*, 235 F. Supp. 2d at 1244; *see also*

---

[12] *See also Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 977-78 (N.D. Cal. 2015) (challenge to management's certification of internal controls "is nothing more than a non-actionable 'generalized claim of mismanagement'"); *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682-83 (D. Colo. 2007) (similar).

*Magnum Hunter*, 26 F. Supp. 3d at 295 ("[P]laintiffs[] … do not adequately plead falsity.  While these [confidential] witnesses are certainly able to muster a litany of criticisms of accounting practices … the inference is one of an oversight failure of management.").[13]

> **B.      Plaintiffs Fail To State a Claim Based on Alleged Misstatements Concerning SunEdison's Planned Use of Proceeds from the Preferred Offering.**

Plaintiffs also make an impermissibly reverse-engineered allegation that the "use of proceeds" section of the Offering Documents was misleading because SunEdison failed to disclose that it was planning to use the Preferred Offering proceeds to "address its current liquidity crisis and to pay down margin calls on the Margin Loan."  (Compl. ¶ 464.)  However, the Offering Documents stated that SunEdison expected to use the net proceeds of the Offering "for general corporate purposes," including "funding working capital and growth initiatives," but noted that, "in light of the variety of factors that will impact how [the] net proceeds will ultimately be utilized," "management will retain broad discretion over the use of the net proceeds."  (Ex. 22 at S-31.)  Addressing liquidity needs, including satisfying any margin calls on the margin loan, is fully consistent with both "general corporate purposes" and "funding working capital," and well within the "broad discretion" that management retained over the use of the proceeds.  *See DeMaria v. Anderson*, 153 F. Supp. 2d 300, 313 (S.D.N.Y. 2001) (no misrepresentation where company used IPO proceeds to repay losses and prospectus (i) stated that proceeds would be used primarily as working capital and (ii) noted company's broad discretion over use of proceeds).

---

[13] In a similar vein, Plaintiffs allege that SunEdison used an Excel spreadsheet without access controls to house its consolidated financial data, and that SunEdison's turnover rate for accountants was high.  (Compl. ¶ 473.)  But Plaintiffs do not and cannot allege that people actually accessed and manipulated the Excel spreadsheet or that they failed to use it effectively (albeit manually) to manage SunEdison's financial reporting.  *Cutsforth*, 235 F. Supp. 2d at 1244.  Plaintiffs also allege that SunEdison employees were able to open bank accounts with SunEdison's funds in 2013 and 2014 without any review.  (Compl. ¶ 473.)  Even assuming this remained the case in 2015—and there is not any non-conclusory allegation that it did—this too amounts at most to an allegation of "operational problems" that provides no basis for a securities law claim.  *Cutsforth*, 235 F. Supp. 2d at 1245.

### C.   Plaintiffs Fail To State a Claim Based on Alleged Debt Misclassification.

Plaintiffs allege they were misled by a footnote in SunEdison's 10-Qs for the first and second quarters of 2015 because it supposedly misclassified the margin loan and $336 million in exchangeable notes as "non-recourse to SunEdison."  (Compl. ¶¶ 467-69.)  However, SunEdison described those obligations in greater detail elsewhere in those 10-Qs and stated clearly that the debts were guaranteed by SunEdison.  Thus, in describing the margin loan, SunEdison explained:

> On January 29, 2015, a wholly-owned subsidiary of SunEdison entered into a margin loan agreement … and SunEdison concurrently entered into a guaranty … pursuant to which *SunEdison guaranteed all of the subsidiary's obligations under the Margin Loan Agreement* … *Upon the occurrence and during the continuance of an event of default, any lender may* … exercise remedies with respect to the collateral and *demand payment from SunEdison* of the obligations under the Margin Loan Agreement then due and payable.

(*See* Ex. 9 at 22, emphasis added; Ex. 10 at 25.)  Similarly, SunEdison explained that "[t]he Exchangeable Notes are *fully and unconditionally guaranteed by SunEdison*."  (Ex. 9 at 22-23, emphasis added.)  These disclosures (which Plaintiffs ignore) make clear that SunEdison's guarantees with respect to the margin loan and the exchangeable notes were recourse to SunEdison.  Thus, whatever confusion Plaintiffs profess based upon reading the footnote alone, they cannot plausibly allege a misrepresentation concerning the classification of those debts when the 10-Qs are read in their entirety, as they must be.  *See, e.g.*, *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (key inquiry is "whether defendants' representations, taken together and in context, would have misled a reasonable investor"); *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008) ("In evaluating claims under Sections 11 and 12(a)(2), the court must review the Offering Documents as a whole rather than determining whether individual statements are true.").

