**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SUNEDISON, INC. SECURITIES LITIGATION | Case No.  1:16-md-2742-PKC |
| This Document Applies To: | |
| *Horowitz, et al. v. SunEdison, Inc., et al.*, 1:16-cv-07917-PKC | |

**MEMORANDUM OF LAW IN SUPPORT OF EXCHANGE ACT DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED CONSOLIDATED
<u>SECURITIES CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS..........................................................................................3

    A.    Factual and Procedural Background ....................................................3

    B.    Overview of Challenged Statements...................................................6

ARGUMENT ...........................................................................................................7

I.    Legal Standards. ...........................................................................................7

II.    The Common Categories Of Statements Plaintiffs Challenge
Cannot Support A Section 10(b) Claim Any More Than They
Can Support A Securities Act Claim. ..............................................................8

    A.    Plaintiffs Fail To State A Claim Based On
The Challenged Liquidity Statements. ................................................8

        1.    Plaintiffs Have Not Pled Facts Giving Rise
To A Cogent Or Compelling Inference Of Scienter..................8

        2.    The Challenged Liquidity Opinion Statement
In SunEdison's Third-Quarter 2015 10-Q
Is Immunized By The Company's Extensive Risk Disclosures. ..............10

        3.    The Challenged Liquidity Statements In SunEdison's
Second-Quarter And Third-Quarter 2014 10-Qs
Are Not Actionable Either. ....................................................12

        4.    Plaintiffs Likewise Fail To Plead Facts Showing
That Defendants' Oral Statements About Liquidity
Were Actionable, Were Materially False Or Misleading,
Or Were Made With Scienter..................................................13

    B.    Plaintiffs Fail To State A Claim Based On Alleged Omissions
Concerning The Margin Loan And Second Lien Loan........................14

        1.    Plaintiffs Do Not Plead Facts Giving Rise To
A Cogent And Compelling Inference Of Scienter. ..................14

2.      Plaintiffs Have Not Stated A Claim With Respect To Statements Related To The Margin Loan Or Second Lien Loan In October–November 2015. ....................................15

C.      Plaintiffs Fail To State A Claim Based On The "Use Of Proceeds" Statement In SunEdison's Prospectus...................................19

D.      Plaintiffs Fail To State A Claim Based On Debt Classification. ..........................19

E.      Plaintiffs Fail To State A Claim Based On Internal Control Certifications. ..........................................................................................20

1.      Plaintiffs Have Not Pled Facts Supporting A Cogent Or Compelling Inference Of Scienter......................................20

2.      Plaintiffs Have Not Stated A Claim With Respect To The Internal Control Certification In SunEdison's Second-Quarter 2014 10-Q, Third-Quarter 2014 10-Q Or Third-Quarter 2015 10-Q.....................................................21

F.      Plaintiffs Fail To State A Claim Based On Item 303 Of Regulation S-K....................................................................22

III.      Plaintiffs Have Not Stated A Claim With Respect To Any Of The Statements Challenged Exclusively Under Section 10(b)...........................24

A.      Plaintiffs Fail To Show That Challenged Projections In September And December 2015 Were Actionable, Let Alone Materially False or Misleading Or Made With Scienter.....................24

B.      Plaintiffs Fail To Show That Challenged Statements About The LAP deal Were Materially False Or Misleading Or Made With Scienter..........................................................................................25

C.      Plaintiffs Fail To State A Claim Based On SunEdison's Statements Of Cash Position At The End of Q3 2015. ........................................27

1.      Plaintiffs Do Not Dispute That Cash At The DevCo Was $1.4 Billion At The End Of Q3 2015. ..............................................27

2.      Plaintiffs' Warehouse Allegations Do Not Change The Analysis. ...........30

D.      Plaintiffs Fail To State A Claim Based On SunEdison's 8-K Filings Concerning Board And Management Changes At The Yieldcos. ........................32

IV.      Plaintiffs' Standalone Scienter Allegations Do Not Create A Cogent Or Compelling Inference Of Conscious Wrongdoing, Nor Otherwise Redeem Plaintiffs' Claims................................................................................................33

A.      Plaintiffs Make No Attempt To Plead Motive And Opportunity. .........................34

B.      The Facts Plaintiffs Allege Do Not Constitute Strong Circumstantial
        Evidence Of Scienter............................................................................................35

        1.      Plaintiffs Misapprehend The Nature Of The Scienter Showing
                They Are Required To Make. ................................................................35

        2.      The Yieldco Plaintiffs' Allegations Do Not Support A Cogent Or
                Compelling Inference Of Scienter.........................................................36

        3.      Plaintiffs' Confidential Witness Allegations Do Not Support A
                Cogent Or Compelling Inference Of Scienter........................................38

        4.      Plaintiffs' Remaining Scienter Allegations Also Fall Short....................39

CONCLUSION.................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abely v. Aeterna Zentaris Inc.*,
  2013 WL 2399869 (S.D.N.Y. May 29, 2013) ...................................................... 34

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ...................................................... 40

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) ...................................................... 13, 35

*In re Bank of Am. Corp. Sec., Deriv., and ERISA Litig.*,
  2011 WL 3211472 (S.D.N.Y. July 29, 2011) ...................................................... 35

*In re Braskem S.A. Sec Litig.*,
  2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017) ...................................................... 21

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996) ...................................................... 35

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013) ...................................................... 22

*City of Brockton Ret. Sys. v. The Shaw Grp., Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008) ...................................................... 15, 21

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ...................................................... 36

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ...................................................... 33

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
  778 F.3d 228 (1st Cir. 2015) ...................................................... 34

*Firefighters Pension & Relief Fund of New Orleans v. Bulmahn*,
  147 F. Supp. 3d 493 (E.D. La. 2015) ...................................................... 10, 13, 36

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
  2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ...................................................... 10

*Gissin v. Endres*,
  739 F. Supp. 2d 488 (S.D.N.Y. 2010) ...................................................... 9, 13

*In re HomeBanc Corp. Sec. Litig.*,
   706 F. Supp. 2d 1336 (N.D. Ga. 2010)...............................................................22

*In re ITT Educ. Servs., Inc. Sec. & S'holder Deriv. Litig.*,
   859 F. Supp. 2d 572 (S.D.N.Y. 2012) ...............................................................26

*In re Jumei Int'l Holding Ltd. Sec. Litig.*,
   2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) .........................................................23

*Leidos, Inc. v. Indiana Pub. Ret. Sys.*,
   2016 WL 7011426 (U.S. Nov. 30, 2016) ......................................................22, 23

*In re Longtop Fin. Tech. Ltd Sec. Litig.*,
   939 F. Supp. 2d 360 (S.D.N.Y. 2013)................................................................15

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015)......................20

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) ............................................................................20

*In re MELA Scis., Inc. Sec. Litig.*,
   2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012).....................................................34

*Monachelli v. Hortonworks, Inc.*,
   – F. Supp. 3d –, 2016 WL 7048996 (N.D. Cal. Dec. 5, 2016) ......................... 10, 13

*Nguyen v. MaxPoint Interactive, Inc.*,
   – F. Supp. 3d –, 2017 WL 570939 (S.D.N.Y. Feb. 13, 2017) ...............................23

*Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
   951 F. Supp. 2d 479 (S.D.N.Y. 2013) ..................................................................9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ........................................................................... 8, 10, 20

*In re Regeneron Pharm., Inc. Sec. Litig.*,
   2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)..........................................................34

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) .................................................................... 7, 13, 32

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) ...............................................................................9

*Ross v. Lloyds Banking Grp.*,
   2012 WL 4891759 (S.D.N.Y. Oct. 16, 2012)..................................................8, 14

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
  75 F.3d 801 (2d Cir. 1996) ....................................................................................32

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ..................................................................................38

*Solow v. Citigroup, Inc.*,
  2012 WL 1813277 (S.D.N.Y. May 18, 2012), *aff'd*, 507 F. App'x 81 (2d Cir.
  2013)...........................................................................................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..................................................................................................8

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) .............................................................................10, 30

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ...................................................................................13

*Western Penn. Elec. Emp. Pension Trust v. Plexus Corp.*,
  2009 WL 604276 (E.D. Wis. Mar. 6, 2009) ...........................................................12

*Wyche v. Advanced Drainage Sys., Inc.*,
  2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) ...........................................................22

**STATUTES & RULES**

15 U.S.C. §78j(b) (Section 10(b) of the Securities Act) .........................................*passim*

15 U.S.C. § 78t(a) (Section 20(a) of the Securities Act)................................................1

15 U.S.C. § 78u-4(b)(2)(A) ...........................................................................................8

15 U.S.C. § 78u-5(c)(1)(B)...............................................................................12, 24, 25

17 C.F.R. § 229.303 (Item 303 of Regulation S-K)......................................7, 22, 23

Fed. R. Civ. P. 12(b)(6)...................................................................................................1

Defendants Ahmad Chatila and Brian Wuebbels respectfully submit this memorandum of law in support of their motion to dismiss the Second Amended Consolidated Securities Action Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This action is one of four matters in which motions to dismiss are being filed simultaneously.  The operative complaint in this action consists of two principal parts.  In the first, Plaintiffs assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against two defendants—SunEdison Inc.'s former Chief Executive Officer Ahmad Chatila and former Chief Financial Officer Brian Wuebbels.  In the second part, Plaintiffs assert claims under the Securities Act of 1933 against a much larger slate of defendants—Chatila and Wuebbels, eight of SunEdison's current or former outside directors, seven underwriters of an offering of SunEdison preferred stock, and SunEdison's auditor.  The present motion addresses the first part of the complaint, which contains the Exchange Act claims.  The second part of the complaint is addressed in two separate motions—one filed by all Securities Act defendants except the auditor (the Securities Act Brief) and one filed by the auditor.

Plaintiffs challenge a common core of statements in their Securities Act and Exchange Act claims.  As a result, the two sets of claims share many of the same defects.  In this brief, we therefore do not repeat but instead incorporate by reference the arguments in the Securities Act Brief, which we believe provides ample grounds to dismiss the common challenged statements under both the Securities Act and the Exchange Act.  We discuss the common categories of challenged statements in this brief for two limited purposes:  (1) to explain why Plaintiffs' inability to create the cogent and compelling inference of scienter required under Section 10(b) provides an additional reason to dismiss the Exchange Act claims, and (2) to address statements

in the common categories that appear in quarterly filings or oral presentations not targeted by the Securities Act claims. We then turn to four additional categories of statements that Plaintiffs challenge exclusively under the Exchange Act.

In their 230-page complaint, Plaintiffs seek to convert the story of SunEdison's decline and fall into a fraud claim. They devote scores of pages to the issues they believe were germane to SunEdison's eventual bankruptcy, including an intercorporate battle between management of SunEdison and management of its two yieldcos, difficulties in integrating the financial systems of acquired companies, and a history of late payments to vendors. Very little of this, however, is connected with the challenged public statements made by the two Section 10(b) defendants. Those statements are, for the most part, high-level and quite general—forward-looking opinions about liquidity at the enterprise level, summaries of the Company's lending arrangements and attendant risks, the resolution of the conflict between SunEdison and the yieldcos through management and board changes. Meanwhile, although Plaintiffs' central theory of fraud is that defendants overstated SunEdison's liquidity, Plaintiffs do not dispute that SunEdison reported its cash position in GAAP-compliant financial statements in every quarter at issue.

