UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

IN RE: SUNEDISON, INC. SECURITIES
LITIGATION

<u>OPINION AND ORDER</u>

16-md-2742 (PKC)
16-cv-7917 (PKC)

---------------------------------------------------------x

CASTEL, U.S.D.J.

        Lead plaintiff the Municipal Employees' Retirement System of Michigan

("MERS") and co-plaintiff Arkansas Teacher Retirement System ("ATRS") move for class

certification.  Rule 23, Fed. R. Civ. P.  The proposed class would consist of all persons and

entities who purchased shares of common stock in SunEdison, Inc. ("SunEdison," or the

"Company") between September 2, 2015 and April 4, 2016, and all persons and entities who

purchased shares of SunEdison's preferred stock pursuant to or traceable to a registered public

offering between August 18, 2015 and April 4, 2016 (the "Preferred Offering").  Plaintiffs'

claims under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act

of 1934 (the "Exchange Act") are discussed in detail in <u>In re SunEdison, Inc. Securities</u>

<u>Litigation</u>, 300 F. Supp. 3d 444 (S.D.N.Y. 2018), which granted in part and denied in part

defendants' motions to dismiss the Complaint.[1]

        For the reasons that will be explained, the motion for class certification will be

granted, with modifications to the class definition as proposed.  The single proposed class is

overbroad in light of the different theories of liability advanced for plaintiffs' claims under the

Securities Act and the Exchange Act.  The proposed class period for the Securities Act claim

---

[1] For ease of reference, the Court will refer to "plaintiffs" throughout this Opinion.  In fact, plaintiff ATRS seeks certification with regard to the Securities Act claims and plaintiff MERS seeks certification of the Exchange Act claims.

also extends beyond the date of statements that plaintiffs have themselves described as disclosures of the omitted material information. The Court exercises its discretion under Rule 23 to divide the single class into two subclasses: one pursuing relief under the Securities Act and a second pursuing relief under the Exchange Act. Separately, the class period for the Securities Act claims is modified to include all persons or entities who purchased or acquired shares traceable to the Company's preferred offering between the dates of August 18, 2015 and November 9, 2015.

THE CLAIMS.

Plaintiffs' claims are brought under sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*, section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The Court summarizes those claims to the extent that they are relevant to deciding this motion for class certification.

Securities Act Claims. The claims under the Securities Act are directed to SunEdison's offering of preferred shares. On August 17, 2015, SunEdison announced a preferred offering of 650,000 convertible preferred securities registered at a price of $1,000 per share (the "Preferred Offering"). (Second Amended Complaint (the "Complaint") ¶ 120.) SunEdison filed an offering prospectus and a shelf registration statement on that same day (the "Offering Documents"). The Preferred Offering was made for "general corporate purposes" and underwritten by the Underwriter Defendants.[2] (Compl't ¶ 120.) According to plaintiffs, when SunEdison's financial condition was later revealed, the value of these preferred shares dropped

---

[2] The Underwriter Defendants are Goldman, Sachs & Co. ("Goldman Sachs"), Merrill Lynch, Pierce, Fenner & Smith Incorporate ("Merrill Lynch"), Deutsche Bank Securities Inc. ("Deutsche Bank"), Morgan Stanley & Co. LLC ("Morgan Stanley"), J.P. Morgan Securities LLC ("J.P. Morgan"), Macquarie Capital (USA) Inc. ("Macquarie") and MCS Capital Markets LLC ("MCS").

to $23 per share.  (Compl't ¶ 7.)  Previously, this Court concluded that the Complaint plausibly alleged violations of the Securities Act in three respects.

First, the Complaint alleged an actionable omission relating to a margin call against the Company that occurred on or about August 7, 2015 (the "Margin Call").  In re SunEdison, 300 F. Supp. 3d at 471-74.  On January 29, 2015, SunEdison obtained a $410 million Margin Loan from five lenders.  Id. at 459-60.  The loan included a debt covenant that required the Company to post at least $159 million in additional collateral in the event that the price of common stock of SunEdison's subsidiary, TerraForm Power, fell below a certain threshold.  Id. at 471-72.  TerraForm Power's shares dropped below that price on or about August 7, 2015, thus triggering the Margin Call.  Id. at 471.  Because the Margin Call was known to the defendants but not disclosed in the Offering Documents, and because the Company's past disclosures of the Margin Loan's terms were opaque, the Court concluded that the omission of the Margin Call plausibly alleged a violation of sections 11 and 12(a)(2).  Id. at 471-74.

Second, the Complaint alleged an actionable omission as to the existence of the Second-Lien Loan that SunEdison took from Goldman Sachs on or about August 11, 2015.  Id. at 474-76.  The loan was for $169 million, with an annual interest rate of 9.25% and an origination fee of $9 million.  Id. at 474.  Plaintiffs alleged that the demanding terms of the loan and its second-lien character would have signaled to investors the growing peril facing the Company, as first-lien assets were no longer available to post as collateral.  Id. at 475-76.  The Offering Documents omitted disclosure of the Second-Lien Loan.  Id. at 474-76.

Third, the Company's public statements were contradictory as to whether certain of its debts provided for direct lender recourse against SunEdison, or whether those debts were

non-recourse.  Id. at 476.  Plaintiffs plausibly alleged that conflicting descriptions of lender recourse in two Form 10-Qs could not be reconciled by a reasonable investor, who plausibly could have been misled about the nature of the Company's debts.  Id.  These 10-Qs were incorporated by reference into the Offering Documents.  Id. at 463.

Plaintiffs' surviving claims under the Securities Act are brought against seventeen defendants, including the members of SunEdison's board of directors;[3] the Underwriter Defendants; Brian Wuebbels, who was the Company's Executive Vice President, Chief Administrative Officer and Chief Financial Officer; and Ahmad Chatila, who was its CEO and President.  Plaintiffs allege that all defendants violated Section 11, and that the Underwriter Defendants separately violated section 12(a)(2).  Plaintiffs also allege that Chatila, Wuebbels and the Director Defendants violated section 15, which provides for control-person liability.

Exchange Act Claim.  The Exchange Act claim is premised on a statement separate from those upon which Securities Act liability is premised.  The Court previously concluded that plaintiffs adequately alleged a violation of section 10(b) and Rule 10b-5 based on Chatila's statement in an article published by *Bloomberg* on September 2, 2015.  300 F. Supp. 3d at 479-81.  In that article, Chatila stated, "The most important question for investors is when do we start generating cash for a living.  I have said it's at the end of 2016 or early 2017.  But we've been signaling it's going to be a lot sooner than that, probably early 2016 or late 2015."  Id. at 479.  However, the Complaint alleged that days earlier, on August 27, 2015, Chatila attended a presentation projecting that the Company would be cash-negative in the fourth quarter of 2015 and the first quarter of 2016.  Id. at 479-80.  The Court concluded that the timing of Chatila's

---

[3] The Director Defendants are Emmanuel Hernandez, Antonio R. Alvarez, Peter Blackmore, Clayton C. Daley, Jr., Georganne Proctor, Steven V. Tesoriere, James B. Williams and Randy H. Zwirn.

statement to *Bloomberg* in relation to the internal presentation about cash flow was sufficient to allege a conscious or reckless misrepresentation of financial information.  Id. at 479-81.  The remaining Exchange Act claim is directed solely to this statement, and Chatila is the claim's only defendant.

RULE 23 STANDARD.

A motion for class certification is governed by Rule 23, Fed. R. Civ. P.  A party moving for certification must prove the well-understood elements of numerosity, commonality, typicality and adequacy under Rule 23(a).  See generally Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345 (2011).  The movant also must prove one of the three requirements listed in Rule 23(b).  See id.  Plaintiffs are required to show that common questions of law or fact among the class members predominate over individual questions, and that a class action is superior to other available methods to fairly and efficiently adjudicate the controversy.

"[A] party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23."  Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (quotation marks omitted).  "To certify a class, a district court must find that each Rule 23 requirement is established by at least a preponderance of the evidence."  In re Petrobras Sec., 862 F.3d 250, 260 (2d Cir. 2017) (quotation marks and citations omitted).  "[P]laintiffs wishing to proceed through a class action must actually prove – not simply plead – that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)."  Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2412 (2014).  The analysis must be "rigorous," and may "overlap with the merits of the plaintiff's underlying claim."  Comcast, 569 U.S. at 33-34.  In scrutinizing a motion brought under Rule 23(b)(3), a

court must "take a close look at whether common questions predominate over individual ones." Id. at 34 (quotation marks omitted).