**D.      Plaintiffs' Allegations of a Failure to Disclose "Known Trends" Under Item 303 of Regulation S-K Do Not State a Claim.**

Lastly, Plaintiffs allege the Offering Documents failed to report SunEdison's "constrained" liquidity as a "known trend" under Item 303 of Regulation S-K.  (Compl. ¶¶ 475-77.)  This argument fails at the threshold.  SunEdison's financial statements, which have never been restated, and the accuracy of which Plaintiffs do not seriously challenge, detailed its liquidity position, including its mounting indebtedness and negative cash flows.  Issuers are not required to supplement objective reports with pejorative characterizations.  *See Lopez v. Ctpartners Exec. Search, Inc*., 173 F. Supp. 3d 12, 35 (S.D.N.Y. 2016); *Scott v. Gen. Motors Corp.*, 46 F. Supp. 3d 387, 397-98 (S.D.N.Y. 2014) (dismissing Section 11 claim because defendant was not required to characterize inventory situation as a negative "trend" where inventory and sales were disclosed and "days supply" could be computed from disclosed figures).  Moreover, the Complaint fails to plead that a trend of "constrained liquidity—rather than delayed payments to vendors, which is not the same thing—was actually *known to management* at the time of the Preferred Offering.  This, too, requires dismissal.  *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011) (Item 303 only requires disclosure of trends "known to management"); *see also Medina v. Tremor Video, Inc.*, 640 F. App'x 45, 47-48 (2d Cir. 2016) (affirming dismissal of complaint for failure to plead "known" trend).

In any event, Item 303 requires disclosure only if the claimed trend is reasonably expected to have a material unfavorable impact on net sales or revenues or income from continuing operations.  17 C.F.R. § 229.303(a)(3)(ii).  Plaintiffs allege this was so as of the time of the Preferred Offering because SunEdison's late payments to vendors meant that its "business partners and vendors would, and indeed did, cut ties with the Company, and SunEdison's creditors would refuse to lend SunEdison additional money."  (Compl. ¶ 476.)

The Complaint's own factual allegations contradict this conclusory assertion. Plaintiffs allege that SunEdison was able to obtain approximately $5.3 billion in additional debt between August 2014 and June 30, 2015. (Compl. ¶ 32.) As to SunEdison's vendors, the Complaint identifies just one that actually terminated its relationship with SunEdison due to allegedly slow payments, and that was in the summer of 2014—more than a year before the Preferred Offering. (*See id.* ¶ 56.) In *In re IAC/InterActiveCorp Securities Litigation*, 695 F. Supp. 2d 109, 117-21 (S.D.N.Y. 2010), investors brought Section 11 claims against an internet company based on an alleged failure to disclose as a "trend" certain "bad business practices" by its online travel subsidiaries, such as late payments to hotel chains and other suppliers, that supposedly sowed discontent among suppliers and customers. The Court dismissed those claims, in part, because the complaint failed to allege any effects those purported "trends" had on defendant's business apart from one major hotel chain deciding to no longer work with the issuer's subsidiaries. *Id.* at 119-20 ("The loss of one hotel chain, without more, is consistent with unremarkable circumstances … Plaintiffs have been unable to allege concrete facts supporting their assertion that widespread [customer and supplier] dissatisfaction was doing damage to IAC's business."); *see also Rombach*, 355 F.3d at 173-74. Here, Plaintiffs' allegations regarding the failure to disclose "known trends" as of the time of the Preferred Offering are equally ineffectual, and the Item 303 claims should be dismissed.[14]

## **CONCLUSION**

For the foregoing reasons, the Underwriter and Individual Defendants respectfully request that the Court dismiss Plaintiffs' Securities Act claims with prejudice.

---

[14] Plaintiffs' failure to plead a claim under Section 11 or 12(a)(2) requires dismissal of their Section 15 claim. *See* 15 U.S.C. § 77o.

Dated:  New York, New York
        June 9, 2017

SHEARMAN & STERLING LLP

By:      /s/  Adam S. Hakki
         Adam S. Hakki
         Daniel Lewis
         Adam J. Goldstein
         SHEARMAN & STERLING LLP
         599 Lexington Avenue
         New York, New York 10022-6069
         Telephone:  (212) 848-4000
         Facsimile:  (212) 848-7179

         *Attorneys for Underwriter Defendants
         Deutsche Bank Securities Inc., Goldman,
         Sachs & Co. LLC (f/k/a Goldman, Sachs &
         Co.), J.P. Morgan Securities LLC,
         Macquarie Capital (USA) Inc., MCS Capital
         Markets LLC, Merrill Lynch, Pierce, Fenner
         & Smith Incorporated, and Morgan Stanley
         & Co. LLC*

By:      /s/  Sara B. Brody
         Sara B. Brody
         Norman J. Blears
         Jaime A. Bartlett
         SIDLEY AUSTIN LLP
         555 California Street, Suite 2000
         San Francisco, California  94104
         Telephone:  (415) 772-1200
         Facsimile:  (415) 772-7400

         *Attorneys for Individual Defendants
         Antonio R. Alvarez, Ahmad Chatila, Clayton
         Daley, Jr., Emmanuel Hernandez,
         Georganne C. Proctor, Steven Tesoriere,
         Martin Truong, James B. Williams, Brian
         Wuebbels, and Randy H. Zwirn*

By:     _/s/  Michael Bongiorno_
        Michael Bongiorno
        Timothy Perla
        WILMER CUTLER PICKERING
        HALE AND DORR LLP
        60 State Street
        Boston, Massachusetts  02109
        Telephone:  (617) 526-6000
        Facsimile:  (617) 526-5000

        *Attorneys for Individual Defendant*
        *Peter Blackmore*