There is consequently a remarkable disconnect in this case between the events Plaintiffs chronicle and the bedrock element of a Section 10(b) claim—a materially false or misleading public statement. And when Plaintiffs do seek to link challenged statements directly to purportedly contradictory information, they rely on semantic games. Plaintiffs claim that SunEdison misstated, during investor presentations, the amount of "unrestricted" cash at its disposal. But in reality, SunEdison never stated that the amount of cash it reported was "unrestricted" or available for all purposes. In fact, SunEdison emphasized the opposite point— that a significant portion of reported cash was committed for particular construction projects.

Plaintiffs' scienter allegations are similarly inadequate.  Plaintiffs make no attempt at all to show that Chatila or Wuebbels was financially motivated to commit fraud.  Nor could they. Both officers voluntarily increased their holdings of SunEdison stock at the very time Plaintiffs say they were working to artificially inflate its price.  And while Plaintiffs seek to marshal circumstantial evidence showing scienter, that effort is generally undermined by the undisputed record of SunEdison's copious truthful disclosures concerning the very issues Plaintiffs claim defendants sought to conceal.  Plaintiffs' efforts are further marred by their apparent misapprehension of the scienter standard.  In multiple instances, Plaintiffs seek to substitute knowledge of certain *facts* with what is actually required under controlling law—an *intent to deceive* investors, or a state of mind approximating such an intent.  Because Plaintiffs have fallen short both in their effort to identify a materially false or misleading statement and in their attempt to create a cogent and compelling inference of scienter, the Court should dismiss their claims.

## STATEMENT OF FACTS

### A.      Factual and Procedural Background

SunEdison is a renewable energy development company; it finances, builds and operates solar, wind and hydro power plants around the world.  SunEdison grew rapidly in 2014 and the first half of 2015, expanding from solar into wind power with the $2.4 billion acquisition of First Wind LLC, spending billions of dollars on other acquisitions, and developing scores of power plants worldwide.  Com. ¶¶ 32–33.[1]

The need to finance this activity made SunEdison a highly capital-intensive business. Throughout the purported class period, SunEdison accordingly disclosed, in detail, (1) its

---

[1] We adopt the well-pled factual allegations in the complaint (Com.) solely for purposes of this motion.  Citations to "Ex. _" refer to the exhibits to the Omnibus Declaration of Jaime A. Bartlett.  Except as otherwise noted, these exhibits are copies of documents cited in the complaint and are therefore properly before the Court on this motion.

significant existing indebtedness and the risks that flowed from it; (2) its need for substantial additional infusions of capital to execute its business plans; (3) its dependence on the sale of its energy projects, and its vulnerability in the event that it was unable to sell projects on a schedule that would accommodate fluctuating cash flows; and (4) its dependence on vendors and their willingness to allow it to accumulate payables.  Ex. 1 at 15–17, 25–28; Ex. 2 at 17–19.

In addition to these systemic risks to its business, SunEdison disclosed rapidly mounting capital needs over the course of 2015.  In its 10-Q for the first quarter of 2015, SunEdison projected incremental capital needs of $2.9 billion to $3.6 billion for the remainder of the year. In its second-quarter 10-Q, SunEdison projected not only incremental capital needs of $2.3 to $2.9 billion but also the need for an additional $5 billion to finance acquisitions.

SunEdison also undertook multiple significant financing activities in the first two quarters of 2015 and the beginning of the third.  Among the largest were two notes offerings in January 2015 ($460 million and $337 million); the Margin Loan in January 2015 ($410 million); the First Reserve Warehouse facility in April 2015 (up to $1.5 billion); another notes offering in May 2015 ($450 million); and a Preferred Stock Offering in August 2015 ($650 million).[2] SunEdison's yieldcos were also conducting significant financing activities during this period, with a Global Class D offering in May–June 2015 ($510 million); the Global IPO in July 2015 ($675 million); and a Global bond offering in July 2015 ($810 million).  The Global IPO was the second of SunEdison's two yieldco IPOs.  SunEdison's first yieldco, TerraForm Power (or "TERP") became a publicly traded company in July 2014.[3]

Notwithstanding this activity, SunEdison painted a sobering picture of its financial

---

[2] The Margin Loan and Preferred Stock Offering are described in detail in the Securities Act Brief.  We discuss the First Reserve Warehouse at pages 30–31, below.

[3] We refer to Global and TERP collectively as "the Yieldcos." The creation of the Yieldcos, their offerings, and their relationship with SunEdison are discussed fully in motions to dismiss filed in the *Global IPO* and *Chamblee* actions.

position at the end of the second quarter of 2015.  In its 10-Q filed August 6, 2015, SunEdison informed investors that current liabilities exceeded current assets, and that it was operating with a working capital deficit.  Ex. 10 at 60.  SunEdison also disclosed that it was consuming cash rapidly:  nearly $2 billion over six months for operating activities and construction expenditures, with another $2.5 billion for acquisitions.  *Id.*  In light of these expenditures, SunEdison cautioned investors that it was dependent on additional long-term project financing, that its growth was limited by capital access, and that there could be no assurance that additional financing would be available, or available on acceptable terms.  *Id.* at 60–61.

Meanwhile—as SunEdison also disclosed—its debt was rising steeply, from $7 billion at the end of 2014 to $10.7 billion as of June 30, 2015.  Risks of various sorts accompanied this burgeoning debt.  As SunEdison had previously cautioned the market, certain of its debt facilities contained restrictive covenants, and it risked breaching those covenants in the event of a business downturn.  That in turn could make outstanding debts payable immediately—and cross-default provisions could magnify the problem.  Ex. 1 at 25; Ex. 2 at 32–33.  SunEdison also warned investors that its ability to fund its debt service obligations was dependent on cash flows and other capital resources, and that serious issues would arise if those sources of capital could not keep pace with the Company's payment obligations.  Ex. 1 at 26; Ex. 2 at 33.

Against this background at the end of Q2 2015, three offerings were conducted in Q3 2015—the Global IPO and Global bond offering in July 2015, and SunEdison's Preferred Stock Offering in August 2015, with combined gross proceeds of more than $2 billion.  Nevertheless, SunEdison's position worsened.  On October 5, 2015, SunEdison announced a restructuring and a 15% workforce reduction.  Com. ¶ 38.  In its third-quarter 10-Q, filed November 9, 2015, SunEdison announced significant losses, mounting debt, and newly uncertain access to capital.

*Infra* at 11.  SunEdison's stock price fell more than 20% after it published these results.  Ex. 36.

SunEdison was not alone.  As discussed in the Securities Act Brief, the Company's decline was part of an industry-wide phenomenon, in which falling oil and gas prices put downward pressure on the renewable energy sector.  Meanwhile, as Plaintiffs recount in detail, management of SunEdison and management of the Yieldcos disagreed about both the causes of and the appropriate response to SunEdison's declining fortunes.  Com. ¶¶ 148–63, 171, 181–91.

SunEdison's stock continued its downward slide over the rest of 2015.  It fell further after SunEdison announced on January 7, 2016 that in order to support operations, it was conducting a dilutive debt offering.  Ex. 36.  The next month, SunEdison reported that its Audit Committee was engaged in an investigation it had begun in late 2015 and that the Company's 2015 10-K would be delayed pending the completion of that investigation.  Com. ¶ 228.  SunEdison provided updates on March 16, 2016 and on April 14, 2016.  *Id.* ¶¶ 240, 269.  In the latter disclosure, SunEdison reported that the Audit Committee had identified internal control issues related to cash forecasting and managing cash flows.  SunEdison also reported that the Audit Committee had found no material misstatements in the Company's financial statements.  Ex. 16.

Following further weakening in the domestic and foreign energy markets and extensive consideration of strategic alternatives by its Board of Directors, SunEdison filed for bankruptcy on April 21, 2016.  Class and individual actions brought against SunEdison and Global under the Securities Act, which had begun appearing in October 2015, continued to accumulate.  The present action was filed on December 2, 2015.

### B.    Overview of Challenged Statements

Most of the categories of statements Plaintiffs challenge under Section 10(b) are also the subject of Plaintiffs' Securities Act claims in this case.  The challenged statements appear in the Prospectus and Registration Statement for SunEdison's August 18, 2015 Preferred Stock

Offering and in the 2014 10-K and first-quarter 2015 and second-quarter 2015 10-Qs incorporated by reference into those offering materials.  These statements—or in some cases, alleged omissions—fall into six categories:  (1) projections and opinions related to liquidity and anticipated capital requirements; (2) alleged omissions related to the Margin Loan and the August 11, 2015 Second Lien Loan; (3) SunEdison's statement of its intended use of the funds raised in the Preferred Stock Offering; (4) a footnote classifying the Margin Loan and certain notes as non-recourse to SunEdison; (5) certifications of internal controls under Sarbanes-Oxley Section 302; and (6) the alleged omission of "known trends" under Item 303 of Regulation S-K. With respect to each category, we discuss only those matters as to which there is an analytical or factual difference between the Securities Act claims and the Section 10(b) claim.

Plaintiffs challenge other statements solely under Section 10(b).  These include (1) limited financial projections for 2016; (2) statements made in October and November 2015 relating to the planned acquisition of Latin American Power; (3) statements related to SunEdison's cash position at the end of the third quarter of 2015; and (4) statements made on November 23–24, 2015 related to board and management changes at the Yieldcos.  For the reasons discussed below, none of these statements supports a claim for securities fraud.[4]

## ARGUMENT

### I.    Legal Standards.

The Court is very familiar with the heightened pleading standards of the Private Securities Litigation Reform Act, and we review them only briefly here.  Plaintiffs "must do more than say that the [challenged] statements . . . were false and misleading; they must *demonstrate with specificity* why and how that is so."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d

---

[4] For ease of reference, and because this brief is directed solely at the claims against Chatila and Wuebbels, we refer to these two defendants hereafter as "Defendants."  We refer to them in the caption as "Exchange Act Defendants."

Cir. 2004) (emphasis added); *Ross v. Lloyds Banking Grp.*, 2012 WL 4891759, at *4 (S.D.N.Y. Oct. 16, 2012) (same).  The standard for pleading scienter is more demanding still.  Under the applicable statutory provisions, courts must dismiss securities fraud claims unless plaintiffs are able to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  A plaintiff creates the necessary "strong inference" of deliberate fraud "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007).

II.     **The Common Categories Of Statements Plaintiffs Challenge Cannot Support A Section 10(b) Claim Any More Than They Can Support A Securities Act Claim.**

A.      **Plaintiffs Fail To State A Claim Based On The Challenged Liquidity Statements.**

As discussed in the Securities Act Brief, Plaintiffs have not stated a claim based on the statements that SunEdison believed its liquidity would be sufficient to support operations for 12 months and expected to have sufficient capital to meet its capital needs in the calendar year. These are forward-looking statements protected under the PSLRA's safe harbors; they are also opinion statements with respect to which Plaintiffs have not met the requirements of *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015).  Plaintiffs' challenge also fails for reasons specific to their Section 10(b) claim.

1.      **Plaintiffs Have Not Pled Facts Giving Rise To A Cogent Or Compelling Inference Of Scienter.**

The heart of Plaintiffs' complaint is their contention that SunEdison concealed a growing "liquidity crisis" throughout the purported class period.  Remarkably, however, with the exception of their challenge to the "non-recourse" footnote in SunEdison's first-quarter 2015 and second-quarter 2015 10-Qs—a challenge put to rest in the Securities Act Brief—Plaintiffs do not

dispute that SunEdison issued accurate, GAAP-compliant financial statements for every relevant quarter.  This is fatal.  Courts routinely dismiss Section 10(b) claims on scienter grounds where plaintiffs claim, on the one hand, that defendants deliberately misrepresented a company's financial position, but do not, on the other hand, question the accuracy of the company's financial statements.  *See, e.g.*, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003) (affirming dismissal where "plaintiffs do not allege that [defendant] falsely represented its capital structure, or its debts . . . . It is difficult to form a 'strong inference' of scienter from the alleged undercapitalization of a company where plaintiffs appear to concede that the company accurately disclosed its capital structure and financial obligations"); *Gissin v. Endres*, 739 F. Supp. 2d 488, 511–12 (S.D.N.Y. 2010) (dismissing claims where plaintiffs dispute defendants' statement that company's balance sheet was strong but do not challenge financial statements).  On this basis alone, Plaintiffs have fallen short of the scienter standard.