"In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)." Halliburton, 134 S. Ct. at 2412. Pursuant to Basic Inc. v. Levinson, 485 U.S. 224 (1988), stock purchasers transacting in an efficient market are presumed to have bought shares in reliance on the pricing effects of a misleading statement. "The Basic presumption does not relieve plaintiffs of the burden of proving – before class certification – that this requirement is met. Basic instead establishes that a plaintiff satisfies that burden by proving the prerequisites for invoking the presumption – namely, publicity, materiality, market efficiency, and market timing. The burden of proving those prerequisites still rests with plaintiffs and (with the exception of materiality) must be satisfied before class certification." Halliburton, 134 S. Ct. at 2412. A defendant may rebut the presumption of predominance if it comes forward with specific evidence sufficient to show, by a preponderance of the evidence, that the claimed misrepresentation did not affect share price. Waggoner v. Barclays PLC, 875 F.3d 79, 99 (2d Cir. 2017).

DISCUSSION.

I.   The Proposed Class Is Modified.

A.   The Court Exercises Its Discretion to Separate the Securities Act Claims and the Exchange Act Claim into Two Separate Subclasses.

"District judges have broad discretion over class definition." Boucher v. Syracuse Univ., 164 F.3d 113, 118 (2d Cir. 1999). "Rule 23 gives the district court flexibility to certify subclasses as the case progresses and as the nature of the proof to be developed at trial becomes clear." Marisol A. v. Giuliani, 126 F.3d 372, 379 (2d Cir. 1997). "When appropriate, a class

may be divided into subclasses that are each treated as a class under this rule." Rule 23(c)(5).

"When exercising its discretion to certify subclasses, a court must assure itself that each subclass independently meets the requirements of Rule 23." Ramirez v. Riverbay Corp., 39 F. Supp. 3d 354, 362 (S.D.N.Y. 2014) (Furman, J.) (internal citation and quotation marks omitted).

Plaintiffs have moved to certify a single shareholder class that consists of persons or entities with claims under either the Securities Act or the Exchange Act. The proposed class is defined as follows:

> All persons or entities who (i) purchased or otherwise acquired SunEdison, Inc. common stock between September 2, 2015 and April 4, 2016, inclusive, and were damaged thereby, or (ii) purchased shares of SunEdison, Inc. preferred stock pursuant or traceable to the registered public offering on or about August 18, 2015, and were damaged thereby.[4]

(Pl. Mem. at 3.) Plaintiffs urge that a single class is appropriate because all claims are directed to alleged misstatements or omissions about Company liquidity and finances, and because all purchasers acquired SunEdison shares at allegedly inflated prices. (Pl. Mem. at 11.)

The Securities Act claims and the Exchange Act claim are directed to different statements and purchasers of different securities issued by SunEdison. There is little to no factual overlap between Chatila's statement to *Bloomberg* on September 2, 2015 and the alleged omissions and misstatements of the Offering Documents. This is not a case where the Exchange Act and Securities Act misstatements or omissions are factually intertwined. See In re Deutsche Telekom Ag Sec. Litig., 229 F. Supp. 2d 277, 283 (S.D.N.Y. 2002) (certification of a single class was appropriate where "the Securities Act and Exchange Act claims implicate similar questions of fact" against "intertwined defendants") (Stein, J.). Here, the factually distinct claims are

---

[4] The proposed class excludes defendants and persons or entities affiliated with defendants. (Pl. Mem. at 3.)

governed by different legal standards. And while Chatila is a defendant under both the Securities Act and the Exchange Act, the Securities Act claims are brought against a larger group of seventeen defendants, including all Director Defendants, Underwriter Defendants and Wuebbels.

Any class entitled to relief under the Exchange Act would likely be significantly larger than any class for the Securities Act claims. The class of Exchange Act plaintiffs would consist of shareholders of SunEdison common stock during a proposed class period of September 2, 2015 to April 4, 2016, during which time the Company had approximately 336.7 million shares of common stock outstanding, with an average daily trading volume of 46.9 million shares. (Feinstein Report ¶¶ 49, 83.) For the Securities Act claim, class members would be limited to a smaller number of preferred shareholders, including those who directly acquired shares in that offering and those who can trace their shares to the offering's registration statement. See DeMaria v. Andersen, 318 F.3d 170, 176-77 (2d Cir. 2003) (discussing traceability requirement of section 11).

The Court concludes that a single class of shareholders, including both purchasers of common stock and preferred shares, would be overbroad. The Court exercises its discretion to divide the proposed class into two sub-classes: one consisting of purchasers of preferred shares traceable to the Preferred Offering, and a second consisting of purchasers of SunEdison common stock.

**B. The Securities Act Class Is Limited to Those Who Purchased or Acquired Preferred Shares Prior to November 9, 2015.**

The Underwriter Defendants also urge that the proposed class period of August 17, 2015 to April 4, 2016 for the Securities Act claims is overbroad. They point to three purported disclosures between August 25 and November 9, 2015, which, they argue, corrected

any omissions and misstatements contained in the Offering Documents. They urge that, at the latest, SunEdison's Form 10-Q for the third quarter of 2015, filed on November 9, 2015, disclosed and corrected all material information related to the Margin Call, the Second-Lien Loan and direct lender recourse against the Company. Defendants' characterizations of the November 9 disclosures are consistent with the allegations of the Second Amended Complaint, which state that SunEdison "disclosed" and "revealed" facts about the Second-Lien Loan, the Margin Call and lender recourse in that 10-Q. (Compl't ¶¶ 164, 166, 167, 169.)

"[A]s a result of the implied requirement of ascertainability, a class definition ordinarily should have temporal limitations. Moreover, the Court has authority sua sponte to modify a proposed class definition." Yi Xiang v. Inovalon Holdings, Inc., 2018 WL 4445114, at *8 (S.D.N.Y. Sept. 18, 2018) (Marrero, J.) (internal citations and quotation marks omitted); see also Pirnik v. Fiat Chrysler Automobiles, N.V., 327 F.R.D. 38, 48 (S.D.N.Y. 2018) ("In a securities fraud class action, 'courts are required to cut off the class period on the date of a statement or event that cures the market.'") (Furman, J.) (quoting Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 310 F.R.D. 69, 97 (S.D.N.Y. 2015)). "A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly." Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir. 1993). "If there is 'no substantial doubt as to the curative effect' of the announcement, the class period may be shortened." In re Virtus Inv. Partners, Inc. Sec. Litig., 2017 WL 2062985, at *7 (S.D.N.Y. May 15, 2017) (Pauley, J.) (quoting Friedlander v. Barnes, 104 F.R.D. 417, 421 (S.D.N.Y. 1984)).

SunEdison disclosed all material facts about the Margin Call, the Second-Lien Loan and lender recourse in its Form 10-Q for the third quarter of 2015, which it filed on November 9, 2015. That 10-Q summarized the Margin Loan's terms and stated that in the third quarter of 2015, SunEdison was "required under the agreement to deposit $152 million into an escrow account as additional collateral." (Lewis Dec. Ex. 23 at 28.) It explained that in October 2015, SunEdison posted another $91 million in cash collateral. (Id.) The 10-Q also stated that on August 11, 2015, SunEdison "entered into a Second Lien Credit Agreement" with Goldman Sachs in an amount of $169 million with an interest rate of 9.25% and fees of $9 million. (Id. at 34.) A table in the 10-Q also correctly identified certain loans as providing for direct recourse by the lenders. (Id. at 22.)

Critically, the Complaint itself alleges that the 10-Q "disclosed" and "revealed" the putatively omitted and misstated information about SunEdison's loans. (Compl't ¶¶ 164 (alleging that the 10-Q "revealed a number of devastating facts" and "for the first time, revealed" and "disclosed" the terms of the Second-Lien Loan); 166 (the 10-Q "disclosed" an additional payment on the Margin Loan); 167 (the 10-Q "disclosed" the correct classifications of recourse and non-recourse debt); 169 ("The market reacted swiftly to SunEdison's disclosures."); see also First Amended Class Action Compl't ¶ 43 (the 10-Q included "disclosure and admission" of recourse debt); 44 (the 10-Q "disclosed" the Second-Lien Loan).). In addition to the contents of the 10-Q, the Complaint also alleges that, on October 7, 2015, SunEdison "revealed" that a $152 margin call had previously been made on the Margin Loan. (Compl't ¶ 142.)