In addition to its virtually unchallenged financial reporting, SunEdison tracked its cash position in the Management's Discussion and Analysis (MD&A) sections of the challenged 10-Qs and 10-K.  As discussed in the Securities Act Brief, SunEdison bluntly disclosed its losses in its second-quarter 2015 10-Q, stressing that its operations were dependent on multiple billions of dollars of additional financing that the Company was by no means certain it could secure.  As discussed immediately below, SunEdison added extensive new cautions in its third-quarter 2015 10-Q.  These copious risk disclosures cut sharply against Plaintiffs' theory that Defendants deliberately misled the market about its financial position.  *E.g.*, *Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 503 (S.D.N.Y. 2013) (no inference of scienter "[i]n light of the number, frequency, and level of detail of [the company's] negative disclosures . . . the more compelling inference is that defendants went to great lengths to make

known the level of risk"); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *20 (S.D.N.Y. Sept. 28, 2010) ("Defendants' disclosures about the risk inherent in the investment . . . are inconsistent with a state of mind going toward deliberate illegal behavior or conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care") (internal notations omitted).[5]

      **2.**     **The Challenged Liquidity Opinion Statement In SunEdison's Third-Quarter 2015 10-Q Is Immunized By The Company's Extensive Risk Disclosures.**

The Securities Act Brief addresses the 12-month liquidity predictions in three of SunEdison's periodic filings: the 2014 10-K, the first-quarter 2015 10-Q and the second-quarter 2015 10-Q, each of which is incorporated into the Preferred Stock Offering materials. In an effort to extend the Section 10(b) class period as far as possible in both directions—Plaintiffs allege a class period of August 7, 2014 through April 4, 2016—Plaintiffs also challenge parallel statements in the two prior 10-Qs (for the second and third quarters of 2014) and in the subsequent 10-Q (for the third quarter of 2015). But Plaintiffs have no more stated a claim with respect to these periods than with respect to the periods targeted in the Securities Act claim.

We begin with the 10-Q for the third quarter of 2015, in which SunEdison stated "We believe that the sources of liquidity . . . will be sufficient to support our operations for the next twelve months, although various factors could affect our liquidity position, including changes in

---

[5] In addition to the scienter issue, which is unique to Plaintiffs' attack on SunEdison's liquidity opinion statements under Section 10(b), it is an open question whether *Omnicare*'s omission clause analysis, on which Plaintiffs rely in an effort to show falsity, provides even a potential route to liability in a case like this one. Although the Second Circuit applied *Omnicare* to a Section 10(b) claim in *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016), the court did not consider whether *Omnicare*'s omission clause analysis extends to cases in which plaintiffs challenge financial projections. At least one other court has held that it does not. *Firefighters Pension & Relief Fund of New Orleans v. Bulmahn*, 147 F. Supp. 3d 493, 528 (E.D. La. 2015) ("the Court will not apply the *Omnicare* test to defendants' forward-looking statements of opinion. With respect to such [opinions], plaintiffs must meet the pleading requirements for forward-looking statements under the PSLRA"; applying PSLRA safe harbor provisions to 12-month liquidity prediction); *see also Monachelli v. Hortonworks, Inc.*, – F. Supp. 3d –, 2016 WL 7048996, at *7 (N.D. Cal. Dec. 5, 2016) (applying PSLRA safe harbor provisions to 12-month liquidity prediction).

the anticipated timing and terms of pending and completed acquisitions and the availability of project capital." Com. ¶ 349.  Here as elsewhere, Plaintiffs overlook the context in which the challenged statement was made.  In the same MD&A discussion in which it rendered its opinion, SunEdison updated the market on new adverse factors affecting its liquidity, and forcefully warned investors of the risks it faced.  Among other things, SunEdison explained:

- "We incurred a net loss attributable to SunEdison stockholders of $284 million and $919 million for the three and nine month period ended September 30, 2015 respectively, . . ."

- "We expect to continue to incur losses, and we expect our operations . . . to continue to require substantial cash expenditures, cash commitments, and third party financing."

- "Our working capital can also fluctuate significantly from period to period as a result of the timing of cash inflows and outflows associated with our development and construction activities."

- "[W]e continue to incur significant indebtedness to fund our operations and acquisitions and have significant pending obligations, . . ."

- "Our ability to meet our debt service obligations and other capital requirements, including capital expenditures and acquisitions, will depend on various factors, including our future operating performance which, in turn will be subject to general economic, financial . . . and other conditions many of which are beyond our control."

Ex. 12 at 69–70.  SunEdison also added several pages of risk disclosures to its third-quarter 10-Q, again explaining that it depended on additional capital infusions but that "[d]ebt or equity financing may not be available to us."  *Id.* at 85.  In addition, SunEdison explained that while it had historically depended on selling projects to the Yieldcos, recent market developments, including the decline in the Yieldcos' stock price, made that strategy problematic.  *Id.*  And SunEdison again emphasized the adverse results that would follow if it was unable to secure additional capital:  "our earnings, liquidity and ability to develop projects will be adversely impacted and we may not be able to maintain compliance with our existing debt covenants and our business will suffer."  *Id.*

In these detailed cautionary statements, SunEdison identified, among others, the precise

risks relevant to its 12-month liquidity predictions—the risk that the Company might not be able to access the financing on which it depended, and that changing circumstances could lead to the acceleration of its debt obligations.  The fact that SunEdison revised its risk disclosures over time, moreover—detailing new risks flowing from new developments—shows exactly the commitment to providing meaningful cautionary statements that garners safe harbor protection under the PSLRA.  *See, e.g.*, *Western Penn. Elec. Emp. Pension Trust v. Plexus Corp.*, 2009 WL 604276, at *8–9, *8 n.7 (E.D. Wis. Mar. 6, 2009) (cautionary language sufficient to trigger safe harbor protection where it "is not static" but instead "changes as [the company] faces new risks").  SunEdison's comprehensive, detailed and on-point risk disclosures render the challenged 12-month liquidity prediction in the third-quarter 10-Q inactionable.

### 3. The Challenged Liquidity Statements In SunEdison's Second-Quarter And Third-Quarter 2014 10-Qs Are Not Actionable Either.

Plaintiffs' challenge to the 12-month liquidity prediction in SunEdison's second-quarter and third-quarter 2014 10-Qs suffers from a different problem.  Com. ¶¶ 261, 276.  These predictions, like those in the SEC filings for later periods, come within the PSLRA's safe harbors, which means that Plaintiffs must plead particularized facts showing that Defendants *actually knew* that SunEdison's liquidity would prove insufficient to sustain operations for 12 months.  15 U.S.C. § 78u-5(c)(1)(B).  Plaintiffs have not pled and cannot plead such facts. Indeed, any argument to the contrary would be nonsensical.  SunEdison in fact *did* continue operations for more than a year after its second-quarter 2014 and third-quarter 2014 filings (in August 2014 and November 2014 respectively), as billions of dollars continued to pour into the Company through debt and equity financings.  *Supra* at 4-6.  Plaintiffs cannot support the counterfactual proposition that Defendants somehow "actually knew" that events that actually came to pass—that SunEdison would raise substantial capital and continue operations for more

than 12 months—would not occur.[6]

### 4.   Plaintiffs Likewise Fail To Plead Facts Showing That Defendants' Oral Statements About Liquidity Were Actionable, Were Materially False Or Misleading, Or Were Made With Scienter.

In addition to the 12-month liquidity predictions, Plaintiffs challenge oral statements about SunEdison's liquidity made on quarterly earnings calls—statements that SunEdison's liquidity was "strong" or "robust," that Defendants were "comfortable" with the Company's balance sheet and liquidity position, and that new financing initiatives would "position" SunEdison with improved cash-generating abilities.  Com. ¶¶ 262, 277, 340–41.  Plaintiffs' challenge to these statements fails at the outset because general expressions of corporate optimism such as these are simply not actionable.  *Rombach*, 355 F.3d at 175 ("misguided optimism is not actionable as fraud"); *In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 757 F. Supp. 2d 260, 314 (S.D.N.Y. 2010) (favorable characterizations of company's capabilities "are too vague to permit reasonable investor reliance").  Moreover, an optimistic characterization of a company's financial position is not actionable in the absence of an allegation that the company's financial statements are inaccurate.  *Gissin*, 739 F. Supp. 2d at 511–12 (dismissing challenge to statement that "the company continues to maintain a strong balance sheet" where defendant "was . . . summarizing [the company's] undisputed SEC disclosures"); *Hortonworks*, 2016 WL 7048996, at *7 ("disclosure[s] of accurate historical data accompanied by general statements of optimism . . . are not actionable") (notations omitted); *Bulmahn*, 147 F. Supp. 3d at 527 (collecting authorities).  Optimistic characterizations of the sort at issue here are also classified as opinion statements—and therefore cannot support a Section 10(b) claim in the

---

[6] In their pre-motion letter, Plaintiffs suggested that their position is supported by *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).  But the analysis on which Plaintiffs rely involves a post-trial challenge to the sufficiency of loss causation evidence.  *Id.* at 262.  It has nothing to do with the application, on a pleading motion, of the actual knowledge prong of the safe harbor for forward-looking statements.

absence of facts demonstrating that the speaker did not hold the opinion expressed.  *Ross*, 2012 WL 4891759, at *6.  Plaintiffs plead no such facts here.

Finally, in addition to oral statements characterizing SunEdison's liquidity generally, Plaintiffs challenge Wuebbels' statement, during SunEdison's August 6, 2015 earnings calls, that "we don't see any additional financings to be able to achieve this growth."  Com. ¶ 316.  As they do elsewhere, Plaintiffs leave out the relevant context.  Wuebbels made the challenged statement in response to a question about specific acquisitions SunEdison had recently announced, for which financing was already in place.  Ex. 23 at 18.  Wuebbels neither said nor implied that existing financing was adequate for all of SunEdison's needs.  Indeed, SunEdison explicitly said the opposite—that it needed billions of dollars of additional financing to execute its business plans.  Ex. 10 at 60–61.

> ### B. Plaintiffs Fail To State A Claim Based On Alleged Omissions Concerning The Margin Loan And Second Lien Loan.
>
> #### 1. Plaintiffs Do Not Plead Facts Giving Rise To A Cogent And Compelling Inference Of Scienter.

The Securities Act Brief shows that SunEdison did not conceal but revealed all relevant information about the Margin Loan in its SEC filings up to and including the August 18, 2015 Preferred Stock Offering materials.  That brief also shows that SunEdison disclosed the existence of the Second Lien Loan in due course in its third-quarter 10-Q, and had no duty to do so earlier.