In light of the disclosures contained in the 10-Q and the plaintiffs' own allegations, the Court concludes that the Securities Act class should be limited to persons and

entities who purchased or acquired Preferred Shares no later than November 9, 2015. Plaintiffs urge that the disclosures in that Form 10-Q were not complete and truthful. But the Complaint itself alleges that the 10-Q "disclosed," "corrected" and "admitted" the truth about the alleged omissions. The additional details and context about these loans and the Company more generally that came to light in subsequent disclosures described in the Complaint did not alter the detailed, unambiguous disclosures in the third quarter of 2015. (See, e.g., Compl't ¶ 397 (summarizing alleged corrective disclosures).)

Plaintiffs urge that the third quarter 2015 10-Q failed to explain that proceeds from the Second-Lien Loan went toward the Margin Call. But the 10-Q described the loan's interest rate, generation fee and second-lien character, all of which plaintiffs have urged were material because they "may have been indicative of a company struggling with liquidity shortfalls and limited financing options." In re SunEdison, Inc., 300 F. Supp. 3d at 476. The need to post collateral on the Margin Call may also have been a motivation for taking the Second-Lien Loan, but the 10-Q disclosed all details about SunEdison's borrowing terms that plaintiffs have alleged were material.

Plaintiffs also urge that it is premature to adjudicate the sufficiency of disclosure at the class certification stage. But when the record warrants, it is appropriate for a district court to modify a proposed class period based on clear, unambiguous disclosures. Yi Xiang, 2018 WL 4445114, at *8 (modifying class period for Securities Act claims to conform with date of public disclosures, relying in part on "[p]laintiff's own allegations"); In re Smart Techs., Inc. S'holder Litig., 295 F.R.D. 50, 58 (S.D.N.Y. 2013) (rejecting plaintiff's proposed open-ended class period and ending it on a date to "affirmatively exclude those individuals" who purchased shares after

public disclosures) (Forrest, J.).  As will be discussed in greater detail concerning the class period for the Exchange Act claim, when a disclosure is less than clear, or would require the Court to adjudicate questions of materiality, the adequacy of disclosure cannot be decided on a Rule 23 motion.  Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc., 879 F.3d 474, 481 (2d Cir. 2018) ("plaintiffs need not prove the materiality of defendants' misstatements at the class certification stage . . . ."); Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 2018 WL 4378445, at *11-12 (S.D.N.Y. Sept. 14, 2018) (describing effect of partial disclosures in press reports as raising issues "better suited for summary judgment or trial.") (Oetken, J.); Strougo v. Barclays PLC, 312 F.R.D. 307, 328 (S.D.N.Y. 2016) (declining to limit class period because the disclosures raised questions of materiality that should be addressed on the merits).

The disclosures here were clear, unambiguous and announced by the Company in its 10-Q for the third quarter of 2015.[5]  Plaintiffs themselves have alleged that the 10-Q "disclosed," "corrected" and "admitted" the alleged misstatements and omissions.  A class that included purchasers who acquired shares after November 9 would be unlikely to satisfy the predominance requirement of Rule 23(b)(3), given the individual issues of purchaser knowledge and reliance that would arise.

The proposed class of Securities Act plaintiffs is therefore modified to include only those persons and entities who purchased or acquired preferred shares traceable to the Preferred Offering between August 18, 2015 and November 9, 2015.

---

[5] The August 25, 2015 and October 7, 2015 disclosures were less thorough and explicit, and hence do not serve as an appropriate endpoint to the class period.  On August 25, a UBS analyst noted that a margin call had been made against the Company but observed that details "remain scarce."  (Lewis Dec. Ex. 21.)  On October 7, an investor presentation by the Company referenced a payment of $152 million on the Margin Loan and referred to a $169 million "term loan" that appears to have been the Second-Lien loan.  (Lewis Dec. Ex. 22 at 10.)  The effects of these partial disclosures may be relevant at the summary judgment stage or at trial, but at the class certification stage, they do not warrant modification of the class period.

C.  Because Chatila Has Not Rebutted the <u>Basic</u> Presumption, Modification of the <u>Exchange Act Class Period Is Not Appropriate at this Time.</u>

With respect to the Exchange Act claim, plaintiffs seek to certify a class of all persons and entities who purchased or acquired SunEdison common stock between September 2, 2015 and April 4, 2016.  (Pl. Mem. at 3.)  Chatila, the sole defendant on this claim, urges that the class period should extend no later than November 10, 2015, when, he asserts, a SunEdison press release corrected his prior alleged misstatement to *Bloomberg*.

As discussed, the claim under section 10(b) and Rule 10b-5 is directed to Chatila's September 2, 2015 statement published by *Bloomberg*, in which he stated that "we've been signaling" that the Company would probably "start generating cash for a living" in "early 2016 or late 2015."  In a Company press release of November 10, 2015, which discussed SunEdison's quarterly results, Chatila is quoted as follows:

> "During the third quarter, we continued our track record of execution within the development business by delivering over 600 MW, more than double versus the prior year," said [Chatila].  "In addition, we made the difficult, but necessary decision to optimize our organization in the face of the current market conditions within the yieldco space.  These changes will not only set up the business for long-term success, but also should position the development business to generate positive cash flow in mid 2016."

(Wechkin Dec. Ex. C.)  Chatila urges that this statement "provided investors with exactly the information" that his September 2 statement "withheld from (or misrepresented to) the market . . . ."  (Ind. Def. Mem. at 10.)  Plaintiffs' expert has opined that the market responded to the November 10 statement, causing a statistically significant drop in the value of SunEdison common stock, and defendants' expert has separately opined that the corrective information of

November 10 was "fully absorbed" into the stock price. (Feinstein Report ¶¶ 146-47; Grenadier Report ¶¶ 21-27.)

The November 10 statement lacks the clarity and definitiveness of the previously discussed disclosures in the 10-Q, which disclosed in detail the information allegedly omitted from the Offering Documents. The November 10 statement refers to positive cash flow for the "development business" in light of a "decision to optimize our organization" due to "market conditions within the yieldco space."[6] (Wechkin Dec. Ex. C.) A reasonable investor aware of the September 2 statement by Chatila might infer that the November 10 statement was intended to revise Chatila's prior remarks, or the investor might have concluded that the statement was directed toward a limited aspect of the Company's business without recognizing it as a correction of the September 2 statement. The November 10 statement also is not phrased as a correction or revision to any past misstatement.

Chatila urges, however, that the Basic presumption of shareholder reliance ought not apply past the November 10 statement. He asserts the November 10 statement "severed the link" between any misrepresentation of September 2 and the market's valuation of share price, after which time, purchasers no longer bought shares at a price inflated by the claimed misrepresentation. According to Chatila, purchasers who bought after November 10 fall outside the Basic presumption.[7]

---

[6] For background on the Company's "yieldco" affiliates, see In re SunEdison, 300 F. Supp. 3d at 458-59.

[7] The applicability of the Basic presumption is typically part of a Rule 23(b)(3) analysis because it goes to whether shareholder reliance is common to the class and predominates over questions of reliance affecting individual members. See, e.g., Arkansas Teachers Ret. Sys., 879 F.3d at 478. The Court resolves this issue at the outset because the proposed class periods of the two sub-classes are relevant to deciding the Rule 23(a) factors discussed below, some of which are vigorously disputed by defendants.

The <u>Basic</u> presumption assumes that in an efficient market, a stock's price incorporates a defendant's misrepresentation, and a purchaser is presumed to rely on the market's valuation of all material, public information.  <u>Halliburton</u>, 134 S. Ct. at 2407-08.  To establish the <u>Basic</u> presumption, the plaintiff need only demonstrate a material misrepresentation that was publicly known, that the stock traded in an efficient market, and that the plaintiff traded the stock between the time of the misrepresentation and the disclosure of the truth.  <u>Id.</u> at 2408. For the purposes of the motion, Chatila does not dispute that that the <u>Basic</u> presumption applies from the date of Chatila's statement of September 2, 2015 through the date of the Company's press release on November 10, 2015.