Plaintiffs' omission allegations are even weaker as a Section 10(b) claim than as a Securities Act claim.  Defendants could not have deliberately defrauded the market by failing to disclose, in SunEdison's August 6, 2015 10-Q, events that had not yet occurred—the margin call on the Margin Loan, which Plaintiffs allege did not occur until August 7, or the Second Lien Loan, which SunEdison did not enter into until August 11.  As to the August 18 offering documents, even if Plaintiffs could show that Defendants had a duty to disclose the margin call

and the Second Lien Loan there—and they cannot—the challenged omissions would amount, at most, to an immaterial oversight by a company that otherwise timely provided detailed and accurate information about its many financing arrangements and the risks that flowed from them. Allegations of negligence do not equate to fraud claims under Section 10(b). *See, e.g.*, *In re Longtop Fin. Tech. Ltd Sec. Litig.*, 939 F. Supp. 2d 360, 390 (S.D.N.Y. 2013); *City of Brockton Ret. Sys. v. The Shaw Grp., Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008).  And a record of detailed and accurate risk disclosures such as those SunEdison provided here cuts against any inference of scienter. *Supra* at 9–10 and authorities cited there.

> **2.    Plaintiffs Have Not Stated A Claim With Respect To Statements Related To The Margin Loan Or Second Lien Loan In October–November 2015.**

Plaintiffs also challenge statements SunEdison made about the Margin Loan and Second Lien Loan in October and November 2015—notwithstanding the fact that in those statements SunEdison *disclosed* the very information Plaintiffs accuse it of concealing in earlier filings. Plaintiffs have pled no facts showing that the challenged statements in October and November 2015 were materially false or misleading, much less deliberately so.

*October 7, 2015.*  SunEdison held an investor call on October 7, 2015, in which it pre-announced third-quarter results and discussed its restructuring and 15% workforce reduction. Com. ¶¶ 138, 336.  Among other things, Wuebbels reported that SunEdison had received margin calls for $152 million during the third quarter and had posted cash collateral in response. *Id.* ¶ 141.  Wuebbels also explained that the Margin Loan agreement had been amended "to adjust the triggers to a point that is significantly below the current market price." *Id.* ¶ 344.

Plaintiffs claim that Wuebbels should have disclosed not only the $152 million paid in Q3 2015 to satisfy margin calls but also an additional $91 million that SunEdison was required to pay in October 2015. *Id.* ¶ 345.  But Plaintiffs plead no facts showing that Wuebbels' statement

was materially false or misleading.  Particularly in this context—a pre-announcement for Q3—Wuebbels had no duty to disclose all payments made in connection with the Margin Loan, much less payments undisputedly made in *Q4*.  *See* Ex. 12 at 28.[7]

Plaintiffs also fault Wuebbels for failing to refer to the Second Lien Loan during the October 7 call.  But like the $91 million payment under the Margin Loan, SunEdison disclosed the Second Lien Loan in due course in its third-quarter 10-Q, filed on November 9, 2015.  It is also worth noting that both the $91 million payment and the $169 million loan (and corresponding debt) are reflected in the slide deck SunEdison presented during the October 7, 2015 call.  Ex. 24 at 10, 16.  Plaintiffs plead no facts—and will be able to cite no law—showing that SunEdison also had a duty to discuss the loan in greater detail as part of its October 7, 2015 pre-announcement.

***November 23-24, 2015.***  SunEdison filed 8-Ks on both November 23 and November 24, 2015 describing significant new developments related to the Margin Loan.  On November 23, SunEdison reported that the parties to the loan agreement had on November 17 made further amendments, pursuant to which one of the loan triggers was again reduced and certain prepayment obligations were temporarily waived.  Com. ¶ 372 & Ex. 14.  SunEdison also reported that as of November 17, it had paid off $307 million of the loan and that approximately $100 million remained outstanding.  *Id.*  On November 24, SunEdison announced that it had paid substantially all amounts due under the Margin Loan agreement.  Ex. 15.

---

[7] Plaintiffs do not dispute that SunEdison disclosed the Second Lien Loan in due course in its third-quarter 10-Q. Instead, they fault SunEdison for omitting from the 10-Q the purported fact that the loan was taken out to satisfy the August 7 margin call.  Com. ¶ 356.  Plaintiffs challenge statements in a November 18, 2015 analyst report on the same basis.  *Id.* ¶ 367.  But Plaintiffs cite no facts supporting the claim that the Second Lien Loan was related to the margin call; nor do they plead facts refuting the analyst's statement that SunEdison structured the loan in July 2015 in connection with planned international projects.  Plaintiffs' linkage of the Second Lien Loan with the margin call is based on nothing more than their own speculation.  Even if such speculation were acceptable as a pleading matter, moreover, Plaintiffs would not have stated a claim based on the omission of the purported link.  Plaintiffs do not and cannot plead that any alleged connection between the loan and the margin call was ever the subject of a corrective disclosure.  For the reasons discussed in Defendants' motion to dismiss in the *Church* action, this is fatal.

Plaintiffs do not challenge the factual accuracy of these statements. Instead, they complain that SunEdison "did not disclose the highly material information concerning the desperate and deceitful maneuvers the Executive Defendants undertook to obtain the funds in order to make this payment." Com. ¶ 373. But SunEdison plainly disclosed the facts Plaintiffs allege were concealed—the Company's sale to Global of $231 million in renewable energy assets in India. Ex. 15A. SunEdison had no obligation to go further and characterize the transactions in the pejorative terms Plaintiffs use. *See, e.g.*, *Solow v. Citigroup, Inc.*, 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012) (defendant company "was not obligated to characterize its performance or future outlook in negative terms, speculate on future negative results or paint themselves in the most unflattering light possible"), *aff'd*, 507 F. App'x 81 (2d Cir. 2013).

Plaintiffs also challenge Chatila's characterization of the $231 million transaction as "win-win" for the two companies' shareholders. Com. ¶ 376. Such generalized statements of optimism, as noted, are not actionable. *Supra* at 13–14 (citing authorities). Nor have Plaintiffs pled facts showing scienter. Plaintiffs note that Global has taken the position in subsequent litigation that the $231 million transaction did not benefit Global, and that the India assets were worth less than Global paid. Com. ¶¶ 377–78. But SunEdison was not required to agree with the position of its litigation adversary any more than it was required to characterize its actions in pejorative terms. Moreover, even if Global's litigation position were credited, this would not show fraud. SunEdison and Global were interdependent. At least at one level, any win for SunEdison—such as the ability to pay off a problematic loan—would also be a win for its Yieldcos.[8]

---

[8] Plaintiffs similarly take issue with Chatila's statement that the November 20 transactions would provide accretive dividends per share to Global's shareholders. Com. ¶ 376. But Plaintiffs plead no facts suggesting that the alternative to those transactions would have led to better dividend performance by Global. In Plaintiffs' view, the alternative would have been a default on the Margin Loan and a cross-default on nearly $8 billion of other debt.

*"Mandatorily prepayable."*  Plaintiffs finally fault Defendants for not disclosing in October or November 2015 that the Margin Loan purportedly became "mandatorily prepayable" at some point in October.  Com. ¶¶ 210, 342, 345, 373.  Plaintiffs adopt this term from a declaration filed in the bankruptcy action.  That declaration is 81 pages long and provides a broad-ranging overview of SunEdison's history and business, in addition to factual support for the debtors' petitions.  Ex. 41.  The discussion of the Margin Loan is necessarily compressed, and the term "mandatorily prepayable" appears in a single sentence.  *Id.* at 27–28.

Plaintiffs nevertheless seek to elevate that term over the undisputed facts disclosed contemporaneously with the relevant events.  SunEdison reported on October 7, 2015 that the Margin Loan agreement had been amended so as to lower its trigger points.  Ex. 24 at 4.  In its third-quarter 10-Q, SunEdison confirmed that this amendment was made in September 2015.  Ex. 12 at 28.  Plaintiffs do not dispute the accuracy of these disclosures.[9]  SunEdison also informed investors on November 24 that it had just repaid the loan substantially in full.  Plaintiffs do not dispute the accuracy of this announcement either.

As these disclosures show, the Margin Loan was not paid off in October, when TERP stock traded between approximately $15 and $19.  Ex. 37.  The loan was paid off in November, after the trigger points had been adjusted downward and after TERP's stock price had fallen further to a point below $10.  *Id.*  This undisputed chronology shows that while the loan may briefly have been mandatorily prepayable in early October (following a late-September drop of TERP's stock price to approximately $14), the prepayment obligation was superseded when the

---

Com. ¶ 188.  That could easily have led to a *less* favorable dividend outcome for the Yieldco.

[9] Plaintiffs do claim that Wuebbels "falsely reassured" investors on the October 7, 2015 call that "there would not be a further margin call forthcoming."  Com. ¶ 344.  But Wuebbels said no such thing.  In the statement Plaintiffs quote, Wuebbels stated that the triggers had been amended "to a point that is significantly below the current market price." *Id.*  Wuebbels did not (and could not) promise that TERP's stock price would not fall further in the future.

Margin Loan agreement was amended and the trigger points adjusted downward.  The loan then did not become mandatorily prepayable again until November, when TERP's stock price fell below $10—and when in response to the corresponding prepayment obligation, SunEdison paid off the loan.  Plaintiffs' citation to the term "mandatorily prepayable" in the bankruptcy filing five months later does not show that any statement SunEdison made about the Margin Loan in October or November 2015 was false or misleading.

### C.      Plaintiffs Fail To State A Claim Based On The "Use Of Proceeds" Statement In SunEdison's Prospectus.

Plaintiffs next challenge SunEdison's statement concerning its intended use of funds raised in the Preferred Stock Offering.  As discussed in the Securities Act Brief, Plaintiffs have not come close to pleading falsity with respect to this statement.  The statement accordingly cannot support a Section 10(b) claim either.

### D.      Plaintiffs Fail To State A Claim Based On Debt Classification.

The Securities Act Brief also lays to rest Plaintiffs' attack on the "non-recourse" footnote in summary debt tables in SunEdison's first-quarter and second-quarter 2015 10-Qs.  As that brief shows, SunEdison made clear in narrative descriptions of the two debts at issue that it had unconditionally guaranteed the obligations of its subsidiaries and consequently bore the full risk of default.  In light of those disclosures, the challenged footnotes were not materially misleading.

The unchallenged narrative disclosures also undercut any inference of scienter.  Had Defendants intended to deceive investors about the nature of SunEdison's debt obligations, they would scarcely have provided detailed and accurate descriptions of those obligations in the same financial statements Plaintiffs challenge.  Nor would Defendants have elected to revise the debt table footnotes in the third-quarter 10-Q, as Plaintiffs concede they did.  Com. ¶ 167.  Providing truthful information on the same subject about which a defendant is supposed to have

19

intentionally deceived the market sharply undercuts the required inference of scienter.  *Supra* at

8–10 (citing authorities).[10]

### E.   Plaintiffs Fail To State A Claim Based On Internal Control Certifications.

#### 1.   Plaintiffs Have Not Pled Facts Supporting A Cogent Or Compelling Inference Of Scienter.

The Securities Act Brief outlines the defects in Plaintiffs' challenge to the SOX Section

302 certifications in SunEdison's 2014 10-K and first-quarter 2015 and second-quarter 2015 10-

Qs.  Among other things, the challenged representations are statements of opinion, and Plaintiffs

have not met the requirements of *Omnicare*.  Because Plaintiffs allege no facts at all about the

bases for the challenged certifications, they have not come close to showing that Defendants

lacked a reasonable basis for their statements or failed to conduct a reasonable investigation.