A defendant can rebut the <u>Basic</u> presumption through "'any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price . . . .'"  <u>Id.</u> at 2408 (quoting <u>Basic</u>, 485 U.S. at 248)).  <u>Id.</u>  The defendant "must demonstrate a lack of price impact by a preponderance of the evidence at the class certification stage rather than merely meet a burden of production." <u>Waggoner</u>, 875 F.3d at 101.  The district court should consider any evidence that a claimed disclosure did not result in a drop to company share price, because such evidence would tend to show that the claimed misrepresentation did not affect the market's valuation of the stock. <u>Arkansas Teachers Ret. Sys.</u>, 879 F.3d at 486.  Such evidence will often consist of event studies, which trace the relationship between a misleading statement or a corrective disclosure, and the market's subsequent reaction.  <u>Halliburton</u>, 134 S. Ct. at 2415.

It is the defendant's burden to submit evidence affirmatively demonstrating that the link between the misrepresentation and share price was severed.  <u>See, e.g., Pirnik</u>, 327 F.R.D.

at 45 (<u>Basic</u> presumption was not rebutted when "Defendant did not conduct, or submit, their own event study to show the absence of price impact" and instead critiqued plaintiffs' expert) (Furman, J.); <u>Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC</u>, 310 F.R.D. 69, 94 (S.D.N.Y. 2015) (defendants did not rebut the <u>Basic</u> presumption under <u>Halliburton</u> because "they ignore[d] the Supreme Court's invitation to offer their own evidence to prove lack of price impact.") (Scheindlin, J.). Similarly, asserting that a corrective disclosure, and a corresponding decline in share price, were based on more than one item of negative information about a company is not enough to sever the link: "[M]erely suggesting that another factor <u>also</u> contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security." <u>Waggoner</u>, 875 F.3d at 105.

Chatila cites principally to the report of defendants' expert witness Steven Grenadier, who opines that "the major part of price adjustment occur[ed] very quickly" on November 10, with share price dropping from $7.40 to an intraday low of $5.59 before closing at $5.77. (Grenadier Rep. ¶ 24.) He points to subsequent analyst reports opining that the Company's cash generation would be delayed to sometime in 2016, one of which stated that SunEdison's "journey toward positive cash flow is delayed . . . ." (Grenadier Rep. ¶ 25.) Grenadier concludes that SunEdison "stock price could not have been impacted" by the September 2 statement following the disclosure of November 10. (Grenadier Rep. ¶ 26.)

Grenadier's conclusions are evidence that, consistent with an efficient market, share value dropped in response to the November 10 statement, but his report does not establish that the November 10 statement "severed the link" between Chatila's prior remark and Company share price. In reply, plaintiffs point to subsequent disclosures about cash generation and

liquidity that drove down the value of SunEdison stock, as well as evidence that Company

insiders were concerned into 2016 that Chatila had manipulated data about cash generation.

Chatila also has not met his burden to rebut the <u>Basic</u> presumption by offering an event study or

other evidence sufficient to affirmatively demonstrate that subsequent corrective disclosures did

not reflect market reactions to the truth about the projected date range of cash generation.

       Plaintiffs, however, have pointed to evidence that the market continued to react to

announcements about the Company's generation of cash. On February 29, 2016, SunEdison

disclosed in an SEC filing that its Form 10-K was delayed because of an Audit Committee

investigation of insider claims "concerning the accuracy of the Company's anticipated financial

position." (Sinderson Dec. Ex. L.) It explained that a former executive had made allegations

about the accuracy of prior financial projections made to the Company's board, and that the

allegations could require reconsideration of SunEdison's liquidity needs. (<u>Id.</u>) Plaintiffs state

that a 24% drop in share price followed. Later, on March 28 and March 31, share price dropped

by 55% and 20% after reports that the SEC and Department of Justice were investigating the

same issues before the Audit Committee.

       There is also some evidence that the Company was unable to correct Chatila's

statement of September 2 because it was not yet aware of the relevant, underlying facts. An

internal October 13, 2015 e-mail referenced efforts to "try to make Q1 '16 TCF positive

according to Ahmad's request," stating that "[c]hanging many of our assumptions and running

the numbers again takes a while. We are working on it . . . ." (Nov. 26 letter Ex. I.) This e-mail

could be construed to reflect an ongoing effort by Chatila to manipulate internal company

processes in order to announce a positive cash flow. Plaintiffs also point to a summary of

findings made by the Paul Hastings law firm, dated March 25, 2016, which stated in part that Company "management makes 'top down' adjustments to cash forecasts, and requires the individual project finance teams and [business units] to attempt to execute according to the 'challenges' issued." (Id. Ex. A at 8.) The same document states that "recent forecasting adjustments have not been reasonable and have not been transparent to the Board or its advisors." (Id.)

At the class certification stage, Chatila has not submitted evidence sufficient to demonstrate by a preponderance of the evidence that the November 10 statement "severed the link" between share price and the alleged misstatement of September 2. His submissions do not account for later market reactions to public disclosures that could plausibly involve adjustments to the date that the Company was expected to "generate cash for a living." At most, he has demonstrated that an efficient market responded to SunEdison's press release of November 10, which is consistent with the Basic presumption. Because Chatila has not met his evidentiary burden to rebut the Basic presumption, the Court declines to modify the proposed class period for the Exchange Act claim.

At this stage, the Court is unable to conclude that the statement of November 10 requires the limitation of the proposed class period. See In re Virtus, 2017 WL 2062985, at *7 (limiting the class period is appropriate only where the "there is no substantial doubt as to the curative effect" of disclosure). The issue of whether "'the [truth] credibly entered the market and dissipated the effects of [prior] misstatements'" based on the November 10 statement is appropriately left to trial or a motion for summary judgment. Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 481-82 (2013). Further, to the extent that the statement of

November 10 amounted to the correction or partial correction of Chatila's alleged misrepresentation of September 2, it would affect all class members in common.  Id. at 474 (distinguishing certification-relevant considerations of efficient markets from issues of materiality because "[w]hile the failure of common, classwide proof on the issues of market efficiency and publicity leaves open the prospect of individualized proof of reliance, the failure of common proof on the issue of materiality ends the case for the class and for all individuals alleged to compose the class.").

The Court therefore declines to modify the proposed class period for the Exchange Act claim.  The Court will consider whether an Exchange Act subclass for the period of September 2, 2015 to April 4, 2016 meets the requisites of Rule 23.

II.  The Proposed Securities Act Class Satisfies Rule 23.

A.  The Proposed Class Satisfies Numerosity.

To demonstrate numerosity, the movant must show that "the class is so numerous that joinder of all members is impracticable . . . ."  Rule 23(a)(1).  "Numerosity is presumed for classes larger than forty members."  Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co., 772 F.3d 111, 120 (2d Cir. 2014).  "Courts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement."  Robidoux, 987 F.2d at 935.  "However, the numerosity inquiry is not strictly mathematical but must take into account the context of the particular case, in particular whether a class is superior to joinder based on other relevant factors including: (i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) requests for

injunctive relief that would involve future class members." Pennsylvania Pub. Sch. Employees'
Ret. Sys., 772 F.3d at 120.

Plaintiffs point out that 650,000 shares of preferred stock were issued in
connection with the Preferred Offering. (Pl. Mem. at 9.) They contend that the volume of
outstanding shares satisfies the numerosity requirement of Rule 23(a) and makes joinder
impracticable.

The Underwriter Defendants urge that the size of the class cannot be calculated
based on the 650,000 shares issued, and that only "22 investor families" directly purchased
shares from the Underwriter Defendants in the initial offering. (Opp. Mem. at 11.) The phrase
"investor family" is defined by the Underwriter Defendants to include "asset managers, broker
dealers, or individual entities or persons that are unaffiliated with an asset manager or broker
dealer," and is used by defendants' witness Kevin Gold, a vice president at Analysis Group, Inc.
who specializes in financial and statistical analysis, and was retained by defendants to reviewing
trading records and identify purchasers in the Preferred Offering. (Gold Dec. ¶ 2 n.1.)