In this area as in others, moreover, Plaintiffs' challenge is even weaker as a scienter-

based Section 10(b) claim than as a Securities Act claim.  As the courts of this Circuit have

recognized, "[a] failure to identify problems with the defendant-company's internal controls and

accounting practices does not constitute reckless conduct sufficient for § 10(b) liability."  *In re*

*Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 298 (S.D.N.Y. 2014) (notations

omitted), *aff'd*, 616 F. App'x 442, 445–46 (2d Cir. 2015).  Indeed, a company's investigation

into and voluntary acknowledgment of internal control issues cuts *against* an inference of

scienter.  *Id.* at 297 (serial disclosures of internal control issues shows not fraud but rather "a

---

[10] The non-recourse classification Plaintiffs challenge appears in two summary slides used in investor presentations as well as in the footnote to the debt table in SunEdison's financial statements. Com. ¶¶ 300, 319.  But Plaintiffs have not pled facts showing that the slides were materially false or misleading any more than they have shown that the footnotes were.  In light of the accurate and unchallenged narrative descriptions in SunEdison's financial statements, the slides did not significantly alter the total mix of information available to investors.  Nor have Plaintiffs pled facts supporting a strong inference of scienter in connection with the slides.  Again, had Defendants wished to deceive the market, they would not have spelled out in narrative descriptions that SunEdison bore the risk of default on the loans.

constant game of 'Catch up'" on the part of the company).[11]  And where, as here, plaintiffs cannot connect internal control weaknesses with financial statement inaccuracies, dismissal is all the more appropriate.  *In re Braskem S.A. Sec Litig.*, 2017 WL 1216592, at *15 (S.D.N.Y. Mar. 30, 2017) (where complaint "d[id] not concretely allege that any of [the company's] financial reports were in any way inaccurate," plaintiffs could not state Section 10(b) claim based on SOX certifications) (collecting authorities).

Other facts too weigh against any inference of scienter.  Plaintiffs contend at length that SunEdison did not effectively merge the financial systems of acquired companies with its own. Com. ¶¶ 70–77.  But to the extent Defendants were aware of this issue, they disclosed it.  As the pace of its acquisitions accelerated, SunEdison provided a detailed explanation of the potential difficulties it faced in assimilating operations, integrating technologies, maintaining controls, and achieving financial and strategic goals in connection with newly acquired companies.  Ex. 2 at 28.  Once again, SunEdison's on-point risk disclosures—and its attention to updating those disclosures to track new corporate developments—is inconsistent with the inference that Defendants intended to deceive investors.

> **2.     Plaintiffs Have Not Stated A Claim With Respect To The Internal Control Certification In SunEdison's Second-Quarter 2014 10-Q, Third-Quarter 2014 10-Q Or Third-Quarter 2015 10-Q.**

As with the 12-month liquidity opinion statements, Plaintiffs reach beyond the three periodic filings at issue in the Securities Act claims in connection with their internal control allegations, targeting parallel statements in SunEdison's 10-Qs for the second and third quarters

---

[11] *See also, e.g.*, *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 187 (4th Cir. 2009) ("Later disclosures that timely raised questions" support the inference that "contemporaneous . . . statements were made in good faith"); *Brockton*, 540 F. Supp. 2d at 474 ("Nor can plaintiffs take pleading comfort from the allegation that defendants' purportedly inaccurate [SOX] certification gives rise to support a strong inference that they were reckless . . . . It may not be prudent as a business matter to have an accounting department that has a hard time keeping up with new information technology, but it is not a violation of the federal securities laws to do so") (citations omitted).

of 2014 and the third quarter of 2015.  But once again, Plaintiffs' claim with respect to these

periods is no stronger than their claims with respect to the periods at issue in their Securities Act

claims.  Plaintiffs' confidential witness allegations are notably defective with respect to Q2 2014

and Q3 2014.  Of the three witnesses on whom Plaintiffs rely on the issue of internal controls,

only one claims to have had any direct contact with Defendants, and that witness is not alleged

even to have begun work at SunEdison until *April 2015*.  Com. ¶ 89.  Simply as a chronological

matter, Plaintiffs' confidential witness allegations fail with respect to any earlier period.

As for Q3 2015, Plaintiffs fall far short of what is required to link the purported concerns

of a confidential witness to scienter on the part of management defendants.  Plaintiffs do not

allege that the two confidential witnesses employed at SunEdison in 2015 *communicated* their

concerns to Defendants, that Defendants *adopted* the witnesses' view, or that Defendants

*believed* that the witnesses' view undermined the Company's public statements, but persisted in

making those statements anyway.  Com. ¶ 89.  This is fatal.[12]

### F.   Plaintiffs Fail To State A Claim Based On Item 303 Of Regulation S-K.

Finally, the Securities Act Brief shows that Plaintiffs have failed to state a claim under

the Securities Act based on alleged noncompliance with Item 303.  Item 303 does not require

pejorative characterizations of objective facts accurately reported in SEC filings.

Plaintiffs once again fare no better with their Section 10(b) claim.  First, there is a serious

question as to whether an alleged violation of Item 303 can serve as the basis of a Section 10(b)

claim at all.  The circuits are split on the issue, and the Supreme Court has granted certiorari in a

---

[12] *E.g.*, *Wyche v. Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *15 (S.D.N.Y. Mar. 10, 2017) (no scienter where plaintiffs do not allege that employees who disputed the truth of the challenged statements had "persuaded the defendants" that the statements were erroneous); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013) (same); *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1350 (N.D. Ga. 2010) (scienter allegations inadequate where plaintiff "failed to plead any facts demonstrating that either Defendant *supported or endorsed* the confidential witnesses' assessments" of the company's problems) (emphasis added).

Second Circuit case to resolve the split. *Leidos, Inc. v. Indiana Pub. Ret. Sys.*, 2016 WL 7011426 (U.S. Nov. 30, 2016) (No. 16-581).

Even if an alleged Item 303 violation remains a viable basis for a Section 10(b) claim after the Supreme Court's decision in *Leidos*, Plaintiffs would not have stated a claim here. As with their liquidity and internal control allegations, Plaintiffs seek to extend the purported class period as far as they can, again sweeping in the second and third quarters of 2014 and the third quarter of 2015. And once again, Plaintiffs' claims are, if possible, even weaker with respect to these periods than with respect to the periods at issue in the Securities Act claims. At the end of Q2 2014 and Q3 2014, SunEdison had nearly 22 months and 19 months respectively of continued operations ahead of it—a period in which the capital markets extended many billions of dollars of debt and equity financing. Plaintiffs plead no fact suggesting that Defendants could at that time discern a "trend" threatening SunEdison's liquidity, much less that Defendants actually knew of the existence of any such trend—a separate requirement rooted in the textual limitation in Item 303 to the disclosure of "known trends." *See, e.g., Nguyen v. MaxPoint Interactive, Inc.*, – F. Supp. 3d –, 2017 WL 570939, at *4-5 (S.D.N.Y. Feb. 13, 2017); *In re Jumei Int'l Holding Ltd. Sec. Litig.*, 2017 WL 95176, at *4 (S.D.N.Y. Jan. 10, 2017).

As to Q3 2015, to the extent such a "trend" existed, SunEdison disclosed it, discussing in detail the negative developments surrounding its liquidity position and the risks it consequently faced. In this final 10-Q, SunEdison reported that changing market conditions had increased the cost of capital for the Yieldcos, thereby compromising their ability to purchase energy projects. Ex. 12 at 85. SunEdison explained that it would accordingly need to find other purchasers for its projects, and that its ability to do so could not be assured. *Id.* SunEdison then discussed other challenges it faced in raising capital: Selling equity had become problematic given its own and

the Yieldcos' declining stock prices, and the availability of debt financing was also uncertain. *Id.* Finally, SunEdison discussed the impact of these interrelated developments:  Debt covenants could be triggered, and its business could suffer.  *Id.*  To the extent the "trend" provisions of Item 303 were triggered in this final 10-Q, SunEdison fully complied with its disclosure duties.

**III.     Plaintiffs Have Not Stated A Claim With Respect To Any Of The Statements Challenged Exclusively Under Section 10(b).**

We now turn to the four categories of statements Plaintiffs challenge solely under Section 10(b).  Plaintiffs fail to state a claim in connection with any of these challenged statements.

**A.     Plaintiffs Fail To Show That Challenged Projections In September And December 2015 Were Actionable, Let Alone Materially False or Misleading Or Made With Scienter.**

Unable to show that SunEdison's historical financial reporting for 2014 or 2015 was false or misleading, Plaintiffs attack two projections relating to performance in 2016.  The first appears in a September 2, 2015 *Bloomberg* article, in which Chatila is quoted as saying "The most important question for investors is when do we start generating cash for a living.  I have said it's at the end of 2016 or early 2017.  But we've been signaling it's going to be a lot sooner than that, probably early 2016 or late 2015."  Com. ¶ 333.  This financial projection is a forward-looking statement protected by the PSLRA actual knowledge safe harbor.  15 U.S.C. § 78u-5(c)(1)(B).  Plaintiffs do not plead facts showing that Chatila actually knew that SunEdison would not generate positive cash flow by early 2016.

Plaintiffs' attack is also defective at a more fundamental level.  Plaintiffs seek to show that the challenged projection was false by pointing to a slide from SunEdison's August 27, 2015 Board of Directors presentation, in which Chatila projected a cash burn rate of $425 million in Q4 2015 and $32 million in Q1 2016.  Com. ¶ 129.  But the projection shown on that slide is not inconsistent with the projection in the *Bloomberg* article.  In the board presentation, Chatila

projected that SunEdison's cash burn rate would be reduced by more than a 90% between Q4 2015 and Q1 2016.  This is consistent with a prediction of positive cash flow by early 2016.

The second projection Plaintiffs challenge appears in a slide deck posted on SunEdison's website on December 24, 2015.  In the slide at issue, SunEdison projected 2016 revenue of $443 million and profits of $235 million for its Services Business (which provides maintenance for power plants).  Com. ¶ 379.  The projections are supported by a quarter-by-quarter breakdown of revenue and costs from various sectors of the Services Business.  *Id.*  In support of their claim that the revenue and profit forecasts were false, Plaintiffs cite to a *WSJ* article, which in turn refers to a budget prepared in mid-November showing far lower estimates for the Services Business—$133 million in revenue and $21 million in profits.  *Id.* ¶ 380.  The author of the budget is not identified, nor is anything else about it—what it was based on, whether it was final, whether Defendants are supposed to have approved or even seen it.

In the absence of any such facts, Plaintiffs have not adequately pled either falsity or scienter.  The challenged projection, like that in the September 2, 2015 *Bloomberg* article, comes within the PSLRA's actual knowledge safe harbor.  It also comes within the cautionary statement safe harbor, as SunEdison warned investors that the slide deck in which the projection appeared contained forward-looking statements, and referred investors to the risk factors in its SEC filings.  Ex. 39 at 2.  Both safe harbors apply here.  Plaintiffs have not pled facts showing actual knowledge; again, they do not even allege that Defendants *saw* the budget referred to in the *WSJ* article.  Meanwhile, SunEdison accurately described the risks that came to pass:  With diminishing access to capital, its liquidity position eventually became unsustainable.

### B.    Plaintiffs Fail To Show That Challenged Statements About The LAP deal Were Materially False Or Misleading Or Made With Scienter.

Plaintiffs next challenge statements SunEdison made about the unraveling of its planned

acquisition of Latin American Power (LAP), a company that owned wind and hydropower projects in Chile and Peru.  Com. ¶ 346.  In an October 6, 2015 *WSJ* story, a SunEdison spokesman was reported to have said that LAP had failed to satisfy a condition precedent for the deal.  Ex. 28.  A LAP spokesman was reported to have disputed this, claiming instead that SunEdison had breached contractual obligations.  *Id.*  The *WSJ* concluded that "[w]hatever the precise cause of the deal's collapse, it adds to a litany of difficulties for SunEdison."  *Id.*  During SunEdison's October 7, 2015 investor call, an analyst asked Chatila to comment on the *WSJ* story and Chatila repeated SunEdison's position that LAP had failed to satisfy a condition precedent.  Com. ¶ 346.