Defendants have failed to show the relationship among the different entities
within each "family." Many, but not all, of the "families" consist of entities with similar names
(e.g., Greenlight Capital (Gold), LP, Greenlight Capital Offshore Master (Gold), Ltd., etc.).
Some appear to be collections of unrelated entities. The "Allianz family" includes plaintiff
ATRS, Baptist Health South Florida, Inc., Lockheed Martin and the Virginia Retirement System,
among others. (Gold Dec. Ex. B.) The Oregon Public Employees Retirement Fund is listed as
being in a "KKR family." (Id.) A family identified as "Omega" includes entities labeled
"Omega Advisors, Inc (SS Texas Teachers)" and "Omega Advisors Inc (State Street Russell)."

(Id.)  By contrast, the Greenlight Capital "family" has seven entities with "Greenlight" in their names and might plausibly be viewed as a single purchaser.  (Id.)  But in several instances, an entity's affiliation with its "family" has not been demonstrated.  For example, there has been no showing of the nature of the relationship between American Beacon Funds and its "family," Calamos Investments.  (Id.)  Plaintiffs assert that certain entities that superficially appear to be affiliated actually have separate owners.  (Reply at 6 n.7.)

Defendants urge that the numerosity analysis should be based on the 22 "families" that they have identified.  Using defendants' "family" concept, additional exhibits to the Gold Declaration suggest a higher number of purchasers prior to the November 9 disclosures than suggested by defendants.  Exhibit D is labeled without explanation as listing "potential class members," and identifies purchasers by "family" name, entity name and purchase date.  (Gold Dec. ¶ 6 & Ex. D.)  An additional 20 "families" acquired shares from defendants prior to the disclosures of November 9, 2015, for a total of 42 purchasers.  (Gold Dec. Exs. C & D.)  If the "family" label is disregarded, Gold has identified 120 purchasers prior to November 9.  (Reply at 6 n.8 & Gold Dec. Ex. C.)

Numerosity is presumed when a class has more than 40 members.  <u>Pennsylvania Pub. Sch. Employees' Ret. Sys.</u>, 772 F.3d at 120.  Assuming that the list of "families" identified by the Underwriter Defendants is accurate and complete, the existence of at least 42 potential class members establishes a presumption of numerosity.  The number of potential class members is likely far higher because the Gold Declaration does not account for transactions on the secondary market that would be traceable to the Preferred Offering.

A purchaser who does not buy a security directly from the issuer may have an actionable claim to relief under section 11, provided that the security is traceable to the allegedly misleading registration statement. <u>DeMaria</u>, 318 F.3d at 77 ("Congress plainly contemplated suit under § 11 by shareholders who did not purchase the security in the initial offering."); <u>accord</u> <u>In re Morgan Stanley Information Fund Sec. Litig.</u>, 592 F.3d 347, 358 (2d Cir. 2010).[8] Based on data available on Bloomberg, plaintiffs assert that from August 19, 2015 to July 22, 2016, 1,000,621 shares traceable to the Preferred Offering traded on a secondary market. (Miller Dec. ¶ 14.) A significant number of shares likely traded prior to November 9, 2015. Plaintiffs also point out that Gold has likely undercounted the number of beneficial owners who directly participated in the Preferred Offering, because broker-dealers who purchased Preferred Shares acted on behalf of beneficial owners not identified in the trading records, but who would be identified in the claims-administration process. (Villanova Dec. ¶ 9.)

The Court concludes that plaintiffs have made a showing sufficient to satisfy the numerosity requirement. At the certification stage, a plaintiff is not required to prove the exact number or identity of all potential class members. <u>Robidoux</u>, 987 F.2d at 935.

The Underwriter Defendants assert that the sophistication and resources of purchasers should be weighed in deciding the practicability of joinder, <u>i.e.</u>, the ability, resources and motivations of would-be class members to institute individual suits. <u>See</u> <u>Pennsylvania Pub.</u>

---

[8] No party has raised the potential distinction between class members eligible for relief under section 12(a)(2) as opposed to section 11. <u>See</u>, <u>e.g.</u>, <u>In re CitiGroup Inc. Bond Litig.</u>, 723 F. Supp. 2d 568, 585 (S.D.N.Y. 2010) ("[W]hile both Sections 11 and 12 require similar showings, unlike a Section 11 claim which may be brought by any purchaser of the relevant security who 'can trace their shares to an allegedly misleading registration statement,' a plaintiff seeking redress pursuant to Section 12(a)(2) must establish that it purchased the security directly from defendants through the public offering at issue.") (quoting <u>DeMaria</u>, 318 F.3d at 178). This Court retains the authority "to maintain or modify the scope of the certified class" at a future stage. <u>Pavano v. Shalala</u>, 95 F.3d 147, 152 n.9 (2d Cir. 1996).

Sch. Employees' Ret. Sys., 772 F.3d at 120 (listing non-numerical factors for deciding practicability of joinder); Robidoux, 987 F.2d at 936 ("Determination of practicability depends on all the circumstances surrounding a case, not on mere numbers."). They urge that the proposed class include many large, well-resourced investors that have the ability to bring individual suit or join the existing action as co-plaintiffs, and do not require a class mechanism to obtain relief. Thus, they contend, joinder of all plaintiffs is practicable. However, the evidence presented on this motion still weighs in favor of a finding of impracticability of joinder. See Pennsylvania Pub. Sch. Employees' Ret. Sys., 772 F.3d at 120.

Impracticability does not require a showing that joinder would be nearly impossible or extremely difficult. Robidoux, 987 F.2d at 935 ("impracticable does not mean 'incapable of being performed or infeasible'") (quoting Goldstein v. North Jersey Trust Co., 39 F.R.D. 363, 367 (S.D.N.Y. 1966)). Individual suits are expensive for the plaintiff, who must bear its own fees. An individual plaintiff has no mechanism to require "joinder" of co-plaintiffs and no means of requiring plaintiffs in separate, parallel suits to share the costly expenses of loss-causation and other expert witnesses. In a context such as this one, with a bankrupt issuer, there is a limited pool of insurance and assets to answer the claims; individual suits, even coordinated through the MDL process, lead to a race to judgment.

The Court concludes that plaintiffs have demonstrated that the members are such that joinder is impracticable. Rule 23(a)(1).

B. The Proposed Class Satisfies Commonality.

"Rule 23(a)'s commonality requirement may be satisfied if plaintiffs 'demonstrate[] that the class members have suffered the same injury.'" Johnson v. Nextel

23

Comme'ns Inc., 780 F.3d 128, 137-38 (2d Cir. 2015) (quoting Wal-Mart, 131 S. Ct. at 2551). It "simply requires that there be issues whose resolution will affect all or a significant number of the putative class members." Id.; see also Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 84 (2d Cir. 2015) (commonality "is satisfied if there is a common issue that 'drive[s] the resolution of the litigation' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'") (quoting Wal-Mart, 131 S. Ct. at 2551).

The proposed class satisfies the commonality requirement because all claims turn on a single set of alleged misstatements and omissions and common methodology for determining losses. Any such misstatements and omissions would have the identical effect on all class members. All class members' entitlement to relief would turn on whether the misstatements and omissions were false, misleading and material, and whether purchasers of the preferred shares suffered losses resulting therefrom.

The Court concludes that plaintiffs have satisfied the commonality requirement of Rule 23(a)(2).

C. ATRS's Claims Are Typical of the Proposed Class Members.

"Typicality requires that 'the disputed issue[s] of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class.'" Mazzei v. Money Store, 829 F.3d 260, 272 (2d Cir. 2016) (quoting Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 293 (2d Cir. 1999)); see also In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009) ("To establish typicality under Rule 23(a)(3), the party seeking certification must show that 'each class member's claim arises from

the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'") (quoting <u>Robidoux</u>, 987 F.2d at 936).

Differences in the purchase date of shares is generally not sufficient to defeat typicality. <u>In re Marsh & McLennan Companies, Inc. Sec. Litig.</u>, 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009) ("Factual differences involving the date of acquisition . . . will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct.") (McMahon, J.). The typicality analysis "requires that a class representative 'have the incentive to prove all the elements of the cause of action . . . .'" <u>Jurkowski v. Molycorp, Inc.</u>, 2014 WL 12792750, at *3 (S.D.N.Y. Apr. 2, 2014) (Crotty, J.) (quoting <u>In re Oxford Health Plans, Inc. Sec. Litig.</u>, 199 F.R.D. 119, 123 (S.D.N.Y. 2001)).