Plaintiffs do not plead facts showing that this statement was false—that LAP did *not* fail to satisfy a condition precedent.  Instead, Plaintiffs accuse SunEdison of hiding the "true circumstances" and the "reason" for the collapse of the deal.  Com. ¶ 347.  But the purported omission of "reasons" does not equate to a materially misleading statement.  *See, e.g.*, *In re ITT Educ. Servs., Inc. Sec. & S'holder Deriv. Litig.*, 859 F. Supp. 2d 572, 578–79 (S.D.N.Y. 2012).  Nor did Chatila's reiteration of SunEdison's position on October 7 alter the total mix of information available to investors.  The market already knew based on the October 6 *WSJ* story that the parties to the LAP deal had taken conflicting positions on its collapse.

SunEdison provided additional details about the unwinding of the LAP deal in its third-quarter 10-Q, filed November 9, 2015.  There, the Company explained that LAP's sellers had purported to terminate the deal, that SunEdison had then exercised its right to terminate based on the failure of the sellers to satisfy conditions precedent, and that on November 6, 2015, the sellers had made an arbitration demand.  Com. ¶ 358.  Plaintiffs again plead no facts showing that any of these statements was false, instead once again faulting SunEdison for failing to

disclose its "reasons."  This does not constitute a fraud claim.

### C.  Plaintiffs Fail To State A Claim Based On SunEdison's Statements Of Cash Position At The End of Q3 2015.

#### 1.  Plaintiffs Do Not Dispute That Cash At The DevCo Was $1.4 Billion At The End Of Q3 2015.

 Plaintiffs next challenge a single figure—$1.4 billion—that appears in multiple reports reflecting SunEdison's cash position at the end of Q3 2015.  The figure appears on slides used during SunEdison's October 7 pre-announcement call and November 10 earnings call as well as in the MD&A section of SunEdison's third-quarter 10-Q and the December 2015 Business Update.  Com. ¶¶ 338, 350, 352, 381.  The $1.4 billion figure represents cash at the "DevCo" – that is, SunEdison minus the two Yieldcos—as of September 30, 2015.  Plaintiffs contend that the figure was misleading because subsumed within the $1.4 billion was "a $500 million credit facility that SunEdison could not access."  *Id.* ¶ 339.

Significantly, Plaintiffs do not dispute that the DevCo in fact *did* have $1.4 billion in cash as of September 30, 2015.  Instead, Plaintiffs draw on complaints filed by two former Yieldco officers (the YieldCo Plaintiffs), who have alleged that only a portion of the $1.4 billion DevCo cash figure was "unrestricted"—a term the Yieldco Plaintiffs define as "immediately available to satisfy any business need."  *E.g., Zornoza v. TerraForm Global, Inc*., Complaint ¶ 56. According to the Yieldco Plaintiffs, the DevCo had only $497 million in "unrestricted" cash at the end of Q3 2015, and less than $100 million by the time of the November 10, 2015 call. Plaintiffs in this case, following suit, claim that the DevCo had only $497 million in "accessible" or "available" cash at the end of Q3 and even less than that as Q4 progressed.  Com. ¶¶ 339, 353.

Notwithstanding the centrality of this issue to their theory of fraud, Plaintiffs' allegations about "available" and "unrestricted" cash are simply irrelevant.  SunEdison did not use the terms "unrestricted" or "available" in its financial statements.  Nor did it suggest, either in its SEC

filings, Business Update, or during the October 7 or November 10, 2015 investor calls, that cash reported on its balance sheet was "immediately available to satisfy any business need." In fact, SunEdison said the opposite. In the financial statements themselves, SunEdison separately broke out cash that was committed for particular construction projects and that therefore could *not* be used to "satisfy any business need." For Q2 2015, for example, SunEdison disclosed that the $2 billion of cash in the combined companies—the DevCo and the Yieldcos—included $704 million committed to particular construction projects. Ex. 10 at 6. For Q3 2015, SunEdison reported cash of $3.1 billion, but specified that $697 million of that was committed for construction. Ex. 12 at 4. Plaintiffs do not dispute the accuracy of any of these figures. Nor do they—or could they—dispute that SunEdison reminded investors in multiple ways that a portion of its reported cash was committed for construction and thus unavailable for general corporate purposes. Com. ¶ 310 (in "cash walk" slide for Q2 2015, SunEdison states that amounts shown include amounts committed for construction); Ex. 12 at 69 (in MD&A in third-quarter 10-Q, SunEdison reiterates that a portion of total cash is project-specific and thus "cannot be used by other project companies or for general corporate purposes").[13]

Plaintiffs' claim arises from the fact that in its third-quarter earnings calls and in its December 2015 Business Update, SunEdison also subdivided cash in a second way—$1.4 billion cash at the DevCo, as opposed to $3.1 billion cash at the combined companies. But just as SunEdison made clear that the $3.1 billion *combined-company* cash figure included portions committed for construction and thus not available for general purposes, so too SunEdison told investors that the $1.4 billion *DevCo* cash figure included cash committed for construction.

---

[13] SunEdison also broke out a separate category of "restricted" cash in its financial statements, which was defined as cash in escrow accounts. Ex. 10 at 6; Ex. 12 at 4; Ex. 2 at 40. With respect to this category too, neither the Yieldco Plaintiffs nor Plaintiffs in this action dispute that SunEdison's financial statements were accurate—$291 million of restricted cash in Q2 and $367 million of restricted cash in Q3.

Indeed, SunEdison made that point in the very "cash walk" slides that Plaintiffs cite as the

sources of the alleged misstatements.  In each slide, SunEdison noted that the cash amounts it

was reporting included "cash committed for construction."  Com. ¶¶ 338, 352, 381.[14]

What SunEdison did not do on the November 2015 earnings call or December 2015

Business Update was to break out a separate figure, *at the DevCo level*, for cash committed for

construction.  That is, while SunEdison told investors that approximately $700 million of the

combined companies' $3.1 billion cash at the end of Q3 was committed for construction,

SunEdison did not quantify the portion of the DevCo's $1.4 billion cash that was committed for

construction.  But critically, Plaintiffs do not and cannot claim that SunEdison had a duty to do

so.  Plaintiffs' challenge to SunEdison's reported cash figure consequently amounts to little more

than semantic sleight of hand.  Plaintiffs are correct that SunEdison did not have $1.4 billion of

"unrestricted" or "available" cash at the end of the third quarter of 2015.  But SunEdison never

indicated anything to the contrary.

Returning to the financial statements—which, again should be the starting point for any

analysis of SunEdison's representations about liquidity—there is no allegation that SunEdison's

entries for cash and cash equivalents, for cash committed for construction, or for restricted cash

were anything other than accurate.  Nor is there any contention that in the third-quarter 2015

MD&A or earnings calls, in which SunEdison separately broke out cash at the DevCo, the

reported figures were inaccurate.  Plaintiffs' claim boils down to the contention that they would

have liked SunEdison to have included a further breakdown—between committed cash and other

_____

[14] SunEdison also presented a DevCo-only cash figure during its Q2 investor presentation.  There, Wuebbels displayed a slide showing that of the nearly $2 billion of cash reported on a consolidated basis at the end of Q2 2015, approximately $1 billion represented cash at the DevCo.  Com. ¶ 310.  Wuebbels also commented that this amount constituted "sufficient liquidity to support the future growth of the platform."  *Id.* ¶ 309.  But in the Q2 call, as in the Q3 call, Wuebbels did not say that the cash reported at the DevCo was "unrestricted" (to use the Yieldco Plaintiffs' term) or generally "available" (to use the *Horowitz* plaintiffs' term).  On the contrary:  The challenged slide makes clear that the DevCo figure included cash committed for construction.  *Id.* ¶ 310.

cash at the DevCo level.  But the fact that Plaintiffs might have preferred that particular

presentation of information does not mean Defendants had an obligation to provide it.  *Sanofi*,

816 F.3d at 212.  Plaintiffs have not pled fraud—or even falsity—in connection with

SunEdison's cash reporting.[15]

### 2.   Plaintiffs' Warehouse Allegations Do Not Change The Analysis.

Plaintiffs' challenge to the $1.4 billion DevCo cash figure is intertwined with allegations

about what Plaintiffs call an "inaccessible" warehouse loan.  As SunEdison disclosed, a wholly-

owned subsidiary acquired equity in a warehouse financing vehicle called Warehouse 1.0 in May

2015.  Ex. 10 at 24.  Warehouse 1.0 was jointly owned by SunEdison's subsidiary and a

subsidiary of First Reserve Corporation, which had committed to contribute $500 million to

purchase equity in the vehicle.  *Id.*

Concurrently, SunEdison's subsidiary entered into the five-year Term Loan agreement

with Warehouse 1.0.  The loan was funded in the amount of $466 million at the time, with a

potential increase to $500 million.  *Id.*  As Plaintiffs allege, quoting SunEdison's public

statements, a warehouse credit facility provides funding according to a set of pre-negotiated

factors.  Com. ¶ 106.  When the borrower submits projects that satisfy those parameters, cash

becomes available; there is no need to re-negotiate terms for each qualifying project.  *Id.*

Again following the lead of the Yieldco Plaintiffs, Plaintiffs contend that the cash held in

Warehouse 1.0 (which they appear to have rounded up to $500 million) should not have been

included in the $1.4 billion cash figure for the DevCo.  Com. ¶ 339.  But this claim fails for the

---

[15] Following the lead of the Yieldco Plaintiffs, Plaintiffs also allege that between September 30, 2015 (the last day of the third quarter) and the November 10, 2015 (the day of the third-quarter earnings call), the DevCo's "unrestricted" cash position continued to deteriorate.  Com. ¶ 353.  This too is a non sequitur.  Because Plaintiffs can identify no duty to report "unrestricted" cash at the DevCo level—or even at the SunEdison level—they also cannot, *a fortiori*, support a claim that Defendants had a duty to update "unrestricted" cash figures to account for intra-quarter developments.

same reason as Plaintiffs' attack on SunEdison's discussion of its cash position fails: SunEdison never suggested that Warehouse 1.0 or the Term Loan could be used to satisfy general corporate obligations. We also note that even if Plaintiffs' $500 million Term Loan figure were to be subtracted from the $1.4 billion cash figure, this would result in cash of $900 million—not the $497 million Plaintiffs allege. Plaintiffs provide no other support for the $497 million figure, which they have lifted wholesale from the Yieldco Plaintiffs' complaint.

There are additional defects in Plaintiffs' warehouse allegations. Plaintiffs claim that cash associated with Warehouse 1.0 was "inaccessible," but the undisputed facts show that it was not inaccessible at all. SunEdison reported that it had begun to use the funds in Warehouse 1.0 to finance the construction of Comanche, a 120 MW solar energy project in Colorado, in the third quarter of 2015. Ex. 12 at 30. Plaintiffs do not dispute the accuracy of this representation. The fact that SunEdison was able to submit a qualifying project within months after entering into the five-year loan agreement shows that the warehouse facility was anything *but* "inaccessible."