The Underwriter Defendants urge that ATRS does not satisfy the typicality requirement because it purchased the preferred shares on August 18, 2015, and corrective disclosures were made on August 25, October 7 and November 9, 2015. (Opp. Mem. at 15-16.) They urge that proposed class members who acquired shares after those dates had varying levels of knowledge about the alleged misstatements and omissions, rendering ATRS's claims atypical. (<u>Id.</u>) They point to <u>In re Initial Public Offerings Securities Litigation</u>, 471 F.3d 24, 43 (2d Cir. 2006), which, as part of its analysis of Rule 23(b)(3) predominance, concluded that individual questions predominated when there was "widespread" knowledge of a scheme to artificially inflate share prices among purchasers in initial public offerings, some of whom were knowingly subjected to the purported scheme. They also rely on <u>Newman v. RNC Telecom Services, Inc.</u>, 238 F.R.D. 57, 77-78 (S.D.N.Y. 2006) (Marrero, J.), which concluded that the movant did not satisfy typicality because his claims were subject to unique defenses and because the record did

not show that all proposed class members were exposed to the same purportedly misleading advertisement.

Here, unlike <u>IPO</u>, there is no contention of widespread knowledge among members of the investing community about a scheme perpetuated by defendants. In any event, <u>IPO</u> treated the issue of investors' knowledge as going to predominance, not typicality. And unlike the plaintiff in <u>Newman</u>, there is no contention that ATRS would potentially be subject to a unique defense.

The Court concludes that ATRS satisfies the typicality requirement. Its claims are typical of the class members because they all relate to omissions and misstatements concerning the existence and terms of SunEdison's borrowing arrangements. ATRS's claims about such statements occupy the same degree of centrality as those of any class member who purchased shares directly in or traceable to the Preferred Offering. <u>Mazzei</u>, 829 F.3d at 272.

D. <u>ATRS Has Demonstrated that It Can Adequately Represent the Class.</u>

"Under Rule 23(a)(4), '[a]dequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members.'" <u>In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.</u>, 827 F.3d 223, 231 (2d Cir. 2016) (quoting <u>Denney v. Deutsche Bank AG</u>, 443 F.3d 253, 268 (2d Cir. 2006)).

ATRS has demonstrated that it is an adequate class representative. It is a public retirement fund with $15.5 billion in assets, and purchased shares in the Preferred Offering. (Compl't ¶ 19.) ATRS claims damages due to the alleged omissions and misrepresentations made in the registration statement of the Preferred Offering. To date, ATRS has, through its

counsel at Bernstein Litowitz Berger & Grossman LLP ("Bernstein Litowitz"), brought Securities Act allegations that partially survived defendants' motion to dismiss, advanced the case through a contentious discovery process, and filed this motion for class certification. ATRS has vigorously pursued claims on behalf of the class, and there is no contention that its interests are antagonistic to other class members.

The Court concludes that ATRS satisfies the adequacy requirement of Rule 23(a)(4).

### E. Common Questions Predominate over Individual Ones.

As noted, in addition to satisfying the requirements of Rule 23(a), plaintiffs must prove that the proposed class satisfies the predominance requirement of Rule 23(b)(3). Halliburton, 134 S. Ct. at 2412. The Court is required to take a "close look" at whether common questions predominate over individual ones. Comcast, 569 F.3d at 34. To satisfy predominance, a plaintiff must demonstrate that "substantial" aspects of the litigation are "susceptible to generalized proof for all class members," as opposed to individual issues. Myers v. Hertz Corp., 624 F.3d 537, 551 (2d Cir. 2010). "The distinction between 'individual' and 'common' questions is thus central to the predominance analysis." In re Petrobras, 862 F.3d at 270. Courts must consider whether some class members are subject to a defense that would cause individual issues to predominate over the claims and defenses of the class as a whole. Myers, 624 F.3d at 551.

If "individualized questions permeate the litigation," certification of a class is "inefficient or unfair." In re Petrobras, 862 F.3d at 270 (quotation marks omitted). "The predominance inquiry mitigates this risk by 'ask[ing] whether the common, aggregation-

enabling, issues in the case are <u>more prevalent or important</u> than the non-common, aggregation-defeating, individual issues.'" <u>Id.</u> (quoting <u>Tyson Foods v. Bouaphakeo</u>, 136 S. Ct. 1036, 1045 (2016)) (emphasis in original). "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." <u>Halliburton</u>, 134 S. Ct. at 2412.

Plaintiffs assert that common questions predominate because proving liability turns on the materiality of any omissions or misstatements made in connection with the Preferred Offering, and that each proposed class member's claims will rise or fall based on common proof related to offering documents. (Pl. Mem. at 14-15.)

In opposition, the Underwriter Defendants urge that the proposed class members had differing degrees of knowledge about the Company's financing arrangements. They argue that because an investor's knowledge of misstatements and omissions is a defense against a Securities Act claim, differences in knowledge among purchasers would cause individual issues to predominate. (Opp. Mem. at 18.) They point to evidence that some large investors who purchased directly from the Underwriter Defendants were able to conduct due diligence in advance of the Preferred Offering because they were "wall crossed" in a manner that gave them direct access to internal Company information. (Opp. Mem. at 18-19.) As described by the Underwriter Defendants, "wall crossed" investors participated in a "'bespoke' investment process" and "proactively provided feedback" on the Preferred Offering.[9] (<u>Id.</u> at 5.) They explain: "Some of these investors were 'wall crossed' for a single day and participated in a single

[9] As used herein, "wall crossed" is understood to mean that the individuals or institutions were on the inside "wall" of the screen, separating those with access to material non-public information, typically the issuer, its underwriters and those professionals working with them. The trading activity and dissemination of information by such insiders is restricted during the registration process.

call with company representatives, while others were wall crossed for multiple days, and had multiple points of contact with the Company." (Id. at 18-19.)

Judge Kaplan rejected similar arguments about investors' knowledge in In re IndyMac Mortgage-Backed Securities Litigation, 286 F.R.D. 226, 238 (S.D.N.Y. Aug. 17, 2012). There, defendants argued that a proposed class of mortgage-backed securities purchasers included sophisticated and/or institutional investors who were aware of deteriorating underwriting standards and had "predicted" the end of the "housing market bubble." Id. Defendants argued that two prospective class members obtained information from defendant IndyMac Bank about flaws in its underwriting guidelines. Id. at 238-39.

Judge Kaplan explained that because knowledge of misstatements is an affirmative defense under the Securities Act, defendants needed to make an evidentiary showing of knowledge on the part of prospective class members in order to defeat predominance. Id. at 238-40. Defendants had to identify "specific statements" by would-be class members to demonstrate "individual knowledge" about the securities being purchased and sold. Id. at 239-40. Investor sophistication alone was insufficient, as was the mere possibility that certain investors might have known the truth that belied the alleged misstatements and omissions. Id.; see also In re Initial Pub. Offering Sec. Litig., 483 F.3d 70, 73 n.1 (2d Cir. 2007) (noting "the general rule that an issuer's liability under section 11 is absolute, but that it can assert a defense that 'the plaintiff knew of the untruth or omission at the time of his or her acquisition of the security.'") (quoting IX Louis Loss & Joel Seligman, *Securities Regulation* 4258 (3d ed. 2004)); Pub. Emps. Ret. Sys. of Mississippi v. Goldman Sachs Grp., Inc., 280 F.R.D. 130, 137 (S.D.N.Y.

2012) (defendants did not demonstrate "specific" or "explicit" evidence of purchaser knowledge, and therefore did not defeat predominance) (Baer, J.).

With one exception, defendants mainly offer speculative assertions as to why certain purchasers in the Preferred Offering knew the true state of affairs about the Company's borrowing arrangements. They assert that "[s]ome of these investors were 'wall crossed'" and participated in calls with representatives of SunEdison, meaning that their inquiries "inevitably raise individualized issues going to knowledge." (Opp. Mem. at 19.) Defendants identify five potential class members who were "wall crossed": Highbridge Capital, Greenlight Capital, Zimmer Partners, Third Point Capital and York Capital. (Id. at 19-20.) With the exception of Highbridge Capital, defendants have not submitted evidence of knowledge held by these entities.