Plaintiffs nevertheless appear to suggest that SunEdison should simply have excluded cash associated with Warehouse 1.0 and the Term Loan from the presentation of its cash position. But Plaintiffs nowhere contend that SunEdison violated GAAP by including that cash. Indeed, Plaintiffs do not suggest that SunEdison had any choice under GAAP *but* to include it. SunEdison presented its financial statements on a consolidated basis. Ex. 2 at 40. Its balance sheet therefore reflected the assets of its subsidiaries, including the subsidiary that entered into the Term Loan. Indeed, although Plaintiffs do not mention it, SunEdison also reported the $466 million Term Loan in the schedule of *debts* in its financial statements. Ex. 10 at 18. In this way as in others, Plaintiffs' claim that SunEdison misrepresented its liquidity is fatally undercut by the fact that the Company set out its cash position in virtually unchallenged financial statements.

### D.      Plaintiffs Fail To State A Claim Based On SunEdison's 8-K Filings Concerning Board And Management Changes At The Yieldcos.

Plaintiffs seek to profit from the conflict between the Yieldco Plaintiffs and SunEdison management in another way as well.  On November 20, 2015, that dissension sparked a series of management and board changes at SunEdison and the Yieldcos.  One of the two Yieldco Plaintiffs, Carlos Domenech Zornoza, was replaced as CEO of the Yieldcos by Wuebbels, who was at that time serving as SunEdison's CFO but had no management role at the Yieldcos.  At the same time, two members of the Yieldcos' Conflicts Committees were relieved of their committee memberships, after which they resigned from the Yieldco boards entirely, stating that they did not believe they could protect the Yieldco stockholders' interests going forward. Plaintiffs describe these developments in highly melodramatic language.  Com. ¶¶ 192–200.

Like the Yieldco Plaintiffs' contentions about "unrestricted" cash, however, the events of November 20 are largely irrelevant to the securities litigation.  What is again missing is any link between those events and a false or misleading statement.  The only challenged statements touching on the November 20 personnel changes appear in a November 23, 2015 Form 8-K attaching a press release.  Plaintiffs have not shown that those statements are false or misleading.

In the press release, SunEdison announced that Wuebbels was replacing Domenech as CEO of the Yieldcos, that Peter Blackmore was resigning from the SunEdison board to chair the boards of the Yieldcos, and that SunEdison's board chair, Emmanuel Hernandez, was assuming a new role as Executive Chairman.  Ex. 14A.  SunEdison did not discuss the reconstitution of the conflicts committees at the Yieldcos, nor the resignation of members of the Yieldco boards. Those events were discussed in the Yieldcos' own press releases and 8-Ks.

Plaintiffs do not contend that SunEdison's recital of the November 20 board and management changes was inaccurate.  Instead, Plaintiffs take issue with the description of these

changes as part of a "plan to improve the alignment and effectiveness of [SunEdison's] operating structure." *Id.*; Com. ¶ 374.  But aspirational and generalized statements of this sort are not actionable.  *Rombach*, 355 F.3d at 175; *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (statements about company's general business plan and optimism about success are inactionable).

Even if SunEdison's description of its plan could serve as the basis of a claim, moreover, that claim would be defective.  Plaintiffs plead no facts suggesting that SunEdison did *not* in fact have a plan to improve its (and the Yieldcos') operating structure, or that the November 20 board and management changes were *not* part of that plan.  Instead, Plaintiffs contend that the challenged statement was misleading because SunEdison did not disclose the "true reason" for the changes—which, according to Plaintiffs, was SunEdison's need to secure cash to repay the Margin Loan and Global's unwillingness to help.  Com. ¶ 375.  But again, there is no duty on the part of a company to set forth all of the reasons for its actions.  Any such obligation would plainly be unworkable:  Plaintiffs could always claim that a company's statement of reasons was incomplete, or that the company did not go back far enough in identifying the root causes of its actions.  Beyond this, the "true" reason Plaintiffs advance is not even inconsistent with the explanation SunEdison provided.  If, as Plaintiffs contend, SunEdison made the board and management changes in order to secure Global's assistance in the Margin Loan repayment, this fits well within the rubric of "improving the alignment" of SunEdison and the Yieldcos.

## IV.    Plaintiffs' Standalone Scienter Allegations Do Not Create A Cogent Or Compelling Inference Of Conscious Wrongdoing, Nor Otherwise Redeem Plaintiffs' Claims.

Section 10(b) plaintiffs may satisfy *Tellabs*' requirement that they create a cogent and compelling inference of scienter by alleging facts that (1) reveal a motive and opportunity to commit fraud, or (2) constitute strong circumstantial evidence of conscious misbehavior or

recklessness.  *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  Plaintiffs have satisfied neither prong here.

### A.      Plaintiffs Make No Attempt To Plead Motive And Opportunity.

Plaintiffs make no attempt to show scienter by reference to Defendants' motivations.  Nor could they.  The relevant facts about motive cut sharply against any inference of scienter.  Both Defendants *purchased* SunEdison stock during the purported class period.  Wuebbels did so on August 21, 2015, and Chatila on March 10, 2015, August 28, 2015, and September 14, 2015.  Exs. 18–19.[16]  According to Plaintiffs, the alleged fraud was at its height during this period, with allegedly false or misleading statements about liquidity, the Margin Loan, the Second Lien Loan, and internal controls all extant and uncorrected, and all purportedly contributing to the artificial inflation of SunEdison's stock price.  Rather than seeking to diminish their stock holdings before the allegedly concealed truth came out, however, Defendants bought more.

These actions plainly negate any inference that Defendants had a motive to artificially inflate SunEdison's stock price.  *See, e.g.*, *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 246 (1st Cir. 2015) ("[Defendant] *increased* his holdings . . . during the Class Period, which negates any inference that he had a motive to artificially inflate [the company's] stock during that period") (emphasis in original).  Indeed, not only do Defendants' stock purchases show that they had no incentive to commit fraud, those transactions cut against any inference of scienter generally.  "[T]he purchase of additional company shares during the class period [] is inconsistent with an intent to commit fraud."  *In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288, at *22 (S.D.N.Y. Feb. 1, 2005); *see also In re MELA Scis., Inc. Sec.*

---

[16] Defendants' stock purchases were publicly reported on Forms 4 filed with the SEC.  "[C]ourts in this District routinely take judicial notice of Form 4 filings at the motion to dismiss stage, and consider them for the truth of their contents."  *Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at *22 (S.D.N.Y. May 29, 2013).

*Litig.*, 2012 WL 4466604, at *5 (S.D.N.Y. Sept. 19, 2012) (class-period stock purchases "inconsistent with an intent to commit fraud").  Plaintiffs' core theory—that Defendants deliberately concealed information showing a purported liquidity crisis in order to inflate SunEdison's stock price—is undermined by the Defendants' stock purchases.[17]

**B.     The Facts Plaintiffs Allege Do Not Constitute Strong Circumstantial Evidence Of Scienter.**

**1.     Plaintiffs Misapprehend The Nature Of The Scienter Showing They Are Required To Make.**

Plaintiffs' effort to provide strong circumstantial evidence of scienter is compromised, most fundamentally, by Plaintiffs' misapprehension of the substantive scienter standard, a problem that cuts across multiple scienter allegations.  Plaintiffs assert, for example, that the circumstances surrounding the Second Lien Loan demonstrate scienter insofar as Defendants "would have had to sign off on the loan," and were therefore familiar with its terms.  Com. ¶ 390.  But Plaintiffs are confusing knowledge of objective facts with scienter, which is something very different—an "intention to deceive, manipulate, or defraud."  *BofA*, 757 F. Supp. 2d at 286 (quoting *Tellabs*, 551 U.S. at 313); *see also, e.g.*, *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (in recklessness cases, scienter must "approximate an actual intent to aid in the fraud being perpetrated") (citations omitted); *In re Bank of Am. Corp. Sec., Deriv., and ERISA Litig.*, 2011 WL 3211472, at *4 (S.D.N.Y. July 29, 2011) (conscious recklessness is a "state of mind *approximating actual intent*, and *not merely a heightened form of negligence*) (emphasis in original, citations omitted).  The fact that Defendants may have known of the terms

---

[17] In light of Plaintiffs' apparent concession that Defendants had no financial motive to commit fraud—motive is not mentioned at all in the standalone portion of the complaint addressing scienter, Com. ¶¶ 383–94—Plaintiffs' allegations about executive compensation in the body of the complaint are baffling.  Plaintiffs claim there that SunEdison's compensation program employed the concept of "Foregone Margins," a metric linked to the strategic decision to hold projects on SunEdison's balance sheet rather than immediately selling them.  *Id.* ¶ 47.  According to Plaintiffs, this arrangement purportedly allowed executives to benefit from projected rather than actual earnings.  *Id.* ¶ 48.  But Plaintiffs never link the allegations regarding this compensation program to any of the challenged statements, nor explain how the incentives created by the program are supposed to relate to the conduct alleged.

35

of the Second Lien Loan scarcely shows that they intended to deceive investors by choosing not to include a detailed discussion of those terms in pre-announcing third-quarter results.

The same confusion between *knowledge of particular facts* and the required *intention to deceive investors* infects Plaintiffs' scienter allegations in connection with the Margin Loan. While Plaintiffs claim that Defendants were aware of the loan and of the difficulty SunEdison faced in meeting its prepayment terms, Com. ¶ 387, such knowledge does not equate to an intent to deceive. As outlined above, SunEdison duly updated the market about developments related to the loan—initially through periodic reports or pre-reports (October 7 and November 9), and then, when the Margin Loan and its repayment assumed greater significance for SunEdison's financial position, through current reporting on Forms 8-K (November 23-24). *Supra* at 15–16. This pattern of appropriate disclosure does not support an inference of scienter. It undermines it.

> **2.     The Yieldco Plaintiffs' Allegations Do Not Support A Cogent Or Compelling Inference Of Scienter.**

Plaintiffs next rely on the Yieldco Plaintiffs' allegations in seeking to create a strong inference of scienter. Com. ¶¶ 384–85. But the existence of dissension within a company— particularly a company confronting difficulties—does not show scienter. *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 187 (2d Cir. 2014) ("uncertainty and disagreement" within a company about valuation and risk relating to financial assets does not establish fraud); *Bulmahn,* 147 F. Supp. 3d at 529 ("That some of [the company's] employees disagreed, perhaps even reasonably so, with defendants regarding [the company's] ability to continue operating . . . does not give rise to an inference that defendants knew, or were reckless in not knowing, that [the company] would eventually fail").

The substance of the Yieldco Plaintiffs' allegations is no more probative of scienter than the fact that they disagreed with SunEdison management. As discussed, the Yieldco Plaintiffs'

claims, which have been adopted by Plaintiffs in this case, are based on the demonstrably false premise that SunEdison claimed that the DevCo had "access" or "unrestricted" access to $1.4 billion at the end of Q3 2015.  In reality, SunEdison said no such thing.[18]

Plaintiffs also seek to amplify the allegations made in the Yieldco Plaintiffs' complaint by citing a *WSJ* article reporting that unnamed "senior executives" levelled the same charges against SunEdison management as those appearing in the Yieldco Plaintiffs' complaints—that is, that SunEdison had less than $1.4 billion in "available" cash at the end of Q3 2015, that "few" of SunEdison's projects were "good fits" for the warehouse facility, and Chatila's alleged September 2, 2015 forecast was inconsistent with other forecasts.  Com. ¶¶ 172, 386; Ex. 34. This adds nothing to the scienter analysis.  It shows only that the Yieldco Plaintiffs were willing to make the same charges anonymously to a reporter that they later made in their complaints.