Defendants describe Third Point Capital and York Capital as major shareholders of SunEdison that "undoubtedly studied the company very closely to develop their own views," and note that Zimmer Partners was "wall crossed" and had direct access to certain unspecified information about the Company before it bought $50 million in preferred shares. (Id. at 20.) But the sophistication of these purchasers and the size of their investments does not equate to the acquisition of material non-public information concerning the Second-Lean Loan, the Margin Call and whether lenders had direct recourse against the Company. Defendants have not pointed to evidence of knowledge on the part of these purchasers.

As to Greenlight Capital, defendants note that its CEO, David Einhorn, sometimes communicated with SunEdison management. They cite a series of e-mails within SunEdison that refer to Einhorn. (Def. Mem. at 19 n. 25.) One internal e-mail refers to "a call with this guy and Greenlight," and requests supplemental detail on the Company's prior quarterly revenues.

(Lewis Dec. Ex. 27.)  Another e-mail chain discusses the importance of "market stability" in finalizing the Preferred Offering, and includes the sentence, "We'll see what einhorn says today[.]"  (Lewis Dec. Ex. 28.)  An e-mail chain dated August 10, 2015 requests background on Einhorn and Greenlight in order to prepare for a meeting, and a later e-mail that day says that "[g]ood progress" was made with Einhorn.  (Lewis Dec. Exs. 29-30.)  In e-mails of August 19 and 20, Einhorn wrote to Chatila outlining criticisms of SunEdison's business strategy, including its over-reliance on the capital markets, "opaque" financial statements and the Company's relationship with the Terraform Power YieldCo.  (Lewis Dec. Ex. 31.)  The same e-mail chain includes correspondence from the following November, where Einhorn asks to speak to Chatila and subsequently indicates frustration with Chatila's failure to respond.  (Id.)

These e-mails are evidence that Greenlight's CEO closely monitored SunEdison's business, believed that its financial statements lacked clarity and worried that some of its strategies were unproductive.  But they do not show awareness of the alleged misstatements and omissions that are the subjects of the Securities Act claims.  Einhorn does not appear to reference any loans taken by the Company.  His communications with Chatila, and SunEdison management do not defeat the predominance of common questions.

As to Highbridge Capital, defendants have come forward with evidence that it had actual knowledge of the Margin Call and received payment of the collateral posted by the Company.  Gold's declaration states that Highbridge purchased 5,000 shares in the Preferred Offering.  (Gold Dec. Ex. B.)  A person or persons with a Highbridge e-mail address received an August 10, 2015 e-mail from a SunEdison executive giving notice that the Company "intends to post cash collateral as it relates to the above margin call."  (Lewis Dec. Ex. 24.)  An August 7,

2015 e-mail from a Deutsche Bank employee states that Highbridge was due $8,378,423.11 in collateral under the Margin Call, and that SunEdison's payment to Highbridge would be allocated through Deutsche Bank.  (Lewis Dec. Ex. 25 at 00032583.)  Defendants have demonstrated that Highbridge Capital had knowledge the Margin Call, the existence of which is alleged to be a material omission from the offering documents.

Highbridge's knowledge of the Margin Call does not defeat predominance, however.  Defendants have not submitted evidence that other members of the proposed class knew of the Margin Call or had a financial stake in it, such that individual questions "permeate the litigation."  In re Petrobras, 862 F.3d at 270.  The common questions of whether offering documents contained material omissions and misstatements remain "more prevalent or important" than the individualized questions related to Highbridge.  See id.  As the Supreme Court has stated, certain class members may be ineligible for relief "here or there," but that "does not cause individual questions to predominate."  Halliburton, 134 S. Ct. at 2412.[10]

Defendants have not come forward with evidence that potential class members other than Highbridge were aware of any alleged omissions and misstatements in the offering documents, while plaintiffs have demonstrated that common questions predominate the purchaser's entitlement to relief.  The Court therefore concludes that the predominance requirement of Rule 23(b)(3) is satisfied as to the proposed Securities Act sub-class.

F.   A Class Action Is the Superior Method of Adjudication.

Rule 23(b)(3) also requires the movant to demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

---

[10] The Court has the authority to consider at some later stage whether the class definition ought to be modified to exclude Highbridge.

Generally, securities actions "easily satisfy" the superiority requirement "because 'the alternatives are either no recourse for thousands of stockholders' or 'a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'" Kaplan v. S.A.C. Capital Advisors, L.P., 311 F.R.D. 373, 383 (S.D.N.Y. 2015) (Marrero, J.) (quoting Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968)); see also In re Merrill Lynch Tyco Research Sec. Litig., 249 F.R.D. 124, 132 (S.D.N.Y. 2008) ("Because of the large number of potential claimants and the relatively small damage suffered by each claimant, it is unlikely that individual plaintiffs would endure the expense of litigation in order to bring their claims.") (Keenan, J.).

The Court concludes that plaintiffs have satisfied the superiority requirement in light of the efficiencies of class wide adjudication.

G.   The Statute of Repose Is Not a Barrier to Certification.

The Underwriter Defendants urge that class certification should be denied because the claims of any class members would be barred by the three-year statute of repose for Securities Act claims, 15 U.S.C. § 77m.  See Calif. Pub. Emps. Ret. Sys. v. ANZ Sec., Inc., 137 S. Ct. 2042, 2049-50, 2053 (2017) ("CalPERS"); see also Footbridge Ltd. Trust v. Countrywide Fin. Corp., 770 F. Supp. 2d 618, 624-27 (S.D.N.Y. 2011).  They argue that because any class would be certified more than three years after the Preferred Offering of August 2015, the statute of repose bars recovery as to any class member.  They do not urge that this action was commenced by the class representative outside the limitations period.

CalPERS addressed whether a section 11 claim brought by an individual plaintiff who opted out of a class and commenced its own action could receive the benefit of equitable

tolling under <u>American Pipe & Construction Co. v. Utah</u>, 414 U.S. 538 (1974).[11]  More than

three years after the relevant transactions occurred, the plaintiff in <u>CalPERS</u> opted out of a

shareholder class and brought a claim on its own behalf under section 11, urging that the claim

was timely under the tolling principles of <u>American Pipe</u>.  137 S. Ct. at 2048.  <u>CalPERS</u> held that

the Securities Act established a firm three-year statute of repose for section 11 claims, and that

because the statute reflects Congress's intent to create "an absolute bar" on temporal liability, the

individual plaintiff was required to bring its action within three years and could not avail itself of

the tolling principles articulated in <u>American Pipe</u>.  137 S. Ct. at 2050-52.

   <u>CalPERS</u> addressed whether a plaintiff who separately sues may, in the face of a

statute-of-repose defense, rely on equitable tolling based on an earlier-filed action.  It did not

address whether claims of putative class members in a timely-filed class action are barred by the

statute of repose because they did not file a separate suit within the repose period, which is the

argument asserted here.  <u>CalPERS</u> explained that the statute of repose was intended to give

certainty to a defendant, and that "[b]y permitting a class action to splinter into individual suits,

the application of <u>American Pipe</u> tolling would threaten to alter and expand a defendant's

accountability, contradicting the substance of a statute of repose."  137 S. Ct. at 2053.  But the

advancement of class claims does not "splinter" the class into individual suits or inject

uncertainty to the case.

---

[11] <u>American Pipe</u> held that the commencement of a class action suspends the statute of limitations as to all purported
class members.  414 U.S. at 765-66.  Therefore, if a court denies a motion for class certification, the purported class
members may timely move to intervene on their own behalves, even if their claims would have been time-barred
absent equitable tolling.  <u>Id.</u> at 766-67; <u>see also</u> <u>Crown, Cork & Seal Co. v. Parker</u>, 462 U.S. 345 (1983) (<u>American
Pipe</u> tolling applies to putative class members who bring individual suit after denial of class certification).