Finally, Plaintiffs claim that Defendants' "scienter is supported by the fact that they fired" one (though interestingly, not both) of the two Yieldco Plaintiffs.  Com. ¶ 389.  Plaintiffs plead no facts showing that this action was taken by Defendants rather than at the board level. Nor would this employment action support a strong inference of scienter in any event.  Plaintiffs' own allegations show open combat among the SunEdison and the Yieldco executives, and the *WSJ* article on which Plaintiffs rely reveals that the Yieldco Plaintiffs were seeking Chatila's ouster.  Ex. 34.  For one of the warring factions to be pushed out under such circumstances does not show an intent to deceive investors.  It shows a company taking necessary employment action to ensure that it is not torn apart from the inside.  Meanwhile, other facts regarding SunEdison's response to the Yieldco Plaintiffs' actions weigh heavily against any inference of scienter.  SunEdison's Audit Committee launched an investigation into the subject matter of the

---

[18] Plaintiffs repeatedly refer to "internal reports" that they contend support the Yieldco Plaintiffs' claim that the DevCo had only $497 million, rather than $1.4 billion, in cash at the end of Q3 2015.  Com. ¶¶ 130, 259.  Notably, the Yieldco Plaintiffs themselves do not refer to any such reports in their complaints.

Yieldco Plaintiffs' allegations, and while the Committee found no inaccuracies in SunEdison's financial statements, it did identify certain internal control issues—which it then disclosed. Com. ¶¶ 93, 228–30; Ex. 16.  This is exactly the kind of "prudent course of action that weakens rather than strengthens an inference of scienter."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (citations omitted).

> ### 3. Plaintiffs' Confidential Witness Allegations Do Not Support A Cogent Or Compelling Inference Of Scienter.

In addition to the Yieldco Plaintiffs, whom they identify by name, Plaintiffs rely heavily on unnamed former employees in seeking to create an inference of scienter.  Plaintiffs marshal the views of these confidential witnesses in support of two allegations:  (1) that SunEdison's internal controls were deficient and Defendants knew it, and (2) that SunEdison had a history of paying vendors late, that Defendants knew it, and that this was evidence of liquidity constraint. Com. ¶¶ 393–94.  The first point is addressed above.  To the extent Plaintiffs' confidential witnesses purport to have had any interaction with Defendants on the subject of internal controls, their allegations do not come close to showing that Defendants believed SunEdison's public statements were materially false or misleading.  *Supra* at 22.

Much the same is true of the confidential witness allegations related to late payments. Plaintiffs cite witnesses for the proposition that Chatila characterized SunEdison's vendor-payment system as "broken" and told employees that paying vendors late was a consequence of rapid growth.  *Id.* ¶¶ 65-66.  But this does not show that Chatila believed his public statements about liquidity were false or misleading.  Plaintiffs attribute to another witness the information that Wuebbels participated in or was briefed on regular calls in which vendor payments were discussed, and that he signed off on such payments.  *Id.*  This too comes nowhere close to showing that Defendants made knowingly false statements about liquidity.

Plaintiffs' scienter allegations on the subject of late payments are also undermined, once again, by SunEdison's record of risk disclosures.  SunEdison cautioned investors that it had historically relied on financing from its vendors in the form of account payables, and that it had at times "increased the number of days' payables outstanding."  Ex. 2 at 18.  SunEdison warned investors that vendors and suppliers could decide that they no longer wanted to allow the Company to accumulate payable balances in this way, and that if this happened, the Company would either need to find alternative financing or risk losing the ability to fund operations.  *Id.* On-point disclosures such as these weigh against any inference of scienter.  *Supra* at 9–10.

### 4.    Plaintiffs' Remaining Scienter Allegations Also Fall Short.

Plaintiffs' remaining scienter allegations are no stronger.  Plaintiffs claim that Defendants' "scienter is supported by the fact that they consistently spoke to investors" on the subjects of SunEdison's liquidity, debts and financial position generally, and that these subjects were of "critical importance."  Com. ¶¶ 391–92.  This is difficult to credit.  The officers of any publicly traded company are required to address the company's financial position "consistently" —at least on a quarterly basis.  And in a capital-intensive business like the development of energy projects, financing and liquidity are bound to be "critically" important.  It cannot be the case that the very circumstances of SunEdison's existence are probative of scienter.

Finally, Plaintiffs claim that scienter can be inferred from Defendants' handling of issues surrounding the classification of the Margin Loan and Exchangeable Notes.  Com. ¶ 388.  But as discussed above, the facts pled weigh heavily *against* scienter.  SunEdison disclosed the fact that it had guaranteed the loans in the very Q1 2015 and Q2 2015 financial statements in which Defendants are supposed to have intentionally deceived investors.  And in its third-quarter 10-Q, SunEdison voluntarily revised the challenged footnote, now classifying the loans as recourse.

Plaintiffs find fault, claiming that Defendants provided "shifting" explanations for this

revision and that this purported "shift" is probative of scienter.  Com. ¶ 388.  In support,

Plaintiffs cite a November 18 report in which an analyst states that the Margin Loan was

reclassified after SunEdison posted cash collateral following third-quarter margin calls, and that

the Exchangeable Notes were reclassified because the original classification had been made in

error.  *Id.*; Ex. 26.  Plaintiffs state in conclusory terms that this explanation "makes little sense"

and "cannot possibly be credited" given the amounts at issue.  Com. ¶ 388.  But Plaintiffs cite no

facts suggesting that the explanation was untrue, much less facts that would support an inference

that Defendants sought to deceive investors.  As to "shifting," Plaintiffs say that the explanation

relayed by the analyst was later contradicted when Defendants "implied"—at an unspecified

time, and in an unspecified way—that the reclassification was triggered by an amendment to the

Margin Loan agreement.  *Id.*  This vague reference to an "implication" does not show even a

shift in explanation, much less an intent to deceive.

## CONCLUSION

Plaintiffs have provided a great deal of detail about SunEdison's business in the 20

months preceding its bankruptcy filings.  Some of the facts Plaintiffs allege are accurate; many

are demonstrably untrue.  But none of what Plaintiffs allege shows that the challenged statements

—high-level opinions, predictions and characterizations of liquidity, descriptions of various

lending arrangements and their risks, summaries of board and management changes—were

materially false or misleading, much less made with an intent to deceive or a state of mind

approximating such an intent.  Defendants accordingly request that the Court dismiss Plaintiffs'

Section 10(b) claim in its entirety and dismiss Plaintiffs' Section 20(a) claim for want of an

underlying Section 10(b) violation.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108

(2d Cir. 2007).  Given Plaintiffs' opportunity and failure to cure the defects in their complaint

through the pre-motion letter practice, Defendants request that dismissal be with prejudice.

DATED:  June 9, 2017                            Respectfully submitted,


By:      /s/ Sara B. Brody

          Sara B. Brody
          Jaime A. Bartlett
          Sarah A. Hemmendinger
          SIDLEY AUSTIN LLP
          555 California Street, Suite 2000
          San Francisco, California 94104
          Telephone:   (415) 772-1200
          Facsimile:    (415) 772-7400
          sbrody@sidley.com
          jbartlett@sidley.com
          shemmendinger@sidley.com

          Dorothy J. Spenner
          SIDLEY AUSTIN LLP
          787 Seventh Avenue
          New York, New York 10019
          Telephone: (212) 839-5300
          Facsimile: (212) 839-5599
          Email: dspenner@sidley.com

          Norman J. Blears
          SIDLEY AUSTIN LLP
          1001 Page Mill Road, Building 1
          Palo Alto, California 94304
          Telephone:   (650) 565-7000
          Facsimile:    (650) 565-7100
          nblears@sidley.com


          Robin Wechkin
          SIDLEY AUSTIN LLP
          701 Fifth Avenue, Suite 4200
          Seattle, Washington 98104
          Telephone:   (206) 262-7680
          rwechkin@sidley.com

          *Attorneys for the Exchange Act
          Defendants*

**SUMMARY OF STATEMENTS CHALLENGED UNDER THE EXCHANGE ACT**

(Statements in highlighted paragraphs are also challenged under the Securities Act)

| NO. | ALLEGED STATEMENT |
|---|---|
| 1 | **Statements concerning SunEdison's liquidity:**<br>• ¶ 261 (Q2 2014 10-Q)<br>• ¶ 262 (oral statement on August 7, 2014)<br>• ¶ 276 (Q3 2014 10-Q)<br>• ¶ 277 (oral statement on November 6, 2014)<br>• ¶ 286 (2014 10-K)<br>• ¶ 295 (Q1 2015 10-Q)<br>• ¶ 307 (Q2 2015 10-Q)<br>• ¶¶ 308-09 (oral statement on August 6, 2015)<br>• ¶ 310 (August 6, 2015 investor presentation)<br>• ¶ 316 (oral statement on August 6, 2015)<br>• ¶¶ 340-41 (oral statements on October 7, 2015)<br>• ¶ 349 (Q3 2015 10-Q) |
| 2 | **Statements concerning the Margin Loan and the Second Lien Loan:**<br>• ¶ 314 (Q2 2015 10-Q)<br>• ¶¶ 328, 332 (Preferred Offering Docs)<br>• ¶ 344 (oral statement on October 7, 2015)<br>• ¶ 356 (Q3 2015 10-Q)<br>• ¶ 367 (oral statement on November 18, 2015)<br>• ¶ 372 (November 23, 2015 and November 24, 2015 8-Ks)<br>• ¶ 376 (November 24, 2015 press release) |
| 3 | **"Use of Proceeds" statement in Preferred Offering Docs:**<br>• ¶ 330 |
| 4 | **Classification of Margin Loan and Exchangeable Notes as non-recourse debt:**<br>• ¶ 299 (Q1 2015 10-Q)<br>• ¶ 300 (May 7, 2015 investor presentation)<br>• ¶ 318 (Q2 2015 10-Q)<br>• ¶ 319 (August 6, 2015 investor presentation)<br>• ¶ 369 (oral statement on November 18, 2015) |
| 5 | **Statements concerning SunEdison's internal controls certifications:**<br>• ¶¶ 265-67 (Q2 2014 10-Q)<br>• ¶¶ 281-82 (Q3 2014 10-Q)<br>• ¶¶ 289-90 (2014 10-K)<br>• ¶¶ 302-03 (Q1 2015 10-Q)<br>• ¶¶ 321-22 (Q2 2015 10-Q)<br>• ¶¶ 360-61 (Q3 2015 10-Q) |

| NO. | ALLEGED STATEMENT |
|-----|-------------------|
| 6 | **Item 303 Omissions of known trends re liquidity:**<br>• ¶¶ 270-74 (Q2 2014 10-Q)<br>• ¶ 284 (Q3 2014 10-Q)<br>• ¶ 292 (2014 10-K)<br>• ¶ 305 (Q1 2015 10-Q)<br>• ¶ 324 (Q2 2015 10-Q)<br>• ¶ 363 (Q3 2015 10-Q) |
| 7 | **Statements concerning financial projections:**<br>• ¶ 333 (oral statement on September 2, 2015)<br>• ¶ 379 (December 2015 Business Update) |
| 8 | **Statements concerning the termination of the LAP deal:**<br>• ¶ 346 (oral statement on October 7, 2015)<br>• ¶ 358 (Q3 2015 10-Q) |
| 9 | **Statements concerning SunEdison's cash position at the end of Q3 2015:**<br>• ¶ 337 (oral statement on October 7, 2015)<br>• ¶ 338 (October 7, 2015 Business Update)<br>• ¶¶ 349-50 (Q3 2015 10-Q)<br>• ¶ 351 (oral statement on November 10, 2015)<br>• ¶ 352 (November 10, 2015 investor presentation)<br>• ¶ 365 (oral statement on November 18, 2015)<br>• ¶ 381 (December 2015 Business Update) |
| 10 | **Statements concerning the November 2015 reorganization of the Yieldcos:**<br>• ¶ 374 (November 23, 2015 8-K and press release) |