Nor did CalPERS disturb American Pipe's holding that "the filing of a timely class action complaint commences the action for all members of the class as subsequently determined." American Pipe, 414 U.S. at 550; see also In re WorldCom Sec. Litig., 496 F.3d 245, 255 (2d Cir. 2007) ("Because members of the asserted class are treated for limitations purposes as having instituted their own actions, at least so long as they continue to be members of the class, the limitations period does not run against them during that time."); In re Cobalt Int'l Energy, Inc. Sec. Litig., 2017 WL 3620590, at *2-3 (S.D. Tex. Aug. 23, 2017) ("There is nothing in the Supreme Court's decision in CalPERS that suggests that the putative class action, filed within the three-year statute of repose, does not protect putative class members who remain in the class and do not opt out to pursue individual lawsuits. Indeed, the majority and dissenting opinions both rely on a presumption that the plaintiff was a proper class member and could have pursued his claims as a member of the class even though the class was not certified within the statute of repose.") (Atlas, J.).

The commencement of an action by an individual plaintiff on behalf of a putative class is implicitly authorized by Rule 23. Upon certification of the class, the claims of the class members are deemed to have been asserted on the date that the individual plaintiff commenced the action. That the timeliness of an absent class member's claim is measured from the date that the class representative filed suit, rather than, for example, the date of the Court's certification order, does no offense to the three-year repose period. An absent class member's claims are deemed to have been asserted on the date the class representative filed the action. This is a traditional judicial determination of when a claim is interposed by a person and not the application of any tolling doctrine.

It is undisputed that the class action complaint seeking relief under the Securities Act was filed within the three-year statute of repose. The Court therefore concludes that the statute of repose is not a barrier to the class members attaining relief.

      H.  <u>The Motion for Class Certification Is Granted as to the Securities Act Claims.</u>

The motion for certification of a class action is granted as to plaintiffs' Securities Act claims, consisting of all persons or entities who purchased or acquired shares traceable to the Preferred Offering of August 18, 2018, up to and including purchases made on November 9, 2018.

III.  <u>The Proposed Exchange Act Class Satisfies Rule 23.</u>

      A.  <u>The Proposed Class Satisfies Numerosity.</u>

According to plaintiffs' expert, during the proposed class period for the Exchange Act claims, SunEdison had approximately 336.7 million shares of common stock outstanding, and an average daily trading volume of 46.9 million shares. (Feinstein Report ¶¶ 49, 83.) Chatila does not dispute that the proposed class satisfies numerosity.

The Court concludes that joinder would be impracticable, and that plaintiffs have satisfied the numerosity requirement for the proposed Exchange Act class.

      B.  <u>The Proposed Class Satisfies Commonality.</u>

Any injury suffered as a result of Chatila's alleged misstatement would have caused the same injury to all prospective class members and would turn on the same proof. Specifically, the claim would turn on evidence of whether Chatila's statement of September 2, 2015 was materially false and misleading, its effect on the price of SunEdison common stock, and the effect of any corrective disclosures. The resolution of these issues would affect all

potential class members and are common issues that would drive resolution of the litigation. See, e.g., Johnson, 780 F.3d at 137-38; Sykes, 780 F.3d at 84.

The Court therefore concludes that plaintiffs has satisfied the commonality requirement for the proposed Exchange Act class.

## C. MERS's Claims Are Typical of the Proposed Class Members.

MERS's claim under section 10(b) and Rule 10b-5 and that of the proposed Exchange Act class members are identical. See Mazzei, 829 F.3d at 272. MERS endeavors to prove that the September 2 statement was materially false and misleading and artificially inflated the price of SunEdison's common stock, and that share price declined when the market learned the truth about the Company's prospects for generating cash. Each class member's claims would arise from the same events, and turn on identical legal arguments and evidence to prove Chatila's liability. See In re Flag Telecom, 574 F.3d at 35. MERS has the incentive to prove all elements of these claims. See Jurkowski, 2014 WL 12792750, at *3.

The Court therefore concludes that MERS has satisfied the typicality requirement for the proposed Exchange Act class.

## D. MERS Has Demonstrated that It Can Adequately Represent the Class.

MERS has demonstrated that it has an interest in pursuing the claims of the class, and that it does not have interests that are antagonistic to other class members. In re Payment Card Interchange Fee, 827 F.3d at 231. MERS is a public-employee retirement fund that purchased shares of SunEdison common stock and claims it was damaged on the basis of Chatila's alleged misstatement of September 2, 2015. (Compl't ¶ 18.) MERS, through its attorneys at Bernstein Litowitz, has pursued this claim under section 10(b) and Rule 10b-5

through a motion to dismiss, advanced the claim through discovery and filed this motion for

class certification. MERS has vigorously pursued the claim, and there is no contention that its

interests are antagonistic to other class members.

The Court therefore concludes that MERS has satisfied the adequacy requirement

for the proposed Exchange Act class.

E. Common Questions Predominate over Individual Ones.

The Court concludes that questions common to the class predominate over

individual ones. They include whether Chatila's statement to *Bloomberg* on September 2, 2015

was a material misstatement and whether Chatila made that statement with scienter. Additional

common questions include the damages caused to SunEdison's shareholders and the effects of

any corrective disclosures.

Chatila disputes predominance on grounds already discussed as to the proposed

class period applicable to the Exchange Act claim. He urges that shareholders who acquired

SunEdison shares after the November 10, 2015 statement would have had "idiosyncratic

reasons" for doing so in reliance on the September 2 statement and "would fracture the

class . . . ." (Ind. Def. Mem. at 18.) For the reasons already discussed, however, Chatila has not

met the burden required to rebut the Basic presumption of shareholder reliance, and to the extent

that "'news of the [truth] credibly entered the market and dissipated the effects of [prior]

misstatements . . . [p]roof of that sort is a matter for trial' (and presumably also for a summary-

judgment motion under Federal Rule of Civil Procedure 56)." Amgen, 568 U.S. at 482 (quoting

Basic, 485 U.S. at 248-49). If the evidence later establishes that the November 10 statement

fully corrected the alleged misstatement of September 2, subsequent purchasers would have no

claim for relief and any damages would be limited accordingly.  See id. at 474 ("Because a

failure of proof on the issue of materiality, unlike the issues of market efficiency and publicity,

does not give rise to any prospect of individual questions overwhelming common ones,

materiality need not be proved prior to Rule 23(b)(3) class certification.").

The Court therefore concludes that common questions predominate over any

individual questions between potential class members.

F.  A Class Action Is the Superior Method of Adjudication.

Plaintiffs have demonstrated "that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy."  Rule 23(b)(3).  The efficiency

of classwide adjudication is superior to individual adjudication in light of the large number of

potential claimants and the relatively small damages of each potential class member.  Kaplan,

311 F.R.D. at 383; In re Merrill Lynch, 249 F.R.D. at 132.  The Court concludes that plaintiffs

have satisfied the superiority requirement in light of the efficiencies of class-wide adjudication.

IV. APPOINTMENT OF CLASS COUNSEL.

Defendants do not oppose the appointment of Bernstein Litowitz as class counsel

pursuant to Rule 23(g).  Prior to this action being transferred to the undersigned by the Judicial

Panel on Multidistrict Litigation, the Hon. Rodney W. Sippel of the Eastern District of Missouri

granted the motion of Bernstein Litowitz for appointment as lead counsel under the PSLRA, 15

U.S.C. § 78u-4(a)(3)(B)(v).  Horowitz v. SunEdison, Inc., 2016 WL 1161600, at *1 (E.D. Mo.

Mar. 24, 2016).

In light of Bernstein Litowitz's substantial resources and experience in litigating

securities class actions, and the conduct of the litigation to date, the Court concludes that

Bernstein Litowitz satisfies Rule 23(g), and its motion for appointment as class counsel on behalf of both subclasses is granted.

CONCLUSION.

The motion for class certification is GRANTED. The proposed class is modified to consist of two subclasses. The Securities Act class consists of all persons or entities who purchased shares of preferred stock pursuant or traceable to the Preferred Offering between August 18, 2015 and November 9, 2015 and were damaged thereby. ATRS is approved as class representative of the Securities Act class. The Exchange Act class consists of persons or entities who purchased or otherwise acquired common stock in SunEdison between September 2, 2015 and April 4, 2016 and were damaged thereby. MERS is approved as class representative of the Exchange Act class. Bernstein Litowitz Berger & Grossman LLP is appointed as class counsel for each of the subclasses. Class counsel shall submit a proposed Order within 21 days certifying the two subclasses and proposing a notice to the class and means of dissemination consistent with Rule 23.

The Clerk is directed to terminate the motion. (16 Civ. 7917, Docket # 193; 16 MD 2742, Docket # 387.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
January 7, 2019